## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY,

        Plaintiff,

v.

JPMORGAN CHASE BANK, N.A.; J.P.
MORGAN MORTGAGE ACQUISITION
CORPORATION; J.P. MORGAN
SECURITIES LLC; J.P. MORGAN
ACCEPTANCE CORPORATION I; DAVID
M. DUZYK; LOUIS SCHIOPPO, JR.;
WILLIAM A. KING; EMC MORTGAGE
CORPORATION; STRUCTURED ASSET
MORTGAGE INVESTMENTS II INC.; BEAR
STEARNS ASSET BACKED SECURITIES I
LLC; COHEN LEGACY, LLC; JEFFREY L.
VERSCHLEISER; MICHAEL B.
NIERENBERG; JEFFREY MAYER;
THOMAS F. MARANO; JOSEPH T.
JURKOWSKI, JR.; MATTHEW E. PERKINS;
SAMUEL L. MOLINARO, JR.; WAMU
ASSET ACCEPTANCE CORPORATION;
WAMU CAPITAL CORPORATION;
WASHINGTON MUTUAL MORTGAGE
SECURITIES CORPORATION;
RICHARD CAREAGA; DAVID BECK;
DIANE NOVAK; THOMAS GREEN; and
ROLLAND JURGENS,

        Defendants.

Civil Action No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

# Contents

NATURE OF ACTION ..................................................................................................1

PARTIES ......................................................................................................................5

    A.    Plaintiff ..........................................................................................5

    B.    JPMorgan Defendants ....................................................................5

    C.    Bear Stearns Defendants .................................................................8

    D.    WaMu Defendants ........................................................................12

JURISDICTION AND VENUE ....................................................................................15

SUBSTANTIVE ALLEGATIONS ...............................................................................15

I.       THE MARKET FOR RESIDENTIAL MORTGAGE-BACKED SECURITIES .............15

II.      THE SECURITIZATION PROCESS.................................................................18

III.     MASSMUTUAL'S PURCHASES OF DEFENDANTS' CERTIFICATES ....................20

IV.    DEFENDANTS' ABANDONMENT AND DISREGARD OF DISCLOSED UNDERWRITING STANDARDS TO FACILITATE SALE OF LOW-QUALITY LOANS TO INVESTORS ..........................................................29

    A.    Defendants' Representations That the Securitized Loans Were Underwritten According to Prudent Underwriting Standards and Practices .........29

            (1)    JPMorgan Defendants' Representations ...................................30

            (2)    Bear Stearns Defendants' Representations ................................44

            (3)    WaMu Defendants' Representations .......................................98

    B.    Defendants' Abandonment and Disregard of Underwriting Standards to Generate a Large Volume of Loans for Securitization and Sale to Investors......106

    C.    Widespread Defaults That Confirm Defendants' Abandonment and Disregard of Their Underwriting Standards ........................................108

    D.    Defendants' Own Documents and Testimony from Former Employees That Confirm the Abandonment and Disregard of Underwriting Standards.......111

            (1)    JPMorgan Securitizations .....................................................111

|  |  | (2) | Bear Stearns Securitizations ....................................................113 |
|  |  | (3) | WaMu Securitizations...........................................................117 |

V. MISREPRESENTATIONS ABOUT APPRAISALS AND LOAN-TO-VALUE RATIOS REVEALED BY A FORENSIC REVIEW OF THE MORTGAGE LOANS .................................................................................................125

    A. Appraisal and LTV Testing ...............................................................125

    B. Specific Misrepresentations in the Offering Materials .......................127

        (1) JPMorgan Securitizations .......................................................127

        (2) Bear Stearns Securitizations ...................................................135

        (3) WaMu Securitizations...........................................................180

VI. MISREPRESENTATIONS ABOUT OWNER-OCCUPANCY STATISTICS REVEALED BY A FORENSIC REVIEW OF THE MORTGAGE LOANS ...............189

    A. Owner-Occupancy Testing ................................................................189

    B. Specific Misrepresentations in the Offering Materials. ......................190

        (1) JPMorgan Securitizations .......................................................190

        (2) Bear Stearns Securitizations ...................................................193

        (3) WaMu Securitizations...........................................................205

VII. LIABILITY OF THE SPONSORS, DEPOSITORS, UNDERWRITERS, AND TRUSTS AS SELLERS OF SECURITIES TO MASSMUTUAL...................................208

VIII. LIABILITY OF THE SPONSORS, DEPOSITORS, AND OFFICER DEFENDANTS AS CONTROL PERSONS .........................................................210

    A. JPMorgan Securitizations .................................................................210

    B. Bear Stearns Securitizations .............................................................211

    C. WaMu Securitizations.......................................................................217

FIRST CAUSE OF ACTION ............................................................................220

SECOND CAUSE OF ACTION ........................................................................222

PRAYER FOR RELIEF ...................................................................................226

JURY DEMAND .................................................................................................................227

Plaintiff Massachusetts Mutual Life Insurance Company ("MassMutual"), by and through its attorneys, brings this action against JPMorgan Chase Bank, N.A.; J.P. Morgan Mortgage Acquisition Corporation; J.P. Morgan Securities LLC; and J.P. Morgan Acceptance Corporation I (collectively, the "JPMorgan Defendants"); EMC Mortgage Corporation; Structured Asset Mortgage Investments II Inc.; Bear Stearns Asset Backed Securities I LLC; and Cohen Legacy, LLC (collectively, the "Bear Stearns Defendants"); WaMu Asset Acceptance Corporation; WaMu Capital Corporation; and Washington Mutual Mortgage Securities Corporation (collectively, the "WaMu Defendants"); David M. Duzyk; Louis Schioppo, Jr.; William A. King; Jeffrey L. Verschleiser; Michael B. Nierenberg; Jeffrey Mayer; Thomas F. Marano; Joseph T. Jurkowski, Jr.; Matthew E. Perkins; Samuel L. Molinaro, Jr.; Richard Careaga; David Beck; Diane Novak; Thomas Green; and Rolland Jurgens (collectively, the "Officer Defendants," and together with all Defendants, the "Defendants"), and alleges as follows:

## NATURE OF ACTION

1.      This action arises out of the sale of certain residential mortgage-backed securities (the "Certificates") to MassMutual.  The Certificates were sold pursuant to public filings and offering materials that contained untrue statements and omissions of material facts, in violation of the Massachusetts Uniform Securities Act, Mass. Gen. Laws ch. 110A, § 410.

2.      The Certificates were created and sold pursuant to four securitizations structured by the JPMorgan Defendants, 24 securitizations structured by the Bear Stearns Defendants, and five securitizations structured by the WaMu Defendants.

3.      Prior to 2001, the majority of mortgage loans that the Bear Stearns Defendants securitized were large, high-quality loans referred to as "jumbo prime."  Beginning in 2003, however, the Bear Stearns Defendants – primarily via EMC Mortgage Corporation ("EMC") – began dramatically to increase the volume of mortgage loans they acquired and securitized.  In

-1-

2003, EMC securitized 86,000 mortgage loans valued at approximately $20 billion.  By 2005,

the number of mortgage loans had grown to 389,000 loans valued at nearly $75 billion.  In total,

from 2003 to 2007, EMC purchased and securitized over one million mortgage loans that were

originally valued at more than $212 billion.

4.      The JPMorgan Defendants also significantly increased their origination and

securitization of mortgage loans – particularly non-prime loans – starting in 2003.  Between

2004 and 2005, their securitization of residential mortgage loans grew more than fivefold, from

approximately $4.5 billion to $24 billion.

5.      The WaMu Defendants similarly began to increase their origination and

securitization of riskier loans around 2003.  From 2003 to 2004, the WaMu Defendants increased

their securitization of subprime loans over 100%, from $4.6 billion to $11.8 billion.  By the end

of 2006, this figure had almost tripled again to $29 billion.

6.      In marketing the Certificates to MassMutual, Defendants represented that the

loans backing the securities were underwritten in accordance with prudent underwriting

standards designed to ensure that borrowers could repay the loans.  They also represented that

the loans had certain characteristics, including defined loan-to-value ratios and specific owner-

occupancy statistics.

7.      These representations were material to MassMutual's decision to purchase the

Certificates.  Defendants were the exclusive source of information regarding the loans backing

the Certificates.  Unlike Defendants, MassMutual did not have access to loan files.  MassMutual

therefore depended on Defendants to verify that the information presented to it and other

investors was true and accurate.

8.     In reality, however, the loans backing the Certificates deviated substantially from what was represented to MassMutual.  To generate substantial volumes of loans to sell to investors, Defendants abandoned or disregarded disclosed underwriting guidelines, often originating or acquiring loans issued to borrowers regardless of the borrowers' ability to repay. The loans were issued on the basis of overstated incomes, inflated appraisals, false verifications of employment, and exceptions to underwriting criteria that had no proper justification.

9.     EMC's practices highlight this systematic abandonment of underwriting standards.  To increase the volume of its mortgage securitizations, starting around 2003, EMC began acquiring riskier loans from third-party originators, while discarding its internal due diligence and quality control procedures.  Having moved from the prime mortgage market into the "Alt A" and "subprime" markets in 2003, EMC further extended the reach of its mortgage portfolio by acquiring in bulk loans originated under alternative and no documentation programs. During this same period, EMC also began to acquire and securitize increasing numbers of second-lien loans and home-equity lines of credit.

10.    EMC's increased securitization of these riskier loans corresponded with an increasing failure to adhere to its own due diligence and quality control policies.  Despite being informed by third-party due diligence firms that many of the loans it sought to purchase were defective, EMC nonetheless waived almost half of these defective loans into securitizations anyway.  According to a former consultant who conducted due diligence on EMC loans, "[a]bout 75 percent of the time, loans that should have been rejected were still put in the pool and sold."

11.    The JPMorgan Defendants also systematically abandoned underwriting standards in their quest to generate and securitize more mortgage loans.  James Dimon, the Chief Executive Officer of JPMorgan Chase & Co., admitted that "the underwriting standards of our

-3-

mortgage business should have been higher." He further added that the JPMorgan Defendants had originated and securitized "bad products" that were pushed on borrowers by "unscrupulous mortgage salesmen and mortgage brokers." These admissions are bolstered by an internal Chase Home Finance, LLC memorandum from the relevant time period that outlined "cheats and tricks" for brokers to gain approval for risky loan products.

12.     The WaMu Defendants likewise discarded internal risk guidelines in order to increase their production and securitization of mortgage loans. Motivated by the goal of becoming a "dominant sub-prime lender," as described by its former Chief Credit Officer/Chief Risk Officer, WaMu delved into ever-riskier loan products while ignoring its underwriting and due diligence procedures. In particular, WaMu aggressively pushed Option ARM loans on unsuspecting borrowers. The interest rate on these types of loans adjusted monthly, and the payments adjusted annually. Borrowers were offered options on the size of their payments, including interest-only payments and minimum payments that were less than the interest payments, which resulted in a growing loan balance. Referring to these Option ARM loans, WaMu's former Chief Legal Officer recently admitted that WaMu's "[mortgage] brokers put people into the product who shouldn't have been."

13.     The WaMu Defendants consistently sacrificed loan quality in their pursuit of increased market share. A former Senior Mortgage Underwriter, who worked at WaMu from 2003 until 2007, explained that "[a]t WaMu it wasn't about the quality of the loans; it was about the numbers . . . . They didn't care if we were giving loans to people that didn't qualify. Instead, it was how many loans did you guys close and fund . . . ." Unsurprisingly, an internal review of WaMu's loan offices discovered that "an extensive level of loan fraud exist[ed] in the Emerging Market CFCs [Customer Fulfillment Centers], virtually all of it stemming from employees in

those areas circumventing bank policy surrounding loan verification and review." When later asked about these types of incidents, a former WaMu executive in charge of securitizations replied: "I understood there was fraud."

14.     Just a few years after MassMutual purchased the Certificates from Defendants, they now qualify as junk. In a majority of the 33 securitizations in which MassMutual purchased Certificates, over 30% of the loans backing the securities have now defaulted, have been foreclosed upon, or are delinquent. Indeed, the defaults, foreclosures, and delinquencies have reached more than 60% in some securitizations. A subsequent forensic analysis commissioned by MassMutual has demonstrated that the representations about the loans in all the securitizations were materially false. Under the Massachusetts Uniform Securities Act, MassMutual is entitled to rescind its purchase of these securities and/or recover appropriate damages.

## PARTIES

**A.      Plaintiff**

15.     Plaintiff Massachusetts Mutual Life Insurance Company is a Massachusetts mutual life insurance company with its principal place of business in Springfield, Massachusetts. Founded in 1851, MassMutual is a leading, diversified financial services organization providing life insurance, disability income insurance, long-term care insurance, annuities, retirement and income products, investment management, mutual funds, and trust services to individual and institutional customers.

**B.      JPMorgan Defendants**

16.     *JPMorgan Seller/Sponsor Defendant.*  Defendant J.P. Morgan Mortgage Acquisition Corp. ("JPM Mortgage Acquisition") is a Delaware corporation with its principal place of business in New York, New York. JPM Mortgage Acquisition is a direct, wholly-

owned subsidiary of JPMorgan Chase Bank, N.A.  JPM Mortgage Acquisition served as the

Sponsor and Seller with regard to each of the four JPMorgan securitizations at issue.

17.     *JPMorgan Underwriter Defendant.*  Defendant J.P. Morgan Securities LLC is a

Delaware limited liability company with its principal place in New York, New York.  J.P.

Morgan Securities LLC is the successor-in-interest to J.P. Morgan Securities Inc., which

converted to a limited liability company on or about September 1, 2010.  J.P. Morgan Securities

Inc. and its successor-in-interest, J.P. Morgan Securities LLC, are referred to herein as "J.P.

Morgan Securities."  J.P. Morgan Securities engaged in investment banking activities in the

United States and was the primary nonbank subsidiary of JPMorgan Chase & Co. ("JPMorgan

Chase").  J.P. Morgan Securities acted as the Underwriter for each of the four JPMorgan

securitizations at issue.  As such, J.P. Morgan Securities participated in the drafting and

dissemination of the prospectus supplements pursuant to which all of the JPMorgan Certificates

were sold to MassMutual.

18.     *JPMorgan Depositor Defendant.*  Defendant J.P. Morgan Acceptance Corporation

I ("JPMAC") is a Delaware corporation with its principal place of business in New York, New

York.  JPMAC is a direct, wholly-owned subsidiary of J.P. Morgan Securities Holdings LLC.

JPMAC was the Depositor for each of the four JPMorgan securitizations at issue.

19.     *JPMorgan Originator Defendant.*  Defendant JPMorgan Chase Bank, N.A.

("JPMC Bank") is a national banking association, a wholly-owned bank subsidiary of JPMorgan

Chase, and a Delaware corporation.  Its main office is located in New York, New York.  JPMC

Bank is a commercial bank that is chartered, and its business is subject to examination and

regulation by the Officer of the Comptroller of Currency ("OCC").  It is a member of the Federal

Reserve System and its deposits are insured by the Federal Deposit Insurance Corporation

("FDIC"). JPMC Bank originated and/or acquired loans securitized in three of the four JPMorgan securitizations at issue in this case. JPMC Bank is also a defendant in this action as the successor-in-interest to Washington Mutual Bank.

20. *JPMorgan Officer Defendants.* Defendant David M. Duzyk is an individual residing in Lexington, Kentucky. Duzyk was, at all relevant times, the President (Principal Executive Officer) and a Director of JPMAC. He signed registration statements for each of the four JPMorgan securitizations at issue in this case.

21. Defendant Louis Schioppo, Jr. is an individual residing in Monroe Township, New Jersey. Schioppo was, at all relevant times, the Controller and Chief Financial Officer (Principal Financial and Accounting Officer) of JPMAC. He signed registration statements for each of the four JPMorgan securitizations at issue in this case.

22. Defendant William A. King is an individual residing in Old Greenwich, Connecticut. King was, at relevant times, a managing director and the global co-head of securitized products at JPMorgan Chase and a Director of JPMAC. He signed registration statements for two of the four JPMorgan securitizations at issue in this case.

23. *Relevant JPMorgan Non-Parties.* The Certificates for each of the JPMorgan securitizations were issued by trusts established by the Depositor. The four issuing trusts were: J.P. Morgan Mortgage Trust 2005-ALT1; J.P. Morgan Alternative Loan Trust 2006-A1; J.P. Morgan Mortgage Acquisition Trust 2006-CH1; and J.P. Morgan Mortgage Acquisition Trust 2006-CH2 (collectively, the "JPMorgan Trusts").

24. JPMorgan Chase is a Delaware corporation subject to examination and regulation by the OCC. It is the direct or indirect parent of all the JPMorgan corporate defendants in this action.

25.     Chase Home Finance, LLC ("CHF"), a Delaware limited liability company, is a

wholly owned, indirect subsidiary of JPMC Bank.  CHF originated certain JPMC Bank mortgage

loans and subsequently provided these loans to JPM Mortgage Acquisition, on behalf of JPMC

Bank, for the following three JPMorgan Trusts:  JPMAC 2006-CH1, JPMAC 2006-CH2, and

JPALT 2006-A1.

26.     At all relevant times, the JPMorgan Defendants committed the acts, caused or

directed others to commit the acts, or permitted others to commit the acts alleged in this

Complaint.  Any allegations about acts of the corporate defendants means that those acts were

committed through their officers, directors, employees, agents, and/or representatives while those

individuals were acting within the actual or implied scope of their authority.

**C.      Bear Stearns Defendants**

27.     *Bear Stearns Seller/Sponsor Defendants.*  Defendant EMC is a Delaware

corporation with its principal place of business in Lewisville, Texas.  EMC was, at all relevant

times, a wholly owned subsidiary of The Bear Stearns Companies Inc. ("BSI").  EMC was

organized for the purpose of acquiring, holding, servicing, and securitizing mortgage loans and

mortgage securities.  EMC was the seller and/or sponsor for 23 of the 24 Bear Stearns

securitizations at issue.  Pursuant to a Merger Agreement (the "BSI Merger") effective May 30,

2008, BSI merged with a wholly owned subsidiary of JPMorgan Chase, making EMC a wholly

owned indirect subsidiary of JPMorgan Chase.

28.     Defendant Cohen Legacy, LLC is a Delaware limited liability company with its

principal place of business in Philadelphia, Pennsylvania.  Cohen Legacy, LLC is the successor-

in-interest to Alesco Loan Holdings Trust, a Maryland business trust.  Pursuant to a merger

agreement effective December 29, 2010, Alesco Loan Holdings Trust merged with Cohen &

Company Funding, LLC, a Delaware limited liability company, which simultaneously changed

-8-

its name to Cohen Legacy, LLC. Alesco Loan Holdings Trust and its successor-in-interest,

Cohen Legacy, LLC, are referred to herein as "Alesco." Alesco engaged in, among other things,

the acquisition of residential mortgage loans from unaffiliated third parties. Alesco was the

sponsor for one of the 24 Bear Stearns securitizations at issue.

29.     *Bear Stearns Underwriter Defendant.* Bear, Stearns & Co. Inc. ("BSC" and,

together with EMC, "Bear Stearns") was, at all relevant times, a registered broker-dealer with its

principal place of business in New York, New York. BSC was a wholly owned subsidiary of

BSI, and served as the Underwriter for each of the 24 Bear Stearns securitizations at issue, and

co-underwriter for the WaMu 2005-AR1 securitization, and was intimately involved in

structuring, pricing and selling the Bear Stearns Certificates at issue. It also assisted in drafting

and disseminating the prospectus supplements for the offerings. Following the BSI Merger, on

or about October 1, 2008, BSC merged with and into J.P. Morgan Securities, which is the

successor-in-interest to BSC.

30.     *Bear Stearns Depositor Defendants.* Defendant Structured Asset Mortgage

Investments II Inc. ("SAMI") is a Delaware corporation with its principal place of business in

New York, New York. At all relevant times, SAMI was a wholly-owned subsidiary of BSI.

SAMI filed registration statements and prospectus supplements with the SEC, and served as

Depositor, in connection with 16 of the 24 Bear Stearns securitizations at issue in this case. On

information and belief, SAMI is now a subsidiary of JPMorgan Chase.

31.     Defendant Bear Stearns Asset Backed Securities I LLC ("BSABS") is a Delaware

limited liability company with its principal place of business in New York, New York. At all

relevant times, BSABS was a wholly-owned subsidiary of BSI. BSABS filed the registration

statements and prospectus supplements with the SEC, and served as Depositor, for eight of the

24 Bear Stearns securitizations at issue in this case. On information and belief, BSABS is now a subsidiary of JPMorgan Chase.

32.     *Bear Stearns Officer Defendants.* Defendant Jeffrey L. Verschleiser is an individual residing in New York, New York. Verschleiser was, at all relevant times, the President (Principal Executive Officer) of SAMI, and signed registration statements for 16 of the 24 Bear Stearns securitizations at issue in this case.

33.     Defendant Michael B. Nierenberg is an individual residing in Port Washington, New York. Nierenberg was, at all relevant times, the Treasurer (Principal Financial Officer and Principal Accounting Officer) of SAMI, and signed registration statements for 16 of the 24 Bear Stearns securitizations at issue in this case.

34.     Defendant Jeffrey Mayer is an individual residing in Alpine, New Jersey. Mayer was, at all relevant times, a Senior Managing Director and co-head of the Fixed-Income Desk at BSC and a Director of SAMI. Mayer signed registration statements for 16 of the 24 Bear Stearns offerings at issue in this case.

35.     Defendant Thomas F. Marano is an individual residing in Madison, New Jersey. Marano was, at all relevant times, a senior managing director and the global head of mortgage and asset-backed securities at BSC. He was also a Director of SAMI and a Director of BSABS. Marano signed registration statements for each of the 24 Bear Stearns securitizations at issue in this case.

36.     Defendant Joseph T. Jurkowski, Jr. is an individual residing in New York, New York. Jurkowski was, at all relevant times, a Vice President of BSABS, and signed registration statements for 13 of the 24 Bear Stearns securitizations at issue in this case.

37.     Defendant Matthew E. Perkins is an individual residing in New York, New York. Perkins was, at all relevant times, the President (Principal Executive Officer) and a Director of BSABS, and signed registration statements for eight of the 24 Bear Stearns securitizations at issue in this case.

38.     Defendant Samuel L. Molinaro, Jr. is an individual residing in New Canaan, Connecticut. Molinaro was, at all relevant times, the Treasurer (Principal Financial and Accounting Officer) and a Director of BSABS, and signed registration statements for eight of the 24 the Bear Stearns securitizations at issue in this case.

39.     *Relevant Non-Parties.* The Certificates for each of the 24 Bear Stearns securitizations were issued by trusts established by the Bear Stearns Depositors. The 24 issuing trusts were: Bear Stearns ARM Trust 2005-10; Bear Stearns ALT-A Trust 2006-6; Bear Stearns ALT-A Trust 2006-7; Bear Stearns Asset Backed Securities I Trust 2006-AC4; Bear Stearns Asset Backed Securities I Trust 2006-AQ1; Bear Stearns Mortgage Funding Trust 2006-SL1; Bear Stearns Mortgage Funding Trust 2006-AC1; Bear Stearns Mortgage Funding Trust 2006-AR1; Bear Stearns Mortgage Funding Trust 2006-AR2; Bear Stearns Mortgage Funding Trust 2006-AR3; Bear Stearns ARM Trust 2007-2; Bear Stearns Asset Backed Securities Trust 2007-1; Bear Stearns Asset Backed Securities I Trust 2007-AC2; Bear Stearns Asset Backed Securities I Trust 2007-HE3; Bear Stearns Mortgage Funding Trust 2007-AR1; Structured Asset Mortgage Investments II Trust 2005-AR8; Structured Asset Mortgage Investments II Trust 2006-AR3; Structured Asset Mortgage Investments II Trust 2006-AR5; Structured Asset Mortgage Investments II Trust 2006-AR6; Structured Asset Mortgage Investments II Trust 2006-AR7; Structured Asset Mortgage Investments II Trust 2006-AR8; Structured Asset Mortgage

Investments II Trust 2007-AR1; GreenPoint Mortgage Funding Trust 2006-AR1; and GreenPoint Mortgage Funding Trust 2006-AR3.

40.     At all relevant times, the Bear Stearns Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint.  Any allegations about acts of the corporate defendants means that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

**D.     WaMu Defendants**

41.     *WaMu Sponsor Defendants.*  At all relevant times, Washington Mutual Bank ("WaMu Bank") was a federal savings association that provided financial services to consumer and commercial clients.  WaMu Bank served as the Sponsor for three of the five WaMu securitizations at issue in this action.  On September 25, 2008, JPMC Bank entered into a Purchase and Assumption Agreement with the FDIC, under which JPMC Bank agreed to assume substantially all of WaMu Bank's liabilities and purchase substantially all of WaMu Bank's assets, including its ownership of WaMu Capital Corporation, WaMu Asset Acceptance Corporation, and Washington Mutual Mortgage Securities Corporation.  Therefore, this action is brought against JPMC Bank as the successor-in-interest to WaMu Bank.  WaMu Bank is not a defendant in this action.

42.     Defendant Washington Mutual Mortgage Securities Corporation ("WMMSC") is a Delaware corporation with its principal place of business in Brooklyn, New York.  WMMSC was, at all relevant times, a wholly-owned, special-purpose subsidiary of WaMu Bank. WMMSC served as the Sponsor with respect to two of the five WaMu securitizations at issue in this action, and the Depositor with respect to one of the WaMu securitizations at issue in this

action.  WMMSC is not currently affiliated with WaMu Bank and is now a subsidiary of JPMC

Bank, successor-in-interest to WaMu Bank.

43.     *WaMu Underwriter Defendant.*  Defendant WaMu Capital Corporation ("WCC")

is a Washington corporation with its principal place of business in Seattle, Washington.  WCC

was, at all relevant times, a registered broker-dealer and a wholly-owned subsidiary of WaMu

Bank, and served as the sole or co-Underwriter for all five WaMu securitizations at issue in this

action.  In this capacity, WCC was intimately involved in structuring, pricing, and selling the

WaMu Certificates at issue.  WCC is not currently affiliated with WaMu Bank and is now a

subsidiary of JPMC Bank, successor-in-interest to WaMu Bank.

44.     *WaMu Depositor Defendants.*  Defendant WaMu Asset Acceptance Corporation

("WMAAC") is a Delaware corporation with its principal place of business in Seattle,

Washington.  WMAAC was, at all relevant times, a wholly-owned subsidiary of WaMu Bank.

WMAAC served as Depositor and filed registration statements and accompanying prospectuses

with respect to four of the five WaMu securitizations at issue.  WMAAC is not currently

affiliated with WaMu Bank and is now a subsidiary of JPMC Bank, successor-in-interest to

WaMu Bank.

45.     *Individual WaMu Defendants.*  Defendant Richard Careaga is an individual

residing in Lakewood Ranch, Florida.  Careaga was, at all relevant times, a First Vice President

of WMAAC and signed registration statements for four of the five WaMu securitizations at issue

in this case.

46.     Defendant David Beck is an individual residing in Tiburon, California.  Beck was,

at all relevant times, the President (Principal Executive Officer) and a Director of WMAAC and

-13-

an Executive Vice President at WCC.  He signed registration statements for four of the five WaMu securitizations at issue in this case.

47.     Defendant Diane Novak is an individual residing in Seattle, Washington.  Novak was, at all relevant times, a Senior Vice President and the Senior Compliance Officer, Legal and Compliance Division, at WaMu Bank (now JPMC Bank), and Chief Compliance Officer at WCC.  She was also a Director of WMAAC.  She signed registration statements for four of the five WaMu securitizations at issue in this case.

48.     Defendant Thomas Green is an individual residing in Chicago, Illinois.  Green was, at all relevant times, the Chief Financial Officer (Principal Financial Officer) of WMAAC.  He signed registration statements for four of the five WaMu securitizations at issue in this case.

49.     Defendant Rolland Jurgens is an individual residing in Walnut Creek, California.  Jurgens was, at all relevant times, the Controller (Principal Accounting Officer) of WMAAC.  He signed registration statements for four of the five WaMu securitizations at issue in this case.

50.     *Relevant Non-Parties.*  The Certificates for each of the five WaMu securitizations were issued by trusts established by the WaMu Depositors.  The five issuing trusts were:  WaMu Mortgage Pass-Through Certificates Series 2005-AR1 Trust; Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2006-AR1 Trust; Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2006-AR5 Trust; WaMu Mortgage Pass-Through Certificates Series 2006-AR7 Trust; and WaMu Asset-Backed Certificates Series 2007-HE2 Trust.

51.     The term "WaMu" refers to the Washington Mutual group of companies before September 25, 2008, including the WaMu Defendants.

-14-

52.     At all relevant times, the WaMu Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint.  Any allegations about acts of the corporate defendants mean that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

### JURISDICTION AND VENUE

53.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

54.     This Court has personal jurisdiction over the Defendants by virtue of their securities sales to MassMutual in Massachusetts.

55.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391, because substantial events giving rise to this Complaint took place in Massachusetts.

### SUBSTANTIVE ALLEGATIONS

56.     The JPMorgan Defendants structured four securitizations at issue in this action. The Bear Stearns Defendants structured 24 securitizations at issue in this action.  And the WaMu Defendants structured five securitizations at issue in this action.  These defendants are all now wholly owned subsidiaries of JPMorgan Chase.

### I.     THE MARKET FOR RESIDENTIAL MORTGAGE-BACKED SECURITIES

57.     In the 1980's and 1990's, mortgage originators followed a traditional model for originating mortgage loans.  Under the traditional model, they either held the mortgage loans they provided to borrowers through the terms of the loans, or sold the mortgage loans to governmental agencies Federal National Mortgage Association ("Fannie Mae") or Federal Home Loan Mortgage Corporation ("Freddie Mac").

58.     Loans held by mortgage originators were typically conservative, first-lien loans to prime borrowers because the originator would profit if the borrower made timely interest and principal payments, but would bear the loss if the borrower defaulted and the property value was insufficient to repay the loan.  As a result, the originator had economic incentives to establish the creditworthiness of the borrower and the true value of the underlying property by appraising it fairly before issuing the mortgage loan.

59.     Loans sold to Fannie Mae and Freddie Mac were also conservative loans to prime borrowers because the loans had to meet specific guidelines for sale.  By law, Fannie Mae and Freddie Mac can purchase only those mortgage loans that conform to certain regulatory guidelines.  These loans are known in the industry as "conforming" loans, and are historically the most conservative loans with the lowest rates of delinquency and default.  Mortgage loans that fail to meet the regulatory guidelines are known in the industry as "non-conforming" loans.

60.     In the 1980's and 1990's, Fannie Mae and Freddie Mac securitized the loans they purchased from mortgage originators and sold the securities backed by the loans, referred to as residential mortgage-backed securities, to investors.  Investors in these early mortgage-backed securities were provided protections not only because the underlying loans conformed to strict regulatory guidelines, but also because Fannie Mae and Freddie Mac guaranteed that investors would receive timely payments of principal and interest.  Because Fannie Mae and Freddie Mac were perceived as being backed by the federal government, investors viewed the guarantees as diminishing credit risk, if not removing it altogether.

61.     In the early 2000's, the demand for securities backed by mortgage loans increased.  Private financial institutions stepped in to meet the demand by originating an ever-growing number of non-conforming loans, such as loans based on reduced documentation, loans

issued to subprime borrowers, and adjustable loans where the interest rate increases after a period of time. These loans were then securitized for sale to private investors. By 2001, $240 billion in residential mortgage-backed securities were issued through private securitizations. By 2006, that amount had increased by almost five times – to $1.033 trillion.

62.     The Bear Stearns Defendants took advantage of this exploding demand for mortgage-backed securities by originating and securitizing large volumes of residential mortgage loans. From 2003 to 2004, the Bear Stearns Defendants nearly tripled their securitization of mortgage loans, from 86,000 loans valued at approximately $20 billion, to 230,000 loans valued at approximately $48 billion. In 2005, that number jumped again to 389,000 loans valued at nearly $75 billion. And in 2006, the Bear Stearns Defendants securitized over 345,000 loans valued at nearly $69 billion. In total, from 2003 to 2007, the Bear Stearns Defendants purchased and securitized over one million mortgage loans that were originally valued at more than $212 billion.

63.     Similarly, beginning in 2003, the JPMorgan Defendants also significantly increased their origination and securitization of mortgage loans – particularly non-prime loans. The JPMorgan Defendants originated approximately $7.2 billion in non-prime mortgage loans in 2003, $8.5 billion in 2004, and $8.7 billion in 2005. In addition, JPMAC increased its securitization of residential mortgage loans more than fivefold between 2004 and 2005, from approximately $4.5 billion to $24 billion.

64.     The WaMu Defendants also took advantage of the exploding market for residential mortgage-backed securities by dramatically increasing their origination and securitization of riskier loans around 2003. From 2003 to 2004, the WaMu Defendants increased their securitization of subprime loans over 100%, from $4.6 billion to $11.8 billion. By the end

-17-

of 2006, this figure had almost tripled again to $29 billion. In 2003, subprime and Option ARM

originations and purchases constituted just 5% and 7% of WaMu's business, respectively,

compared to 64% in fixed loans. By the end of 2006, however, subprime and Option ARM

originations had risen to 16% and 22% of originations and purchases, respectively, while fixed

loans had dropped to just 25%.

II.     **THE SECURITIZATION PROCESS**

        65.     To create residential mortgage-backed securities, such as the Certificates

purchased by MassMutual, a process known as mortgage securitization is used. Mortgage loans

are acquired from mortgage originators and pooled together, with securities constituting interests

in the cash flow from the mortgage pools then sold to investors. The securities are also referred

to as mortgage pass-through securities because the cash flow from the pool of mortgages is

passed through to the securities holders when payments are made by the underlying mortgage

borrowers.

        66.     Each securitization involves several entities that perform distinct tasks. The first

step in creating a residential mortgage-backed security, such as the Certificates, is the acquisition

by the Depositor of an inventory of mortgage loans from a Sponsor or Seller, which either

originates the loans or acquires the loans from other mortgage originators in exchange for cash.

        67.     To create securities backed by the mortgage loans, the Depositor then forms one

or more mortgage pools with the inventory of loans and creates tranches of interests in the

mortgage pools with various levels of seniority. Interests in these tranches are then issued by the

Depositor (who serves as the Issuer) through a trust in the form of bonds, or certificates.

        68.     Each tranche has a different level of purported risk and reward, and, often, a

different credit rating. The most senior tranches often receive the highest investment grade

rating (triple-A). Junior tranches, which usually have lower ratings, are more exposed to risk,

but offer higher potential returns. The most senior tranches of securities will be entitled to payment in full before the junior tranches. Conversely, losses on the underlying loans in the asset pool – whether due to default, delinquency, or otherwise – are allocated first to the most subordinate or junior tranche of securities, then to the tranche above that. This hierarchy in the division of cash flows is referred to as the "flow of funds" or "waterfall."

69.     The Depositor works with one or more of the nationally recognized credit-rating agencies to ensure that each tranche of the mortgage-backed securities receives the rating desired by the Depositor (and Underwriter). Once the asset pool is securitized, the certificates are issued to one or more Underwriters (typically Wall Street banks), who resell them to investors, such as MassMutual.

70.     Because the cash flow from the loans in the mortgage pool of a securitization is the source of funds to pay the holders of the securities issued by the trust, the credit quality of the securities depends primarily on the credit quality of the loans in the mortgage pool, which often includes thousands of loans. Detailed information about the credit quality of the loans is contained in the loan files developed and maintained by the mortgage originators when making the loans.

71.     For residential mortgage loans, such as the loans that backed the Certificates purchased by MassMutual, each loan file normally contains documents including the borrower's application for the loan, verification of income, assets, and employment, references, credit reports, and an appraisal of the property that will secure the loan and provide the basis for other measures of credit quality, such as loan-to-value ratios, and occupancy status. The loan file should also include notes from the person who underwrote the loan describing the loan's

purported compliance with underwriting guidelines, and documentation of compensating factors that justified any departure from those standards.

72.    MassMutual and other investors do not have access to the loan files.  Instead, the Sponsor, Depositor, and Underwriter are responsible for gathering and verifying information about the credit quality and characteristics of the loans that are deposited into the trust, and presenting this information in the registration statements, prospectuses, and prospectus supplements (collectively, the "Offering Materials") prepared for potential investors.  This due diligence process is a critical safeguard for investors and a fundamental legal obligation of the Sponsor, Depositor, and Underwriter.

### III.    MASSMUTUAL'S PURCHASES OF DEFENDANTS' CERTIFICATES

73.    MassMutual made the following purchases of Certificates from the following Defendants, representing a total investment of over $650 million:

| Asset | Full Name Of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| J.P. Morgan Mortgage Trust 2005-ALT1 Mortgage Pass-Through Certificates, Series 2005-ALT1, Class 1A1 | J.P. Morgan Mortgage Trust 2005-ALT1 Mortgage Pass-Through Certificates, Series 2005-ALT1 | $21,034,350.00 | J.P. Morgan Mortgage Acquisition Corp. (Sponsor)<br><br>J.P. Morgan Acceptance Corporation I (Depositor)<br><br>J.P. Morgan Securities Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| J.P. Morgan Alternative Loan Trust 2006-A1 Mortgage Pass-Through Certificates, Series 2006-A1, Class 1A1 | J.P. Morgan Alternative Loan Trust 2006-A1 Mortgage Pass-Through Certificates, Series 2006-A1 | $29,634,000.00 | J.P. Morgan Mortgage Acquisition Corp. (Sponsor)<br><br>J.P. Morgan Acceptance Corporation I (Depositor)<br><br>J.P. Morgan Securities Inc. (now J.P. Morgan Securities LLC) (Underwriter) |

| Asset | Full Name Of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| J.P. Morgan Mortgage Acquisition Trust 2006-CH1 Asset-Backed Pass Through Certificates, Series 2006-CH1, Class M9 | J.P. Morgan Mortgage Acquisition Trust 2006-CH1 Asset-Backed Pass Through Certificates, Series 2006-CH1 | $2,000,000.00 | J.P. Morgan Mortgage Acquisition Corp. (Sponsor)<br><br>J.P. Morgan Acceptance Corporation I (Depositor)<br><br>J.P. Morgan Securities Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| J.P. Morgan Mortgage Acquisition Trust 2006-CH2 Asset-Backed Pass Through Certificates, Series 2006-CH2, Classes AF6, MF9, MV8, and MV9 | J.P. Morgan Mortgage Acquisition Trust 2006-CH2 Asset-Backed Pass Through Certificates, Series 2006-CH2 | $8,953,094.60 | J.P. Morgan Mortgage Acquisition Corp. (Sponsor)<br><br>J.P. Morgan Acceptance Corporation I (Depositor)<br><br>J.P. Morgan Securities Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Bear Stearns ARM Trust, Mortgage Pass-Through Certificates, Series 2005-10, Class A3 | Bear Stearns ARM Trust, Mortgage Pass-Through Certificates, Series 2005-10 | $49,061,250.01 | EMC Mortgage Corporation (Seller)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2006-6, Class 2B3 | Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2006-6 | $1,546,041.98 | EMC Mortgage Corporation (Sponsor)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |

| Asset | Full Name Of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2006-7, Class 1B2 | Bear Stearns ALT-A Trust, Mortgage Pass-Through Certificates, Series 2006-7 | $2,859,881.64 | EMC Mortgage Corporation (Sponsor)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Bear Stearns Asset Backed Securities I Trust 2006-AC4 Asset-Backed Certificates, Series 2006-AC4, Class B3 | Bear Stearns Asset Backed Securities I Trust 2006-AC4 Asset-Backed Certificates, Series 2006-AC4 | $1,265,538.67 | EMC Mortgage Corporation (Sponsor)<br><br>Bear Stearns Asset Backed Securities I LLC (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Bear Stearns Asset Backed Securities I Trust 2006-AQ1 Asset-Backed Certificates, Series 2006-AQ1, Class 2M5 | Bear Stearns Asset Backed Securities I Trust 2006-AQ1 Asset-Backed Certificates, Series 2006-AQ1 | $1,851,442.15 | EMC Mortgage Corporation (Sponsor)<br><br>Bear Stearns Asset Backed Securities I LLC (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Bear Stearns Mortgage Funding Trust 2006-SL1 Mortgage-Backed Certificates, Series 2006-SL1, Class B2 | Bear Stearns Mortgage Funding Trust 2006-SL1 Mortgage-Backed Certificates, Series 2006-SL1 | $1,900,000.00 | EMC Mortgage Corporation (Sponsor)<br><br>Bear Stearns Asset Backed Securities I LLC (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |

| Asset | Full Name Of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| Bear Stearns Mortgage Funding Trust 2006-AC1 Asset-Backed Certificates, Series 2006-AC1, Class B1 | Bear Stearns Mortgage Funding Trust 2006-AC1 Asset-Backed Certificates, Series 2006-AC1 | $1,104,538.01 | EMC Mortgage Corporation (Sponsor)<br><br>Bear Stearns Asset Backed Securities I LLC (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Bear Stearns Mortgage Funding Trust 2006-AR1 Mortgage Pass-Through Certificates, Series 2006-AR1, Classes 1A1 and 2A1 | Bear Stearns Mortgage Funding Trust 2006-AR1 Mortgage Pass-Through Certificates, Series 2006-AR1 | $33,000,000.00 | EMC Mortgage Corporation (Sponsor)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Bear Stearns Mortgage Funding Trust 2006-AR2 Mortgage Pass-Through Certificates, Series 2006-AR2, Class 2B3 | Bear Stearns Mortgage Funding Trust 2006-AR2 Mortgage Pass-Through Certificates, Series 2006-AR2 | $6,626,000.00 | EMC Mortgage Corporation (Sponsor)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Bear Stearns Mortgage Funding Trust 2006-AR3 Mortgage Pass-Through Certificates, Series 2006-AR3, Classes 2B3 and 2B4 | Bear Stearns Mortgage Funding Trust 2006-AR3 Mortgage Pass-Through Certificates, Series 2006-AR3 | $6,487,503.27 | EMC Mortgage Corporation (Sponsor)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |

| Asset | Full Name Of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| Bear Stearns ARM Trust, Mortgage-Backed Notes, Series 2007-2, Class 1A1 | Bear Stearns ARM Trust, Mortgage-Backed Notes, Series 2007-2 | $17,903,539.06 | Alesco Loan Holdings Trust (now Cohen Legacy, LLC) (Sponsor)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Bear Stearns Asset Backed Securities Trust 2007-1 Asset-Backed Certificates, Series 2007-1, Class A2 | Bear Stearns Asset Backed Securities Trust 2007-1 Asset-Backed Certificates, Series 2007-1 | $4,160,792.50 | EMC Mortgage Corporation (Sponsor)<br><br>Bear Stearns Asset Backed Securities I LLC (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Bear Stearns Asset Backed Securities I Trust 2007-AC2 Asset-Backed Certificates, Series 2007-AC2, Class A2 | Bear Stearns Asset Backed Securities I Trust 2007-AC2 Asset-Backed Certificates, Series 2007-AC2 | $32,153,287.51 | EMC Mortgage Corporation (Sponsor)<br><br>Bear Stearns Asset Backed Securities I LLC (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Bear Stearns Asset Backed Securities I Trust 2007-HE3 Asset-Backed Certificates, Series 2007-HE3, Class 1A4 | Bear Stearns Asset Backed Securities I Trust 2007-HE3 Asset-Backed Certificates, Series 2007-HE3 | $4,039,470.00 | EMC Mortgage Corporation (Sponsor)<br><br>Bear Stearns Asset Backed Securities I LLC (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |

| Asset | Full Name Of Offering | Purchase Price | Seller Defendants |
|-------|----------------------|----------------|-------------------|
| Bear Stearns Mortgage Funding Trust 2007-AR1 Mortgage Pass-Through Certificates, Series 2007-AR1, Class 2B4 | Bear Stearns Mortgage Funding Trust 2007-AR1 Mortgage Pass-Through Certificates, Series 2007-AR1 | $1,982,462.11 | EMC Mortgage Corporation (Sponsor)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Structured Asset Mortgage Investments II Trust 2005-AR8 and Structured Asset Mortgage Investments II Grantor Trust 2005-AR8, Mortgage Pass-Through Certificates, Series 2005-AR8, Class A1A | Structured Asset Mortgage Investments II Trust 2005-AR8 and Structured Asset Mortgage Investments II Grantor Trust 2005-AR8, Mortgage Pass-Through Certificates, Series 2005-AR8 | $50,000,000.00 | EMC Mortgage Corporation (Seller)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Structured Asset Mortgage Investments II Trust 2006-AR3, Mortgage Pass-Through Certificates, Series 2006-AR3, Class 12A2 | Structured Asset Mortgage Investments II Trust 2006-AR3, Mortgage Pass-Through Certificates, Series 2006-AR3 | $75,000,000.00 | EMC Mortgage Corporation (Sponsor)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |

| Asset | Full Name Of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| Structured Asset Mortgage Investments II Trust 2006-AR5, Mortgage Pass-Through Certificates, Series 2006-AR5, Classes 1A1, 2A1, and 4A1 | Structured Asset Mortgage Investments II Trust 2006-AR5, Mortgage Pass-Through Certificates, Series 2006-AR5 | $84,144,046.87 | EMC Mortgage Corporation (Sponsor)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Structured Asset Mortgage Investments II Trust 2006-AR6, Mortgage Pass-Through Certificates, Series 2006-AR6, Class 2A1 | Structured Asset Mortgage Investments II Trust 2006-AR6, Mortgage Pass-Through Certificates, Series 2006-AR6 | $7,500,000.00 | EMC Mortgage Corporation (Sponsor)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Structured Asset Mortgage Investments II Trust 2006-AR7 and Structured Asset Mortgage Investments II Grantor Trust 2006-AR7, Mortgage Pass-Through Certificates, Series 2006-AR7, Classes 1A1A, B6, and B7 | Structured Asset Mortgage Investments II Trust 2006-AR7 and Structured Asset Mortgage Investments II Grantor Trust 2006-AR7, Mortgage Pass-Through Certificates, Series 2006-AR7 | $27,988,593.75 | EMC Mortgage Corporation (Sponsor)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |

| Asset | Full Name Of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| Structured Asset Mortgage Investments II Trust 2006-AR8 and Structured Asset Mortgage Investments II Grantor Trust 2006-AR8, Mortgage Pass-Through Certificates, Series 2006-AR8, Classes 1B8 and 1B9 | Structured Asset Mortgage Investments II Trust 2006-AR8 and Structured Asset Mortgage Investments II Grantor Trust 2006-AR8, Mortgage Pass-Through Certificates, Series 2006-AR8 | $3,921,476.56 | EMC Mortgage Corporation (Sponsor)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| Structured Asset Mortgage Investments II Trust 2007-AR1 Mortgage Pass-Through Certificates, Series 2007-AR1, Class 2B4 | Structured Asset Mortgage Investments II Trust 2007-AR1 Mortgage Pass-Through Certificates, Series 2007-AR1 | $1,998,720.00 | EMC Mortgage Corporation (Sponsor)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| GreenPoint Mortgage Funding Trust 2006-AR1 and GreenPoint Mortgage Funding Grantor Trust 2006-AR1, Mortgage Pass-Through Certificates, Series 2006-AR1, Class A1A | GreenPoint Mortgage Funding Trust 2006-AR1 and GreenPoint Mortgage Funding Grantor Trust 2006-AR1, Mortgage Pass-Through Certificates, Series 2006-AR1 | $30,994,000.00 | EMC Mortgage Corporation (Sponsor)<br><br>Bear Stearns Asset Backed Securities I LLC (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |

| Asset | Full Name Of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| GreenPoint Mortgage Funding Trust 2006-AR3 Mortgage Pass Certificates, Series 2006-AR3, Class 4A1 | GreenPoint Mortgage Funding Trust 2006-AR3 Mortgage Pass Certificates, Series 2006-AR3 | $59,400,000.00 | EMC Mortgage Corporation (Sponsor)<br><br>Structured Asset Mortgage Investments II Inc. (Depositor)<br><br>Bear, Stearns & Co. Inc. (now J.P. Morgan Securities LLC) (Underwriter) |
| WaMu Mortgage Pass-Through Certificates Series 2005-AR1 Trust WaMu Mortgage Pass-Through Certificates Series 2005-AR1 , Class A1A | WaMu Mortgage Pass-Through Certificates Series 2005-AR1 Trust WaMu Mortgage Pass-Through Certificates Series 2005-AR1 | $25,000,000.00 | Washington Mutual Bank (now JPMorgan Chase Bank, N.A.) (Sponsor)<br><br>Washington Mutual Mortgage Securities Corp. (Depositor)<br><br>WaMu Capital Corp. (Underwriter) |
| WaMu Mortgage Pass-Through Certificates Series 2006-AR1 Trust WaMu Mortgage Pass-Through Certificates, WMALT Series 2006-AR1, Class A1A | WaMu Mortgage Pass-Through Certificates Series 2006-AR1 Trust WaMu Mortgage Pass-Through Certificates, WMALT Series 2006-AR1 | $50,000,000.00 | Washington Mutual Mortgage Securities Corp. (Sponsor)<br><br>WaMu Asset Acceptance Corp. (Depositor)<br><br>WaMu Capital Corp. (Underwriter) |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5, Class 4A1B | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | $4,500,000.00 | Washington Mutual Mortgage Securities Corp. (Sponsor)<br><br>WaMu Asset Acceptance Corp. (Depositor)<br><br>WaMu Capital Corp. (Underwriter) |

| Asset | Full Name Of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR7, Class C1B2 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR7 | $2,350,000.00 | Washington Mutual Bank (now JPMorgan Chase Bank, N.A.) (Sponsor)<br><br>WaMu Asset Acceptance Corp. (Depositor)<br><br>WaMu Capital Corp. (Underwriter) |
| WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust Asset-Backed Certificates WaMu Series 2007-HE2 , Class 2A4 | WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust Asset-Backed Certificates WaMu Series 2007-HE2 | $4,989,605.00 | Washington Mutual Bank (now JPMorgan Chase Bank, N.A.) (Sponsor)<br><br>WaMu Asset Acceptance Corp. (Depositor)<br><br>WaMu Capital Corp. (Underwriter) |
| TOTAL | | $655,349,633.69 | |

## IV. DEFENDANTS' ABANDONMENT AND DISREGARD OF DISCLOSED UNDERWRITING STANDARDS TO FACILITATE SALE OF LOW-QUALITY LOANS TO INVESTORS

### A. Defendants' Representations That the Securitized Loans Were Underwritten According to Prudent Underwriting Standards and Practices

74.    The fundamental basis upon which residential mortgage-backed securities are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral for those loans.  If the borrowers cannot pay, and the collateral is insufficient, the securities experience losses.  For this reason, the underwriting standards and practices of the mortgage originator that issued the loans backing the certificates, and the representations in the offering materials regarding those standards, are critically important to the value of the securities, and to investors' decisions to purchase the securities.

75.     As Sponsors of the securitizations at issue, JPMAC, EMC, Alesco, WMMSC and

WaMu Bank (now JPMC Bank) either originated loans or purchased loans from third-party

originators.  Each loan was purportedly underwritten according to a set of underwriting

guidelines, which are specific criteria that the mortgage loans must meet.  In general, the

underwriting guidelines stipulated what documentation was required to be included in the

mortgage loan files for each loan product (which may include, depending upon the loan product,

verifications of income, assets, closing funds, and payment histories, among other things) and

criteria for eligibility, including tests for DTI and combined loan-to-value ("CLTV") ratios.

76.     Defendants represented to investors, including MassMutual, that the securitized

loans were underwritten according to meaningful underwriting standards.  As detailed below, for

each securitization, Defendants made specific representations about the originators' underwriting

standards or the underwriting standards that Defendants insisted the originators follow.

### (1)     JPMorgan Defendants' Representations

### (a)     JPMMT 2005-ALT1

77.     For the JPMMT 2005-ALT1 offering, approximately 36.28% of the mortgage

loans in pool 1, 86.13% of the mortgage loans in pool 2, 97.47% of the mortgage loans in pool 3,

and 98.96% of the mortgage loans in pool 4 were originated or acquired by PHH Mortgage

Corporation ("PHH").  Approximately 63.72% of the mortgage loans in pool 1, 13.87% of the

mortgage loans in pool 2, 2.53% of the mortgage loans in pool 3, and 1.04% of the mortgage

loans pool 4 were originated or acquired by GreenPoint Mortgage Funding, Inc. ("GreenPoint").

78.     The Prospectus Supplement for this offering made representations that the

mortgage originators for the loans had followed specific underwriting guidelines to ensure the

quality of the loans being originated, as described below.

-30-

79.     The Prospectus Supplement represented that, generally, regardless of originator,

the underwriting process was utilized to "evaluate a borrower's credit standing and repayment

ability, and the value and adequacy of the related Mortgaged Property as collateral."  (JPMMT

2005-ALT1 Prospectus Supplement, dated September 26, 2005, at S-27.)

80.     The Prospectus Supplement represented standard underwriting procedures as

follows:

> In general, a prospective borrower applying for a loan is required
> to fill out a detailed application designed to provide to the
> underwriting officer pertinent credit information.  As part of the
> description of the borrower's financial condition, the borrower
> generally is required to provide a current list of assets and
> liabilities and a statement of income and expenses, as well as an
> authorization to apply for a credit report which summarizes the
> borrower's credit history with local merchants and lenders and any
> record of bankruptcy.  In most cases, an employment verification is
> obtained from an independent source (typically the borrower's
> employer), which verification reports, among other things, the
> length of employment with that organization, the current salary,
> and whether it is expected that the borrower will continue such
> employment in the future.

(*Id.*)

81.     The Prospectus Supplement also represented the eligibility and underwriting

requirements for loans made under an alternative documentation program:

> A lender may also originate mortgage loans pursuant to alternative
> sets of underwriting criteria under reduced or limited
> documentation programs . . . .  Loans underwritten under these
> programs are generally limited to borrowers who have
> demonstrated an established ability and willingness to repay the
> mortgage loans in a timely fashion.  Permitted maximum loan-to-
> value ratios under these programs are generally more restrictive
> than those under the lender's standard underwriting criteria.

(*Id.*)

-31-

82.    Finally, the Prospectus Supplement represented that, under standard underwriting procedures, exceptions were allowed only in specific circumstances:

> From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.

(*Id.*)

83.    The Prospectus Supplement for the JPMMT 2005-ALT1 offering also made specific representations about the underwriting standards applied by each originator.

84.    As to originator PHH, the Prospectus Supplement represented that:

> PHH's underwriting standards . . . are intended to result in the origination of investment-quality mortgage loans that are salable in the secondary mortgage market. They are applied in originating or purchasing loans for its own account, and in originating loans for, or purchasing loans from, other lenders under various "private-label" programs . . . PHH's underwriting guidelines are applied to evaluate an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan made.

(*Id.* at S-27.)

85.    To that end, the Prospectus Supplement represented that PHH calculated borrowers' DTI ratios to ensure that they could make their monthly payments:

> PHH generally applies debt service-to-income ratios of up to 50% of the proposed borrower's acceptable stable monthly gross income. From time to time, PHH makes loans where these ratios are exceeded. In those instances, PHH's underwriters typically look at compensating factors such as the liquidity of the mortgagor and the stability of the real estate market where the property is located.

(*Id.* at S-29.)

86.     The Prospectus Supplement further represented that PHH required all borrowers

to:

> provide information concerning his or her assets, liabilities, income
> and expenses . . . along with an authorization to obtain any
> necessary third party verifications, including a credit report
> summarizing the applicant's credit history . . . PHH reviews the
> applicant's credit history and outstanding debts, as reported on the
> credit report.  PHH verifies the applicant's liquid assets to ensure
> that the applicant has adequate liquid assets to apply toward any
> required down payment, closing costs, prepaid interest, and a
> specified amount of cash reserves after the closing of the related
> mortgage . . . PHH also evaluates the applicant's income to
> determine its stability, probability of continuation, and adequacy to
> service the proposed PHH debt payment.

(*Id.* at S-28.)

87.     The Prospectus Supplement also represented that PHH applied conservative

underwriting guidelines even to loans originated under alternative documentation programs:

> Loans underwritten under the Reduced Documentation Program,
> Stated Income, Stated Asset Program, Stated Income Full Asset
> Program and No Income Stated Asset Program are generally
> limited to borrowers who have demonstrated an established ability
> and willingness to repay the mortgage loans in a timely fashion.
> Permitted maximum loan-to-value ratios under the Reduced
> Documentation Program, Stated Income, Stated Asset Program,
> Stated Income Full Asset Program and No Income Stated Asset
> Program are generally more restrictive than those under the
> standard underwriting criteria of PHH.

(*Id.* at S-29.)

88.     Finally, the Prospectus Supplement represented that exceptions to the

underwriting guidelines would be allowed only in specific circumstances, and that those loans

had sufficient compensating factors:

> From time to time, exceptions to PHH's underwriting policies may
> be made.  Such exceptions are made on a loan-by-loan basis only
> at the discretion of PHH's underwriters and may be made only

> after careful consideration of certain compensating factors such as borrower capacity, liquidity, employment and residential stability.

(*Id.* at S-27.)

89.     As to originator GreenPoint, the Prospectus Supplement represented that:

> Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Based on these and other factors, GreenPoint will determine the level of documentation to be provided by the prospective borrower.  Exceptions to the GreenPoint underwriting guidelines are permitted where compensating factors are present.

(*Id.* at S-30.)

90.     The Prospectus Supplement represented that underwriting standards were consistently applied to confirm the value of the collateral and the borrower's ability to repay.  To that end, the Prospectus Supplement represented that GreenPoint calculated borrowers' DTI ratios to ensure that they could make their monthly payments:

> In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers . . . the ratio of those amounts to the proposed borrower's monthly gross income.

(*Id.*)

91.     Finally, the Prospectus Supplement represented that reduced documentation programs were available only to borrowers with favorable credit histories and LTV ratios:

> Mortgage loans underwritten under this type of [limited documentation] program are generally limited to borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion . . . Permitted maximum loan-to-value ratios (including secondary financing) under limited documentation programs are generally more restrictive than mortgage loans originated with full documentation or alternative

-34-

> documentation requirements . . . Mortgage loans underwritten
> under no documentation programs are generally limited to
> borrowers with favorable credit histories and who satisfy other
> standards for limited documentation programs.

(*Id.* at S-31.)

### (b)   JPALT 2006-A1

92.    For the JPALT 2006-A1 securitization, approximately 26.22% of the pool 1 and

10.24% of the aggregate pool A mortgage loans were originated by WMMSC.  Approximately

26.18% of the pool 1 and 20.83% of the aggregate pool A mortgage loans were originated by

PHH.  Finally, 42.15% of the pool 1 and 63.93% of the aggregate pool A mortgage loans were

originated by CHF or JPMC Bank (collectively, "CHF").  No other originator originated or

acquired more than 10% of the mortgage loans in any mortgage group.

93.    The Prospectus Supplement for this offering made representations that the

originators followed specific underwriting guidelines to ensure the quality of the loans being

originated, as described below.

94.    The Prospectus Supplement represented that generally, regardless of originator,

the underwriting process was utilized to "evaluate a borrower's credit standing and repayment

ability, and the value and adequacy of the related Mortgaged Property as collateral."  (JPALT

2006-A1 Prospectus Supplement, dated February 24, 2006, at S-33-34.)

95.    The Prospectus Supplement represented the standard underwriting procedures

applied in originating the securitized loans as follows:

> In general, a prospective borrower applying for a loan is required
> to fill out a detailed application designed to provide to the
> underwriting officer pertinent credit information.  As part of the
> description of the borrower's financial condition, the borrower
> generally is required to provide a current list of assets and
> liabilities and a statement of income and expenses, as well as an
> authorization to apply for a credit report which summarizes the
> borrower's credit history with local merchants and lenders and any

> record of bankruptcy. In most cases, an employment verification is
> obtained from an independent source (typically the borrower's
> employer), which verification reports, among other things, the
> length of employment with that organization, the current salary,
> and whether it is expected that the borrower will continue such
> employment in the future.

(*Id.* at S-33.)

96.     The Prospectus Supplement also represented the eligibility and underwriting

requirements for securitized loans made under an alternative documentation program:

> Loans underwritten under [limited documentation] programs are
> generally limited to borrowers who have demonstrated an
> established ability and willingness to repay the mortgage loans in a
> timely fashion. Permitted maximum loan-to-value ratios under
> these programs are generally more restrictive than those under the
> lender's standard underwriting criteria. Based on the data provided
> in the application and certain verification (if required), a
> determination is made by the original lender that the mortgagor's
> monthly income . . . will be sufficient to enable the mortgagor to
> meet the monthly payments on the mortgage loan and other
> expenses related to the property such as property taxes, utility
> costs, standard hazard insurance and other fixed obligations other
> than housing expenses. . .

(*Id.* at S-33-34.)

97.     Finally, the Prospectus Supplement represented that under the standard

underwriting procedures that were applied to the securitized loans, exceptions were allowed only

in specific circumstances:

> From time to time, exceptions to a lender's underwriting policies
> may be made. Such exceptions may be made on a loan-by-loan
> basis at the discretion of the lender's underwriter. Exceptions may
> be made after careful consideration of certain mitigating factors
> such as borrower liquidity, employment and residential stability
> and local economic conditions.

(*Id.* at S-34.)

98.    The Prospectus Supplement for the JPALT 2006-A1 offering also made

representations about the specific underwriting standards applied by each originator.

99.    As to originator PHH, the Prospectus Supplement represented that:

> PHH's underwriting standards . . . are intended to result in the
> origination of investment-quality mortgage loans that are salable in
> the secondary mortgage market.  They are applied in originating or
> purchasing loans for its own account, and in originating loans for,
> or purchasing loans from, other lenders under various "private-
> label" programs . . . PHH's underwriting guidelines are applied to
> evaluate an applicant's credit standing, financial condition, and
> repayment ability, as well as the value and adequacy of the
> mortgaged property as collateral for any loan made.

(*Id.* at S-36-37.)

100.    To that end, the Prospectus Supplement represented that PHH calculated

borrowers' DTI ratios and limits thereto to ensure that they could make their monthly payments:

> PHH generally applies debt service-to-income ratios of up to 50%
> of the proposed borrower's acceptable stable monthly gross
> income.  Under certain programs, however, PHH makes loans
> where these ratios are up to 60%.

(*Id.* at S-39.)

101.    To ensure the borrower's ability to repay the loan, the Prospectus Supplement

further represented that PHH required all borrowers to:

> provide information concerning his or her assets, liabilities, income
> and expenses . . . along with an authorization to obtain any
> necessary third party verifications, including a credit report
> summarizing the applicant's credit history . . . PHH reviews the
> applicant's credit history and outstanding debts, as reported on the
> credit report.  PHH verifies the applicant's liquid assets to ensure
> that the applicant has adequate liquid assets to apply toward any
> required down payment, closing costs, prepaid interest, and a
> specified amount of cash reserves after the closing of the related
> mortgage . . . PHH also evaluates the applicant's income to
> determine its stability, probability of continuation, and adequacy to
> service the proposed PHH debt payment.

(*Id.* at S-37.)

102.    Finally, the Prospectus Supplement represented that exceptions to the

underwriting guidelines would be allowed only in specific circumstances, and that those loans

had sufficient compensating factors:

> From time to time, exceptions to PHH's underwriting policies may
> be made.  Such exceptions are made on a loan-by-loan basis only
> at the discretion of PHH's underwriters and may be made only
> after careful consideration of certain compensating factors such as
> borrower capacity, liquidity, employment and residential stability.
> References to mortgage loans in this section only refer to those
> mortgage loans originated or acquired by PHH.

(*Id.* at S-37.)

103.    As to originator CHF, the Prospectus Supplement represented that "the mortgage

loans . . . were originated generally in accordance with the underwriting policies of CHF. "  (*Id.*

at S-41.)

104.    The Prospectus Supplement represented that CHF's alternative documentation

programs were reserved only for specific sorts of borrowers with compensating factors.

Specifically, under the "No Doc" program, "[t]he underwriting for such mortgage loans are

based primarily or entirely on a stronger credit profile (evidenced by a higher minimum FICO

credit risk score), a lower maximum product limit and additional due diligence performed on the

collateral."  (*Id.* at S-42.)

105.    Finally, the Prospectus Supplement represented that exceptions to the

underwriting guidelines would be allowed only in specific circumstances, and that those loans

had sufficient compensating factors:

> From time to time, exceptions and/or variances to CHF Alternative
> A Underwriting Policies may be made.  Such exceptions and/or
> variances may be made only if specifically approved on a loan-by-
> loan basis by certain credit personnel of CHF who have the

-38-

authority to make such exceptions and/or variances. Exceptions
and/or variances may be made only after careful consideration of
certain mitigating factors such as borrower capacity, liquidity,
employment and residential stability and local economic
conditions.

(*Id.*)

106.    As to originator WMMSC, the Prospectus Supplement represented that:

The mortgage loans have been originated generally in accordance
with the underwriting standards of WMMSC or the underwriting
guidelines of Washington Mutual Bank as described in this section.
The following is a summary of the underwriting standards
generally applied by WMMSC and the underwriting guidelines
generally applied by Washington Mutual Bank. . .

(*Id.* at S-44.)

107.    The Prospectus Supplement represented that the purpose of "WMMSC's

underwriting standards and Washington Mutual Bank's underwriting guidelines" were "to

evaluate the prospective borrower's credit standing and repayment ability and the value and

adequacy of the mortgaged property as collateral."  (*Id.*)

108.    To ensure the borrower's ability to repay the loan, the Prospectus Supplement

represented that all borrowers under WMMSC-originated loans were required to:

complete a standard loan application in which they may provide
financial information regarding such factors as their assets,
liabilities and related monthly payments, income, employment
history and credit history. Each borrower also provides an
authorization to access a credit report that summarizes the
borrower's credit history . . . To evaluate a prospective borrower's
credit history, the loan underwriter obtains a credit report relating
to the borrower from one or more credit reporting companies,
usually in the form of a merged credit report . . . Minimum credit
scores are required for some loan products and loan programs. For
borrowers for which credit scores are not available, the loan
underwriter will require alternative documentation indicating the
borrower's creditworthiness, such as rental or utility payment
history or payment history on other debt.

(*Id.*)

109. In addition, the Prospectus Supplement represented that, under all of WMMSC's

"documentation programs other than the no ratio programs and the no documentation programs":

> in evaluating a prospective borrower's ability to repay a mortgage
> loan, the loan underwriter considers the ratio of the borrower's
> mortgage payments, real property taxes and other monthly housing
> expenses to the borrower's gross income . . . and the ratio of the
> borrower's total monthly debt (including non-housing expenses) to
> the borrower's gross income (referred to as the "debt-to-income
> ratio" or "back end ratio").

(*Id.* at S-44-45.)

110. The Prospectus Supplement represented that WMMSC reserved alternative

documentation programs only for borrowers who had compensating factors:

> Generally, a reduced documentation program is available to
> borrowers with certain loan-to-value ratios, loan amounts, and
> credit scores. A reduced documentation program places increased
> reliance on the value and adequacy of the mortgaged property as
> collateral, the borrower's credit standing and (in some cases) the
> borrower's assets . . . Eligibility criteria vary but may include
> minimum credit scores, maximum loan amounts, maximum debt-
> to-income ratios and specified payment histories on an existing
> mortgage loan (generally, a history of timely mortgage payments
> for the past twelve months, or for the duration of the mortgage loan
> if less than twelve months old) or on other debt. In all cases, the
> borrower's employment is verified with the employer by
> telephone.

(*Id.* at S-45.)

111. The Prospectus Supplement also represented that exceptions to the underwriting

guidelines would be allowed only in specific circumstances, and that those loans had sufficient

compensating factors:

> Exceptions to the underwriting standards described above may be
> made on a case-by-case basis if compensating factors are present.
> In those cases, the basis for the exception is documented.
> Compensating factors may include, but are not limited to, low

loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address.

(*Id.*)

112.    Finally, the Prospectus Supplement represented that WMMSC undertook due diligence into loan pools before acquiring them from third parties:

> WMMSC's credit risk oversight department conducts a credit, appraisal, and compliance review of adverse samplings (and, in some cases, statistical samplings) of mortgage loans prior to purchase from unaffiliated mortgage loan sellers.  Sample size is determined by due diligence results for prior purchased pools from that seller, performance of mortgage loans previously purchased and characteristics of the pool presented for purchase . . . For mortgage loans originated by Washington Mutual Bank, Washington Mutual Bank's credit risk oversight department conducts a quality control review of statistical samplings of originated mortgage loans on a regular basis.

(*Id.*)

### (c)    JPMAC 2006-CH1

113.    For the JPMAC 2006-CH1 offering, all of the mortgage loans were originated by JPMC Bank.  The Prospectus Supplement for this offering represented that JPMC Bank followed specific underwriting guidelines to ensure the quality of the loans being originated, as described below.

114.    The Prospectus Supplement represented that "[t]he mortgage loans were originated and underwritten in accordance with either the Chase Home Mortgage Call Center Underwriting Guidelines described below (the "CHM Call Center Underwriting Guidelines") or the Chase Home Mortgage Wholesale/Retail Underwriting Guidelines described below (the "CHM Wholesale/Retail Underwriting Guidelines")."  (JPMAC 2006-CH1 Prospectus Supplement, dated October 26, 2006, at 49.)

115.    In the Prospectus Supplement, JPMC Bank further represented that "[t]here are

three major steps in the underwriting process: (1) identify the eligibility and appropriate credit

grade of the mortgagor, (2) evaluate the eligibility and lendable equity of the mortgaged

property, and (3) ensure that the mortgage loan terms meet those acceptable for the applicable

credit grade." (*Id.* at 50.)

116.    The Prospectus Supplement went on to represent that underwriting standards were

consistently applied to confirm the value of the collateral and the borrower's ability to repay.

Specifically, under the CHM Call Center Underwriting Guidelines, "the value and adequacy of

the mortgaged property as collateral for the proposed mortgage loan," as well as the "credit

standing and repayment ability of the prospective borrower" were considered in the loan

approval process. (*Id.* at 49, 51.)

117.    The Prospectus Supplement further represented that JPMC Bank applied

conservative underwriting guidelines even to loans originated under its stated income program:

> The CHM Stated Income Program is a no income verification
> program available for credit grades A1/A+ through B2. The CHM
> Call Center Underwriting Guidelines utilize various credit grade
> categories to grade the likelihood that the mortgagor will satisfy
> the repayment conditions of the mortgage loan. These credit grade
> categories establish the maximum permitted loan-to-value ratio,
> debt-to-income ratio and loan amount, given the borrower's credit
> history considered in a manner generally consistent with non-prime
> mortgage industry practice, the occupancy status of the mortgaged
> property, the type of mortgaged property and documentation type.

(*Id.* at 50.)

118.    Finally, the Prospectus Supplement represented that exceptions to the

underwriting guidelines would be allowed only in specific circumstances, and that those loans

had sufficient compensating factors:

-42-

> On a case by case basis, CHM Call Center underwriters may
> determine that, based upon compensating factors, a prospective
> borrower not strictly qualifying under the underwriting risk
> category guidelines described below warrants an underwriting
> exception.  Compensating factors may include, but are not limited
> to, relatively low loan-to-value ratio, relatively low debt-to-income
> ratio, stable employment and time in the same residence.

(*Id.* at 51-52.)

### (d)  **JPMAC 2006-CH2**

119.    For the JPMAC 2006-CH2 offering, all of the mortgage loans were originated by
JPMC Bank.  The Prospectus Supplement for this offering represented that JPMC Bank followed
specific underwriting guidelines to ensure the quality of the loans being originated, as described
below.

120.    The Prospectus Supplement represented that "[t]he mortgage loans were
originated and underwritten in accordance with either the Chase Home Mortgage Call Center
Underwriting Guidelines described below (the "CHM Call Center Underwriting Guidelines") or
the Chase Home Mortgage Wholesale/Retail Underwriting Guidelines described below (the
"CHM Wholesale/Retail Underwriting Guidelines")."  (JPMAC 2006-CH2 Prospectus
Supplement, dated October 6, 2006, at S-82.)

121.    In the Prospectus Supplement, JPMC Bank further represented that "[t]here are
three major steps in the underwriting process: (1) identify the eligibility and appropriate credit
grade of the mortgagor, (2) evaluate the eligibility and lendable equity of the mortgaged
property, and (3) ensure that the mortgage loan terms meet those acceptable for the applicable
credit grade."  (*Id.* at S-83.)

122.    The Prospectus Supplement went on to represent that underwriting standards were
consistently applied to confirm the value of the collateral and the borrower's ability to repay.
Specifically, under the CHM Call Center Underwriting Guidelines, "the value and adequacy of

the mortgaged property as collateral for the proposed mortgage loan," as well as the "credit standing and repayment ability of the prospective borrower" were considered in the loan approval process. (*Id.*)

123.   The Prospectus Supplement further represented that JPMC Bank applied conservative underwriting guidelines even to loans originated under its stated income program:

> The CHM Stated Income Program is a no income verification program available for credit grades A1/A+ through B2. The CHM Call Center Underwriting Guidelines utilize various credit grade categories to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan. These credit grade categories establish the maximum permitted loan-to-value ratio, debt-to-income ratio and loan amount, given the borrower's credit history considered in a manner generally consistent with non-prime mortgage industry practice, the occupancy status of the mortgaged property, the type of mortgaged property and documentation type.

(*Id.* at S-83.)

124.   Finally, the Prospectus Supplement represented that exceptions to the underwriting guidelines would be allowed only in specific circumstances, and that those loans had sufficient compensating factors:

> On a case by case basis, CHM Call Center underwriters may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, relatively low loan-to-value ratio, relatively low debt-to-income ratio, stable employment and time in the same residence.

(*Id.* at S-82.)

      **(2)**    **Bear Stearns Defendants' Representations**

      **(a)**    **BSARM 2005-10**

125.   For the BSARM 2005-10 offering, all of the mortgage loans were originated by Wells Fargo Bank, N.A. ("Wells Fargo").

126.    The Prospectus Supplement for the BSARM 2005-10 offering made specific

representations about Wells Fargo's underwriting standards.

127.    The Prospectus Supplement represented that Wells Fargo applied conservative

underwriting standards to confirm a borrower's ability to repay and to produce performing loans:

> The Wells Fargo Underwriting Guidelines evaluate the applicant's
> credit standing and ability to repay the loan, as well as the value
> and adequacy of the mortgaged property as collateral.  The Wells
> Fargo Underwriting Guidelines represent a balancing of several
> factors that may affect the ultimate recovery of the loan amount,
> including, among others, the amount of the loan, the ratio of the
> loan amount to the property value (*i.e.*, generally the lower of the
> appraised value of the mortgaged property and the purchase price),
> the borrower's means of support and the borrower's credit history.

(BSARM 2005-10 Prospectus Supplement dated October 27, 2005, at 26.)

128.    The Prospectus Supplement further stated that Wells Fargo closely examined a

borrower's financial history to determine his or her ability to repay:

> A prospective borrower applying for a mortgage loan is required to
> complete a detailed application.  The loan application elicits
> pertinent information about the applicant, with particular emphasis
> on the applicant's financial health (assets, liabilities, income and
> expenses), the property being financed and the type of loan
> desired.  A self-employed applicant may be required to submit his
> or her most recent signed federal income tax returns.  With respect
> to every applicant, credit reports are obtained from commercial
> reporting services, summarizing the applicant's credit history with
> merchants and lenders.  Generally, significant unfavorable credit
> information reported by the applicant or a credit reporting agency
> must be explained by the applicant.

(*Id.* at 27.)

129.    Finally, the Prospectus Supplement represented that Wells Fargo calculated a

borrower's DTI ratio to ensure that the borrower could make his or her monthly payments:

> In general, borrowers applying for loans must demonstrate that the
> ratio of their total monthly debt to their monthly gross income does
> not exceed certain maximum levels.

-45-

*(Id.)*

### (b)   **BALTA 2006-6**

130.   For the BALTA 2006-6 offering, EMC purchased (a) 44.94% of the mortgage loans backing the securities (based on total principal balance) from various originators that purportedly applied EMC's underwriting guidelines ("EMC loans"), (b) 41.21% of the mortgage loans from Countrywide Home Loans, Inc. ("Countrywide"), and (c) the remaining mortgage loans from various other originators, each of which originated less than 10% of the loans.

131.   The Prospectus Supplement for the BALTA 2006-6 offering made specific representations about EMC's and Countrywide's underwriting standards.

132.   With respect to the EMC loans, the Prospectus Supplement represented that EMC's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> Such underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. These standards are applied in accordance with the applicable federal and state laws and regulations.

(BALTA 2006-6 Prospectus Supplement dated September 29, 2006, at 34.)

133.   The Prospectus Supplement further provided that, under EMC's underwriting guidelines, the originators calculated a borrower's DTI ratio to ensure that the borrower could make his or her monthly payments:

> In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income.

(*Id.* at 35.)

134.   The Prospectus Supplement also represented that originators applied conservative underwriting guidelines even to EMC loans originated under their "stated income/verified asset" documentation programs:

> Under a stated income/verified asset documentation program, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower. Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income. Borrower's assets are verified.

(*Id.*)

135.   Additionally, the Prospectus Supplement represented that EMC's guidelines allowed exceptions to its underwriting standards only when there were sufficient compensating factors:

> Exceptions to the underwriting standards are permitted where compensating factors are present and are managed through a formal exception process.

(*Id.* at 34.)

136.   With respect to loans acquired from Countrywide, the Prospectus Supplement represented that Countrywide's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

(*Id.* at 34.)

137.   The Prospectus Supplement further provided that Countrywide calculated a borrower's DTI ratio to ensure that the borrower could make his or her monthly payments:

[A] prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "DTI" ratios) are within acceptable limits.

(*Id.*)

138.  To confirm a borrower's ability to repay, the Prospectus Supplement also stated that Countrywide collected information about the borrower's income:

As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income.  If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization.  Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

(*Id.*)

139.  Finally, the Prospectus Supplement represented that Countrywide allowed exceptions to its underwriting standards only when there were sufficient compensating factors:

Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

(*Id.* at 36.)

### (c)     **BALTA Trust 2006-7**

140.  For the BALTA 2006-7 offering, EMC purchased 51.11% of the mortgage loans backing the securities (based on total principal balance) from Countrywide; 25.38% of the mortgage loans from various originators that purportedly originated loans based on EMC's

underwriting guidelines ("EMC loans"); 18.00% of the mortgage loans from HomeBanc

Mortgage Corporation ("HomeBanc"); and the remaining mortgage loans from various

originators, each of which originated less than 10% of the loans.

141.   The Prospectus Supplement for the BALTA 2006-7 offering made specific

representations about Countrywide's, EMC's, and HomeBanc's underwriting standards.

142.   With respect to loans acquired from Countrywide, the Prospectus Supplement

represented that Countrywide's underwriting standards were consistently applied to confirm a

borrower's ability to repay and to produce performing loans:

> Countrywide Home Loans' underwriting standards are applied by
> or on behalf of Countrywide Home Loans to evaluate the
> prospective borrower's credit standing and repayment ability and
> the value and adequacy of the mortgaged property as collateral.

(BALTA 2006-7 Prospectus Supplement dated October 30, 2006, at 34.)

143.   The Prospectus Supplement further provided that Countrywide calculated a

borrower's DTI ratio to ensure that the borrower could make his or her monthly payments:

> [A] prospective borrower must generally demonstrate that the ratio
> of the borrower's monthly housing expenses (including principal
> and interest on the proposed mortgage loan and, as applicable, the
> related monthly portion of property taxes, hazard insurance and
> mortgage insurance) to the borrower's monthly gross income and
> the ratio of total monthly debt to the monthly gross income (the
> "debt-to-income" ratios) are within acceptable limits.

(*Id.*)

144.   To confirm a borrower's ability to repay, the Prospectus Supplement also stated

that Countrywide collected information about the borrower's income:

> As part of its evaluation of potential borrowers, Countrywide
> Home Loans generally requires a description of income.  If
> required by its underwriting guidelines, Countrywide Home Loans
> obtains employment verification providing current and historical
> income information and/or a telephonic employment confirmation.
> Such employment verification may be obtained, either through

-49-

> analysis of the prospective borrower's recent pay stub and/or W-2
> forms for the most recent two years, relevant portions of the most
> recent two years' tax returns, or from the prospective borrower's
> employer, wherein the employer reports the length of employment
> and current salary with that organization. Self-employed
> prospective borrowers generally are required to submit relevant
> portions of their federal tax returns for the past two years.

(*Id.* at 33.)

145.   Additionally, the Prospectus Supplement represented that Countrywide allowed

exceptions to its underwriting standards only when there were sufficient compensating factors:

> Exceptions to Countrywide Home Loans' underwriting guidelines
> may be made if compensating factors are demonstrated by a
> prospective borrower.

(*Id.* at 34.)

146.   With respect to the EMC loans, the Prospectus Supplement represented that

EMC's underwriting standards were consistently applied to confirm a borrower's ability to repay

and to produce performing loans:

> Such underwriting standards are applied to evaluate the
> prospective borrower's credit standing and repayment ability and
> the value and adequacy of the mortgaged property as collateral.
> These standards are applied in accordance with the applicable
> federal and state laws and regulations.

(*Id.* at 32.)

147.   The Prospectus Supplement further provided that the originators calculated a

borrower's DTI ratio to ensure that the borrower could make his or her monthly payments:

> In determining whether a prospective borrower has sufficient
> monthly income available (i) to meet the borrower's monthly
> obligation on their proposed mortgage loan and (ii) to meet the
> monthly housing expenses and other financial obligations on the
> proposed mortgage loan, each lender generally considers, when
> required by the applicable documentation program, the ratio of
> such amounts to the proposed borrower's acceptable stable
> monthly gross income.