(*Id.*)

148.   The Prospectus Supplement also represented that the originators applied conservative underwriting guidelines even to loans originated under their "stated income/verified asset" documentation programs:

> Under a stated income/verified asset documentation program, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower. Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income. Borrower's assets are verified.

(*Id.*)

149.   The Prospectus Supplement further represented that EMC's guidelines allowed exceptions to its underwriting standards only when there were sufficient compensating factors:

> Exceptions to the underwriting standards are permitted where compensating factors are present and are managed through a formal exception process.

(*Id.* at 32.)

150.   With respect to loans acquired from HomeBanc, the Prospectus Supplement represented that HomeBanc's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> The HBMC underwriting guidelines allow HBMC to evaluate an applicant's credit standing, financial condition and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan that HBMC reviews.

(*Id.* at 36.)

151.   The Prospectus Supplement further provided that HomeBanc verified a borrower's income to ensure that the borrower could make his or her monthly payments:

> HBMC also evaluates the applicant's income to determine stability, probability of continuation and adequacy to service the

proposed HBMC debt payment.  HBMC's guidelines for verifying
income and employment of a potential borrower are generally as
follows:

• For salaried applicants, HBMC typically requires a written
verification of employment from the applicant's employer, or a
copy of the applicant's two most recent federal tax returns, or a
current pay stub and verbal verification of employment from the
employer;

• For non-salaried applicants, including self-employed applicants,
HBMC requires copies of the applicant's two most recent federal
income tax returns, along with all supporting schedules; and

• For self-employed applicants, HBMC also generally requires the
submission of a signed profit and loss statement.

(*Id.* at 36-37.)

152.    The Prospectus Supplement also represented that HomeBanc verified a

borrower's liquid assets to ensure that he or she could afford the loan:

HBMC verifies the applicant's liquid assets for a general
indication of creditworthiness and to determine whether the
applicant has adequate liquid assets to cover any required down
payment, closing costs and prepaid interest, while maintaining a
minimum cash reserve equal to the sum of three to six monthly
PITI payments plus, in certain cases, the sum of three to six
monthly payments of all other debt obligations included in
determination of the "debt-to-income" ratio.  In addition, HBMC
uses information regarding the applicant's liquid assets, together
with information regarding the applicant's debt obligations to
gauge the reasonableness of the applicant's stated income.

(*Id.* at 36.)

153.    Finally, the Prospectus Supplement stated that HomeBanc allowed underwriting

exceptions only when there were sufficient compensating factors:

The underwriting standards described above are guidelines of
general applicability.  On a case-by-case basis, it may be
determined that an applicant warrants an exception to these
guidelines.  An exception may be allowed by underwriting
personnel with appropriate credit authority and only if the
application reflects compensating factors, such as: a low loan-to-

value ratio; stable ownership; low debt-to-income ratios; or excess
cash reserves or similar mitigating circumstances.

(*Id.* at 37.)

### (d)   **BSABS 2006-AC4**

154.   For the BSABS 2006-AC4 offering, EMC purchased 90.33% of the mortgage
loans backing the securities (based on total principal balance) from various originators that
purportedly applied EMC's underwriting guidelines ("EMC loans"), and the remaining mortgage
loans from various other originators, each of which originated less than 10% of the loans.

155.   The Prospectus Supplement for the BSABS 2006-AC4 offering made specific
representations about EMC's underwriting standards.

156.   With respect to the EMC loans, the Prospectus Supplement represented that
EMC's underwriting guidelines were applied to confirm a borrower's ability to repay and to
produce performing loans:

> Such underwriting standards are applied to evaluate the
> prospective borrower's credit standing and repayment ability and
> the value and adequacy of the mortgaged property as collateral.
> These standards are applied in accordance with the applicable
> federal and state laws and regulations.

(BSABS 2006-AC4 Prospectus Supplement dated June 28, 2006, at 25-26.)

157.   The Prospectus Supplement further stated that originators undertook an analysis
of a borrower's DTI to evaluate his or her ability to repay:

> In determining whether a prospective borrower has sufficient
> monthly income available (i) to meet the borrower's monthly
> obligation on their proposed mortgage loan and (ii) to meet the
> monthly housing expenses and other financial obligation on the
> proposed mortgage loan, each lender generally considers, when
> required by the applicable documentation program, the ratio of
> such amounts to the proposed borrower's acceptable stable
> monthly gross income.

(*Id.* at 26.)

158.    The Prospectus Supplement also represented that originators applied conservative

underwriting guidelines even to loans originated under their "stated income/verified asset"

documentation programs:

> Under a stated income/verified asset documentation program, more
> emphasis is placed on the value and adequacy of the mortgaged
> property as collateral, credit history and other assets of the
> borrower than on a verified income of the borrower. Although the
> income is not verified, the originators obtain a telephonic
> verification of the borrower's employment without reference to
> income. Borrower's assets are verified.

(*Id.*)

159.    Finally, the Prospectus Supplement represented that EMC's guidelines allowed

exceptions to its underwriting standards only when there were sufficient compensating factors:

> Exceptions to the underwriting standards are permitted where
> compensating factors are present and are managed through a
> formal exception process.

(*Id.* at 26.)

### (e)    **BSABS 2006-AQ1**

160.    For the BSABS 2006-AQ1 offering, EMC purchased all of the mortgage loans

from Ameriquest Mortgage Company ("Ameriquest"). All of the mortgage loans were

originated by Ameriquest and Argent Mortgage Company, L.L.C. (together, the "Ameriquest

Loan Sellers").

161.    The Prospectus Supplement for the BSABS 2006-AQ1 offering made specific

representations about the Ameriquest Loan Sellers' underwriting standards.

162.    The Prospectus Supplement represented that the Ameriquest Loan Sellers'

underwriting guidelines were applied to confirm a borrower's ability to repay and to produce

performing loans:

-54-

> The Ameriquest Underwriting Guidelines are primarily intended to
> evaluate: (1) the applicant's credit standing and repayment ability
> and (2) the value and adequacy of the mortgaged property as
> collateral.

(BSABS 2006-AQ1 Prospectus Supplement dated November 29, 2006, at 41.)

163.   The Prospectus Supplement also stated that the Ameriquest Loan Sellers generally

verified a borrower's income and calculated his or her DTI to confirm his or her ability to repay:

> During the underwriting process, each Ameriquest Loan Seller
> reviews and verifies the loan applicant's sources of income (except
> under the Stated Income and Limited Documentation types, under
> which programs such information may not be independently
> verified), calculates the amount of income from all such sources
> indicated on the loan application, reviews the credit history of the
> applicant, calculates the debt-to-income ratio to determine the
> applicant's ability to repay the loan, and reviews the mortgaged
> property for compliance with the Ameriquest Underwriting
> Guidelines.

(Id. at 42.)

164.   The Prospectus Supplement further represented that the Ameriquest Loan Sellers

applied conservative underwriting guidelines even to loans originated under a limited

documentation program:

> The Limited Documentation residential loan program is generally
> based on bank statements from the past 6 months (with respect to
> mortgage loans originated by Argent) or 12 months (with respect
> to mortgage loans originated by Ameriquest) supported by
> additional documentation provided by the applicant or current year
> to date documentation.  The applicant's employment and/or
> business licenses are generally verified.

(Id.)

165.   Finally, the Prospectus Supplement represented that the Ameriquest Loan Sellers'

guidelines allowed exceptions to their underwriting standards only when there were sufficient

compensating factors:

> On a case-by-case basis, the Ameriquest Loan Sellers may
> determine that, based upon compensating factors, a loan applicant,
> not strictly qualifying under one of the risk categories described
> below, warrants an exception to the requirements set forth in the
> Ameriquest Underwriting Guidelines.

(*Id.* at 41.)

### (f)   **BSMF 2006-SL1**

166.    For the BSMF 2006-SL1 offering, EMC purchased 86.70% of the mortgage loans

backing the securities (based on total principal balance) from various originators that purportedly

originated loans based on EMC's underwriting guidelines ("EMC loans"), and 13.30% of the

mortgage loans from Bear Stearns Residential Mortgage Corporation ("BSRM").

167.    The Prospectus Supplement for the BSMF 2006-SL1 offering made specific

representations about EMC's underwriting standards.

168.    With respect to the EMC loans, the Prospectus Supplement represented that

EMC's underwriting standards were consistently applied to confirm a borrower's ability to repay

and to produce performing loans:

> The underwriting guidelines are primarily intended to assess the
> borrower's ability to repay the mortgage loan, to assess the value
> of the mortgaged property and to evaluate the adequacy of the
> mortgaged property as collateral for the mortgage loan.  While the
> originator's primary consideration in underwriting a mortgage loan
> is the value of the mortgaged property, the originator also
> considers, among other things, a mortgagor's credit history,
> repayment ability and debt service to income ratio as well as the
> type and use of the mortgaged property.

(BSMF 2006-SL1 Prospectus Supplement dated June 7, 2006, at 30.)

169.    The Prospectus Supplement further provided that, even under the originator's

limited documentation program, a borrower's income was verified to ensure his or her ability to

repay:

-56-

> The underwriting guidelines require that the income of each applicant for a mortgage loan under the full/alternative documentation program be verified. The specific income documentation required for the originator's various programs is as follows: under the full/alternative documentation program, applicants are required to submit one written form of verification from the employer of stable income for at least 12 months. The documentation may take the form of a Verification of Employment form provided by the employer, the most recent pay stub with year-to-date earnings and the most recent W-2 or a copy of the borrower's federal tax returns. Under the limited documentation program the borrower may choose to submit 12 consecutive months of personal checking account bank statements.

(*Id.* at 31.)

### (g)   **BSMF 2006-AC1**

170.   For the BSMF 2006-AC1 offering, EMC purchased 98.07% of the mortgage loans backing the securities (based on total principal balance) from various originators that purportedly originated loans based on EMC's underwriting guidelines ("EMC loans"), and the remaining mortgage loans from an unspecified originator.

171.   The Prospectus Supplement for the BSMF 2006-AC1 offering made specific representations about EMC's underwriting guidelines.

172.   With respect to the EMC loans, the Prospectus Supplement represented that EMC's underwriting guidelines were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> Such underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. These standards are applied in accordance with the applicable federal and state laws and regulations.

(BSMF 2006-AC1 Prospectus Supplement dated July 27, 2006, at 27.)

173.   The Prospectus Supplement further provided that, under EMC's guidelines, the originators calculated a borrower's DTI ratio to ensure that the borrower could make his or her monthly payments:

> In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income.

(*Id.*)

174.   The Prospectus Supplement also represented that the originators applied conservative underwriting guidelines even to loans originated under their "stated income/verified asset" documentation programs:

> Under a stated income/verified asset documentation program, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower.  Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income.  Borrower's assets are verified.

(*Id.* at 28.)

175.   Finally, the Prospectus Supplement represented that EMC's guidelines allowed exceptions to its underwriting standards only when there were sufficient compensating factors:

> Exceptions to the underwriting standards are permitted where compensating factors are present and are managed through a formal exception process.

(*Id.* at 27.)

**(h)**     **BSMF 2006-AR1**

176.     For the BSMF 2006-AR1 offering, the loans were originated by EMC, third

parties purportedly based on EMC's underwriting guidelines (collectively, "EMC loans"), and

BSRM.

177.     The Prospectus Supplement for the BSMF 2006-AR1 offering made specific

representations about EMC's and BSRM's underwriting standards.

178.     With respect to the EMC loans, the Prospectus Supplement represented that

EMC's underwriting standards were consistently applied to confirm a borrower's ability to repay

and to produce performing loans:

> Such underwriting standards are applied to evaluate the
> prospective borrower's credit standing and repayment ability and
> the value and adequacy of the mortgaged property as collateral.
> These standards are applied in accordance with the applicable
> federal and state laws and regulations.

(BSMF 2006-AR1 Prospectus Supplement dated July 28, 2006, at 21.)

179.     The Prospectus Supplement further provided that, under EMC's guidelines, the

originators calculated a borrower's DTI ratio to ensure that the borrower could make his or her

monthly payments:

> In determining whether a prospective borrower has sufficient
> monthly income available (i) to meet the borrower's monthly
> obligation on their proposed mortgage loan and (ii) to meet the
> monthly housing expenses and other financial obligations on the
> proposed mortgage loan, each lender generally considers, when
> required by the applicable documentation program, the ratio of
> such amounts to the proposed borrower's acceptable stable
> monthly gross income.

(*Id.*)

180.   The Prospectus Supplement also represented that the originators applied conservative underwriting guidelines even to loans originated under their "stated income/verified asset" documentation programs:

> Under a stated income/verified asset documentation program, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower. Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income. Borrower's assets are verified.

(*Id.* at 22.)

181.   Additionally, the Prospectus Supplement represented that EMC's guidelines allowed exceptions to its underwriting standards only when there were sufficient compensating factors:

> Exceptions to the underwriting standards are permitted where compensating factors are present and are managed through a formal exception process.

(*Id.* at 21.)

182.   With respect to loans originated by BSRM, the Prospectus Supplement represented that BSRM's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> The BSRM Alt–A Underwriting Guidelines are intended to ensure that (i) the loan terms relate to the borrower's willingness and ability to repay and (ii) the value and marketability of the property are acceptable. Both the Bear Stearns Option ARM loans originated by BSRM and the 5 Yr. Bear Stearns Secure Option ARM loans are originated pursuant to the BSRM Alt-A Underwriting Guidelines.

(*Id.*)

183.    The Prospectus Supplement further provided that BSRM generally verified a

borrower's income and calculated a DTI ratio to ensure that the borrower could make his or her

monthly payments:

> During the underwriting process, BSRM calculates and verifies the
> loan applicant's sources of income (except documentation types,
> which do not require such information to be stated or
> independently verified), reviews the credit history of the applicant,
> calculates the debt-to-income ratio to determine the applicant's
> ability to repay the loan, and reviews the mortgaged property for
> compliance with the BSRM Underwriting Guidelines.

(*Id.*)

184.    The Prospectus Supplement also represented that BSRM applied conservative

underwriting guidelines even to loans originated under its "limited" documentation program:

> The Limited Documentation type is based on the recent twelve
> (12) months of consecutive bank statements.  Self-employed
> borrowers must be self-employed in the same business or have
> received 1099 income in the same job for the past two years.
> Assets must be documented and independently verified by means
> of a written verification of deposit (VOD) with two (2) months'
> average balance; most recent bank statements, stocks or securities
> statements covering a two-(2) month period.  The borrower must
> demonstrate that they have sufficient reserves (sourced and
> seasoned) of greater than or equal to three months principal,
> interest, taxes and insurance.  A verbal verification of employment
> is also completed within 10 days of funding the loan.

(*Id.* at 23.)

185.    Finally, the Prospectus Supplement represented that BSRM allowed exceptions to

its underwriting guidelines only on a case-by-case basis when there were sufficient compensating

factors:

> Exceptions to the BSRM Underwriting Guidelines are considered
> with reasonable compensating factors on a case-by-case basis and
> at the sole discretion of senior management.  When exception
> loans are reviewed, all loan elements are examined as a whole to
> determine the level of risk associated with approving the loan
> including appraisal, credit report, employment, compensating

> factors and borrower's willingness and ability to repay the loan.
> Compensating factors may include, but are not limited to, validated
> or sourced/seasoned liquid reserves in excess of the program
> requirements, borrower's demonstrated ability to accumulate
> savings or devote a greater portion of income to housing expense
> and borrowers' potential for increased earnings based on
> education, job training, etc. Loan characteristics such as refinance
> transactions where borrowers are reducing mortgage payments and
> lowering debt ratios may become compensating factors as well.

(*Id.*)

### (i)   **BSMF 2006-AR2**

186.   For the BSMF 2006-AR2 offering, the loans were originated by EMC, third

parties purportedly based on EMC's underwriting guidelines (collectively, "EMC loans"), and

BSRM.

187.   The Prospectus Supplement for the BSMF 2006-AR2 offering made specific

representations about EMC's and BSRM's underwriting standards.

188.   With respect to the EMC loans, the Prospectus Supplement represented that

EMC's underwriting standards were consistently applied to confirm a borrower's ability to repay

and to produce performing loans:

> Such underwriting standards are applied to evaluate the
> prospective borrower's credit standing and repayment ability and
> the value and adequacy of the mortgaged property as collateral.
> These standards are applied in accordance with the applicable
> federal and state laws and regulations.

(BSMF 2006-AR2 Prospectus Supplement dated September 27, 2006, at 22.)

189.   The Prospectus Supplement further provided that, under EMC's guidelines, the

originators calculated a borrower's DTI ratio to ensure that the borrower could make his or her

monthly payments:

> In determining whether a prospective borrower has sufficient
> monthly income available (i) to meet the borrower's monthly
> obligation on their proposed mortgage loan and (ii) to meet the

> monthly housing expenses and other financial obligations on the
> proposed mortgage loan, each lender generally considers, when
> required by the applicable documentation program, the ratio of
> such amounts to the proposed borrower's acceptable stable
> monthly gross income.

(*Id.*)

190.   The Prospectus Supplement also represented that the originators applied

conservative underwriting guidelines even to loans originated under their "stated income/verified

asset" documentation programs:

> Under a stated income/verified asset documentation program, more
> emphasis is placed on the value and adequacy of the mortgaged
> property as collateral, credit history and other assets of the
> borrower than on a verified income of the borrower.  Although the
> income is not verified, the originators obtain a telephonic
> verification of the borrower's employment without reference to
> income.  Borrower's assets are verified.

(*Id.*)

191.   Additionally, the Prospectus Supplement represented that EMC's guidelines

allowed exceptions to its underwriting standards only when there were sufficient compensating

factors:

> Exceptions to the underwriting standards are permitted where
> compensating factors are present and are managed through a
> formal exception process.

(*Id.* at 22.)

192.   With respect to loans originated by BSRM, the Prospectus Supplement

represented that BSRM's underwriting standards were consistently applied to confirm a

borrower's ability to repay and to produce performing loans:

> The BSRM Alt–A Underwriting Guidelines are intended to ensure
> that (i) the loan terms relate to the borrower's willingness and
> ability to repay and (ii) the value and marketability of the property
> are acceptable.  Both the Bear Stearns Option ARM loans
> originated by BSRM and the 5 Yr. Bear Stearns Secure Option

-63-

> ARM loans are originated pursuant to the BSRM Alt-A
> Underwriting Guidelines.

(*Id.* at 23.)

193.    The Prospectus Supplement further provided that BSRM generally verified a

borrower's income and calculated a DTI ratio to ensure that the borrower could make his or her

monthly payments:

> During the underwriting process, BSRM calculates and verifies the
> loan applicant's sources of income (except documentation types,
> which do not require such information to be stated or
> independently verified), reviews the credit history of the applicant,
> calculates the debt-to-income ratio to determine the applicant's
> ability to repay the loan, and reviews the mortgaged property for
> compliance with the BSRM Underwriting Guidelines.

(*Id.*)

194.    The Prospectus Supplement also represented that BSRM applied conservative

underwriting guidelines even to loans originated under its "limited" documentation program:

> The Limited Documentation type is based on the recent twelve
> (12) months of consecutive bank statements.  Self-employed
> borrowers must be self-employed in the same business or have
> received 1099 income in the same job for the past two years.
> Assets must be documented and independently verified by means
> of a written verification of deposit (VOD) with two (2) months'
> average balance; most recent bank statements, stocks or securities
> statements covering a two-(2) month period.  The borrower must
> demonstrate that they have sufficient reserves (sourced and
> seasoned) of greater than or equal to three months principal,
> interest, taxes and insurance.  A verbal verification of employment
> is also completed within 10 days of funding the loan.

(*Id.* at 24.)

195.    Finally, the Prospectus Supplement also represented that BSRM allowed

exceptions to its underwriting guidelines only on a case-by-case basis when there were sufficient

compensating factors:

> Exceptions to the BSRM Underwriting Guidelines are considered
> with reasonable compensating factors on a case-by-case basis and
> at the sole discretion of senior management. When exception
> loans are reviewed, all loan elements are examined as a whole to
> determine the level of risk associated with approving the loan
> including appraisal, credit report, employment, compensating
> factors and borrower's willingness and ability to repay the loan.
> Compensating factors may include, but are not limited to, validated
> or sourced/seasoned liquid reserves in excess of the program
> requirements, borrower's demonstrated ability to accumulate
> savings or devote a greater portion of income to housing expense
> and borrowers' potential for increased earnings based on
> education, job training, etc. Loan characteristics such as refinance
> transactions where borrowers are reducing mortgage payments and
> lowering debt ratios may become compensating factors as well.

(*Id.* at 23-24.)

### (j)   BSMF 2006-AR3

196.   For the BSMF 2006-AR3 offering, the loans were originated by EMC, third

parties based on EMC's underwriting guidelines (collectively, "EMC loans"), and BSRM.

197.   The Prospectus Supplement for the BSMF 2006-AR3 offering made specific

representations about EMC's and BSRM's underwriting standards.

198.   With respect to the EMC loans, the Prospectus Supplement represented that

EMC's underwriting standards were consistently applied to confirm a borrower's ability to repay

and to produce performing loans:

> Such underwriting standards are applied to evaluate the
> prospective borrower's credit standing and repayment ability and
> the value and adequacy of the mortgaged property as collateral.
> These standards are applied in accordance with the applicable
> federal and state laws and regulations.

(BSMF 2006-AR3 Prospectus Supplement dated October 30, 2006, at 26.)

199.   The Prospectus Supplement further provided that, under EMC's guidelines, the

originators calculated a borrower's DTI ratio to ensure that the borrower could make his or her

monthly payments:

> In determining whether a prospective borrower has sufficient
> monthly income available (i) to meet the borrower's monthly
> obligation on their proposed mortgage loan and (ii) to meet the
> monthly housing expenses and other financial obligations on the
> proposed mortgage loan, each lender generally considers, when
> required by the applicable documentation program, the ratio of
> such amounts to the proposed borrower's acceptable stable
> monthly gross income.

(*Id.*)

200.    The Prospectus Supplement also represented that the originators applied

conservative underwriting guidelines even to loans originated under their "stated income/verified

asset" documentation programs:

> Under a stated income/verified asset documentation program, more
> emphasis is placed on the value and adequacy of the mortgaged
> property as collateral, credit history and other assets of the
> borrower than on a verified income of the borrower.  Although the
> income is not verified, the originators obtain a telephonic
> verification of the borrower's employment without reference to
> income.  Borrower's assets are verified.

(*Id.* at 27.)

201.    Additionally, the Prospectus Supplement represented that EMC's guidelines

allowed exceptions to its underwriting standards only when there were sufficient compensating

factors:

> Exceptions to the underwriting standards are permitted where
> compensating factors are present and are managed through a
> formal exception process.

(*Id.* at 26.)

202.    With respect to loans originated by BSRM, the Prospectus Supplement

represented that BSRM's underwriting standards were consistently applied to confirm a

borrower's ability to repay and to produce performing loans:

> The BSRM Alt–A Underwriting Guidelines are intended to ensure
> that (i) the loan terms relate to the borrower's willingness and

> ability to repay and (ii) the value and marketability of the property
> are acceptable.  Both the Bear Stearns Option ARM loans
> originated by BSRM and the 5 Yr. Bear Stearns Secure Option
> ARM loans are originated pursuant to the BSRM Alt-A
> Underwriting Guidelines.

(*Id.*)

203.    The Prospectus Supplement further provided that BSRM generally verified a

borrower's income and calculated a DTI ratio to ensure that the borrower could make his or her

monthly payments:

> During the underwriting process, BSRM calculates and verifies the
> loan applicant's sources of income (except documentation types,
> which do not require such information to be stated or
> independently verified), reviews the credit history of the applicant,
> calculates the debt-to-income ratio to determine the applicant's
> ability to repay the loan, and reviews the mortgaged property for
> compliance with the BSRM Underwriting Guidelines.

(*Id.*)

204.    The Prospectus Supplement also represented that BSRM applied conservative

underwriting guidelines even to loans originated under its "limited" documentation program:

> The Limited Documentation type is based on the recent twelve
> (12) months of consecutive bank statements.  Self-employed
> borrowers must be self-employed in the same business or have
> received 1099 income in the same job for the past two years.
> Assets must be documented and independently verified by means
> of a written verification of deposit (VOD) with two (2) months'
> average balance; most recent bank statements, stocks or securities
> statements covering a two-(2) month period.  The borrower must
> demonstrate that they have sufficient reserves (sourced and
> seasoned) of greater than or equal to three months principal,
> interest, taxes and insurance.  A verbal verification of employment
> is also completed within 10 days of funding the loan.

(*Id.* at 28.)

205.    Finally, the Prospectus Supplement represented that BSRM allowed exceptions to its underwriting guidelines only on a case-by-case basis when there were sufficient compensating factors:

> Exceptions to the BSRM Underwriting Guidelines are considered with reasonable compensating factors on a case-by-case basis and at the sole discretion of senior management.  When exception loans are reviewed, all loan elements are examined as a whole to determine the level of risk associated with approving the loan including appraisal, credit report, employment, compensating factors and borrower's willingness and ability to repay the loan. Compensating factors may include, but are not limited to, validated or sourced/seasoned liquid reserves in excess of the program requirements, borrower's demonstrated ability to accumulate savings or devote a greater portion of income to housing expense and borrowers' potential for increased earnings based on education, job training, etc.  Loan characteristics such as refinance transactions where borrowers are reducing mortgage payments and lowering debt ratios may become compensating factors as well.

(*Id.*)

### (k)    **BSARM 2007-2**

206.    For the BSARM 2007-2 offering, 60.18% of the mortgage loans backing the securities (based on total principal balance) were originated by Countrywide; 26.48% of the mortgage loans were originated by Wells Fargo; and the remaining mortgage loans were originated by various other originators, each of which originated less than 10% of the loans.

207.    The Prospectus Supplement for the BSARM 2007-2 offering made specific representations about Countrywide's and Wells Fargo's underwriting standards.

208.    With respect to loans originated by Countrywide, the Prospectus Supplement represented that Countrywide's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the

-68-

prospective borrower's credit standing and repayment ability and
the value and adequacy of the mortgaged property as collateral.

(BSARM 2007-2 Prospectus Supplement dated June 28, 2007, at 37-38.)

209.    The Prospectus Supplement further provided that Countrywide calculated a

borrower's DTI ratio to ensure that the borrower could make his or her monthly payments:

[A] prospective borrower must generally demonstrate that the ratio
of the borrower's monthly housing expenses (including principal
and interest on the proposed mortgage loan and, as applicable, the
related monthly portion of property taxes, hazard insurance and
mortgage insurance) to the borrower's monthly gross income and
the ratio of total monthly debt to the monthly gross income (the
"debt-to-income" ratios) are within acceptable limits.

(*Id.*)

210.    To confirm a borrower's ability to repay, the Prospectus Supplement also stated

that Countrywide collected information about the borrower's income:

As part of its evaluation of potential borrowers, Countrywide
Home Loans generally requires a description of income.  If
required by its underwriting guidelines, Countrywide Home Loans
obtains employment verification providing current and historical
income information and/or a telephonic employment confirmation.
Such employment verification may be obtained, either through
analysis of the prospective borrower's recent pay stub and/or W-2
forms for the most recent two years, relevant portions of the most
recent two years' tax returns, or from the prospective borrower's
employer, wherein the employer reports the length of employment
and current salary with that organization.  Self-employed
prospective borrowers generally are required to submit relevant
portions of their federal tax returns for the past two years.

(*Id.* at 37.)

211.    Additionally, the Prospectus Supplement represented that Countrywide allowed

exceptions to its underwriting standards only when there were sufficient compensating factors:

Exceptions to Countrywide Home Loans' underwriting guidelines
may be made if compensating factors are demonstrated by a
prospective borrower.

-69-

(*Id.* at 38.)

212.   With respect to loans originated by Wells Fargo, the Prospectus Supplement represented that Wells Fargo's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral . . . The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (*i.e.*, the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history.

(*Id.* at 43.)

213.   The Prospectus Supplement further stated that Wells Fargo closely examined a borrower's financial history to determine his or her ability to repay:

> A prospective borrower applying for a mortgage loan is required to complete a detailed application. The loan application elicits pertinent information about the applicant, with particular emphasis on the applicant's financial health (assets, liabilities, income and expenses), the property being financed and the type of loan desired. A self-employed applicant may be required to submit his or her most recent signed federal income tax returns. With respect to every applicant, credit reports are obtained from commercial reporting services, summarizing the applicant's credit history with merchants and lenders. Generally, significant unfavorable credit information reported by the applicant or a credit reporting agency must be explained by the applicant.

(*Id.*)

214.   Finally, the Prospectus Supplement represented that Wells Fargo calculated a borrower's DTI ratio to ensure that the borrower could make his or her monthly payments:

> In general, borrowers applying for loans must demonstrate that the ratio of their total monthly debt to their monthly gross income does

> not exceed a certain maximum level. Such maximum level varies depending on a number of factors including Loan-to-Value Ratio, a borrower's credit history, a borrower's liquid net worth, the potential of a borrower for continued employment advancement or income growth, the ability of the borrower to accumulate assets or to devote a greater portion of income to basic needs such as housing expense, a borrower's Mortgage Score and the type of loan for which the borrower is applying.

(*Id.* at 44.)

### (l)   **BSABS 2007-1**

215.   For the BSABS 2007-1 offering, EMC purchased 65.72% of the mortgage loans backing the securities (based on total principal balance) from Wells Fargo; 10.74% of the mortgage loans from IndyMac Bank, F.S.B. ("IndyMac"); and the remaining mortgage loans from various originators, each of which originated less than 10% of the loans.

216.   The Prospectus Supplement for the BSABS 2007-1 offering made specific representations about Wells Fargo's and the various other originators' underwriting standards.

217.   The Prospectus Supplement represented that Wells Fargo's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (*i.e.*, the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history . . . Wells Fargo Bank supplements the mortgage loan underwriting process with either its own proprietary scoring system or scoring systems developed by third parties such as Freddie Mac's Loan Prospector, Fannie Mae's Desktop Underwriter or scoring systems developed by private mortgage insurance companies. These scoring systems assist Wells Fargo

-71-

> Bank in the mortgage loan approval process by providing
> consistent, objective measures of borrower credit and certain loan
> attributes.

(BSABS 2007-1 Prospectus Supplement dated February 14, 2007, at S-39.)

218.   The Prospectus Supplement further stated that Wells Fargo closely examined a

borrower's financial history to determine his or her ability to repay:

> A prospective borrower applying for a mortgage loan is required to
> complete a detailed application.  The loan application elicits
> pertinent information about the applicant, with particular emphasis
> on the applicant's financial health (assets, liabilities, income and
> expenses), the property being financed and the type of loan
> desired.  A self-employed applicant may be required to submit his
> or her most recent signed federal income tax returns.  With respect
> to every applicant, credit reports are obtained from commercial
> reporting services, summarizing the applicant's credit history with
> merchants and lenders.  Generally, significant unfavorable credit
> information reported by the applicant or a credit reporting agency
> must be explained by the applicant.

(*Id.* at S-40.)

219.   The Prospectus Supplement also represented that Wells Fargo calculated a

borrower's DTI ratio to ensure that the borrower could make his or her monthly payments:

> In general, borrowers applying for loans must demonstrate that the
> ratio of their total monthly debt to their monthly gross income does
> not exceed a certain maximum level.  Such maximum level varies
> depending on a number of factors including Loan-to-Value Ratio, a
> borrower's credit history, a borrower's liquid net worth, the
> potential of a borrower for continued employment advancement or
> income growth, the ability of the borrower to accumulate assets or
> to devote a greater portion of income to basic needs such as
> housing expense, a borrower's Mortgage Score and the type of
> loan for which the borrower is applying.

(*Id.* at S-41.)

220.   Additionally, the Prospectus Supplement represented that the various other

originators adhered to conservative underwriting standards to ensure loan performance:

-72-

> The underwriting guidelines are primarily intended to assess a
> borrower's ability to repay the related mortgage loan, to assess the
> value of the related mortgaged property and to evaluate the
> adequacy of a mortgaged property as collateral for the related
> mortgage loan. While an originator's primary consideration in
> underwriting a mortgage loan is the value of the related mortgaged
> property, the originator also considers, among other things, a
> mortgagor's credit history, repayment ability and debt service to
> income ratio as well as the type and use of the related mortgaged
> property.

(*Id.* at S-51.)

### (m)   **BSABS 2007-AC2**

221.    For the BSABS 2007-AC2 offering, EMC purchased (a) 66.43% of the mortgage

loans backing the securities (based on total principal balance) from various originators that

purportedly applied EMC's underwriting guidelines ("EMC loans"); (b) 11.89% of the mortgage

loans from Quicken Loans Inc.; and (c) the remaining mortgage loans from various originators,

each of which originated less than 10% of the loans.

222.    The Prospectus Supplement for the BSABS 2007-AC2 offering made specific

representations about EMC's underwriting standards.

223.    With respect to the EMC loans, the Prospectus Supplement represented that

EMC's underwriting guidelines were consistently applied to confirm a borrower's ability to

repay and the adequacy of the collateral:

> Such underwriting standards are applied to evaluate the
> prospective borrower's credit standing and repayment ability and
> the value and adequacy of the mortgaged property as collateral.
> These standards are applied in accordance with the applicable
> federal and state laws and regulations.

(BSABS 2007-AC2 Prospectus Supplement dated February 23, 2007, at 28.)

224.    The Prospectus Supplement further stated that EMC's underwriting guidelines

generally required an analysis of a borrower's DTI ratio to evaluate his or her ability to repay:

> In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligation on the proposed mortgage loan, each lender generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income.

(*Id.* at 28-29.)

225.    The Prospectus Supplement also represented that the originators applied conservative underwriting guidelines even to loans originated under their "stated income/verified asset" documentation programs:

> Under a stated income/verified asset documentation program, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower.  Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income.  Borrower's assets are verified.

(*Id.* at 29.)

226.    Finally, the Prospectus Supplement represented that EMC's guidelines allowed exceptions to its underwriting standards only when there were sufficient compensating factors:

> Exceptions to the underwriting standards are permitted where compensating factors are present and are managed through a formal exception process.

(*Id.* at 28.)

### (n)    BSABS 2007-HE3

227.    For the BSABS 2007-HE3 offering, EMC purchased 46.69% of the mortgage loans backing the securities (based on total principal balance) from Performance Credit Corporation ("PCC"); 21.18% of the mortgage loans from Fieldstone Mortgage Company

("FMC"); and the remaining mortgage loans from various originators, each of which originated less than 10% of the loans.

228.    The Prospectus Supplement for the BSABS 2007-HE3 offering made specific representations about PCC's and FMC's underwriting standards.

229.    With respect to loans originated by PCC, the Prospectus Supplement represented that PCC's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> PCC's internal underwriting guidelines were designed to help it evaluate a borrower's credit history, capacity, willingness and ability to repay the loan, and the value and adequacy of the collateral . . . PCC's guidelines were primarily intended to (1) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (2) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults.

(BSABS 2007-HE3 Prospectus Supplement dated March 29, 2007, at 31.)

230.    The Prospectus Supplement further stated that PCC employed quality control practices that improved the quality of its loans:

> PCC's quality control program was intended to monitor loan production with the overall goal of improving the quality of loan production generated by its retail loan operation and independent mortgage broker channel. Through systematically monitoring loan production, the quality control department could identify and communicate to management existing or potential underwriting and loan packaging problems or other areas of concern. The quality control file review ensured compliance with PCC's underwriting guidelines and federal and state regulations. This was accomplished by focusing on:
>
> • the accuracy of all credit and legal information;
>
> • a collateral analysis, which may include a desk or field re-appraisal of the property and review of the original appraisal;
>
> • employment and/or income verification; and

-75-

> • legal document review to ensure that the necessary documents
> are in place.

(*Id.* at 32.)

231.     The Prospectus Supplement also represented that PCC allowed underwriting

exceptions only through specially designated managers:

> In the event that an underwriting exception was required for
> approval, only specifically designated personnel, dictated by the
> exception needed, are authorized to make such exceptions.  PCC
> regularly trained its operation managers, who supervised their
> underwriters, on emerging trends in production.  PCC believes that
> these managers and underwriters were highly qualified and
> experienced and were familiar with PCC's underwriting
> guidelines.

(*Id.* at 31.)

232.     With respect to loans originated by FMC, the Prospectus Supplement represented

that FMC adhered to conservative underwriting standards to ensure a borrower's ability and

willingness to repay and the adequacy of the collateral:

> [FMC's] underwriting guidelines are designed to help [FMC]
> evaluate a borrower's credit history, capacity, willingness and
> ability to repay the loan and the value and adequacy of the
> collateral . . . A primary function of the underwriting process is to
> identify the level of credit risk associated with each applicant for a
> mortgage loan.  FMC assigns credit grades by analyzing mortgage
> payment history, consumer credit history, credit score, bankruptcy
> history and debt-to-income ratio.

(*Id.* at 35.)

233.     Finally, the Prospectus Supplement represented that FMC allowed exceptions to

its underwriting guidelines based only on formal policies designed to ensure loan performance:

> If an individual loan application does not meet the formal written
> underwriting guidelines, but the underwriter is confident both that
> the borrower has the ability and willingness to pay and that the
> property provides adequate collateral for the borrower's
> obligations, FMC's loan origination teams and underwriters can
> make underwriting exceptions with a manager's written approval.

> These exceptions must be within FMC's formal exception policies
> and approval authorities.

(*Id.*)

### (o)   BSMF 2007-AR1

234.    For the BSMF 2007-AR1 offering, the loans were originated by EMC, third

parties purportedly based on EMC's underwriting guidelines (collectively, "EMC loans"), and

BSRM.

235.    The Prospectus Supplement for the BSMF 2007-AR1 offering made specific

representations about EMC's and BSRM's underwriting standards.

236.    With respect to the EMC loans, the Prospectus Supplement represented that

EMC's underwriting standards were consistently applied to confirm a borrower's ability to repay

and to produce performing loans:

> Such underwriting standards are applied to evaluate the
> prospective borrower's credit standing and repayment ability and
> the value and adequacy of the mortgaged property as collateral.
> These standards are applied in accordance with the applicable
> federal and state laws and regulations.

(BSMF 2007-AR1 Prospectus Supplement dated January 29, 2007, at 25.)

237.    The Prospectus Supplement further provided that, under EMC's guidelines, the

originators calculated a borrower's DTI ratio to ensure that the borrower could make his or her

monthly payments:

> In determining whether a prospective borrower has sufficient
> monthly income available (i) to meet the borrower's monthly
> obligation on their proposed mortgage loan and (ii) to meet the
> monthly housing expenses and other financial obligations on the
> proposed mortgage loan, each lender generally considers, when
> required by the applicable documentation program, the ratio of
> such amounts to the proposed borrower's acceptable stable
> monthly gross income.

(*Id.*)

238.   The Prospectus Supplement also represented that the originators applied

conservative underwriting guidelines even to loans originated under their "stated income/verified

asset" documentation programs:

> Under a stated income/verified asset documentation program, more
> emphasis is placed on the value and adequacy of the mortgaged
> property as collateral, credit history and other assets of the
> borrower than on a verified income of the borrower.  Although the
> income is not verified, the originators obtain a telephonic
> verification of the borrower's employment without reference to
> income.  Borrower's assets are verified.

(*Id.*)

239.   Additionally, the Prospectus Supplement represented that EMC's guidelines

allowed exceptions to its underwriting standards only when there were sufficient compensating

factors:

> Exceptions to the underwriting standards are permitted where
> compensating factors are present and are managed through a
> formal exception process.

(*Id.* at 25.)

240.   With respect to loans originated by BSRM, the Prospectus Supplement

represented that BSRM's underwriting standards were consistently applied to confirm a

borrower's ability to repay and to produce performing loans:

> The BSRM Alt–A Underwriting Guidelines are intended to ensure
> that (i) the loan terms relate to the borrower's willingness and
> ability to repay and (ii) the value and marketability of the property
> are acceptable.  Both the Bear Stearns Option ARM loans
> originated by BSRM and the 5 Yr. Bear Stearns Secure Option
> ARM loans are originated pursuant to the BSRM Alt-A
> Underwriting Guidelines.

(*Id.*)

241.    The Prospectus Supplement further provided that BSRM generally verified a

borrower's income and calculated a DTI ratio to ensure that the borrower could make his or her

monthly payments:

> During the underwriting process, BSRM calculates and verifies the
> loan applicant's sources of income (except documentation types,
> which do not require such information to be stated or
> independently verified), reviews the credit history of the applicant,
> calculates the debt-to-income ratio to determine the applicant's
> ability to repay the loan, and reviews the mortgaged property for
> compliance with the BSRM Underwriting Guidelines.

(*Id.*)

242.    The Prospectus Supplement also represented that BSRM applied conservative

underwriting guidelines even to loans originated under its "limited" documentation program:

> The Limited Documentation type is based on the recent twelve
> (12) months of consecutive bank statements.  Self-employed
> borrowers must be self-employed in the same business or have
> received 1099 income in the same job for the past two years.
> Assets must be documented and independently verified by means
> of a written verification of deposit (VOD) with two (2) months'
> average balance; most recent bank statements, stocks or securities
> statements covering a two-(2) month period.  The borrower must
> demonstrate that they have sufficient reserves (sourced and
> seasoned) of greater than or equal to three months principal,
> interest, taxes and insurance.  A verbal verification of employment
> is also completed within 10 days of funding the loan.

(*Id.* at 27.)

243.    Finally, the Prospectus Supplement represented that BSRM allowed exceptions to

its underwriting guidelines only on a case-by-case basis when there were sufficient compensating

factors:

> Exceptions to the BSRM Underwriting Guidelines are considered
> with reasonable compensating factors on a case-by-case basis and
> at the sole discretion of senior management.  When exception
> loans are reviewed, all loan elements are examined as a whole to
> determine the level of risk associated with approving the loan
> including appraisal, credit report, employment, compensating

-79-

factors and borrower's willingness and ability to repay the loan. Compensating factors may include, but are not limited to, validated or sourced/seasoned liquid reserves in excess of the program requirements, borrower's demonstrated ability to accumulate savings or devote a greater portion of income to housing expense and borrowers' potential for increased earnings based on education, job training, etc. Loan characteristics such as refinance transactions where borrowers are reducing mortgage payments and lowering debt ratios may become compensating factors as well.

(*Id.*)

### (p)   **SAMI 2005-AR8**

244.    For the SAMI 2005-AR8 offering, all of the mortgage loans backing the securities were originated by Countrywide.

245.    The Prospectus Supplement for the SAMI 2005-AR8 offering made specific representations about Countrywide's underwriting standards.

246.    The Prospectus Supplement represented that Countrywide's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

(SAMI 2005-AR8 Prospectus Supplement dated December 29, 2005, at S-34.)

247.    The Prospectus Supplement further provided that Countrywide calculated a borrower's DTI ratio to ensure that the borrower could make his or her monthly payments:

> [A] prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

(*Id.*)

248.    To confirm a borrower's ability to repay, the Prospectus Supplement also stated

that Countrywide collected information about the borrower's income:

> As part of its evaluation of potential borrowers, Countrywide
> Home Loans generally requires a description of income.  If
> required by its underwriting guidelines, Countrywide Home Loans
> obtains employment verification providing current and historical
> income information and/or a telephonic employment confirmation.
> Such employment verification may be obtained, either through
> analysis of the prospective borrower's recent pay stub and/or W-2
> forms for the most recent two years, relevant portions of the most
> recent two years' tax returns, or from the prospective borrower's
> employer, wherein the employer reports the length of employment
> and current salary with that organization.  Self-employed
> prospective borrowers generally are required to submit relevant
> portions of their federal tax returns for the past two years.

(*Id.* at S-33.)

249.    Finally, the Prospectus Supplement represented that Countrywide allowed

exceptions to its underwriting standards only when there were sufficient compensating factors:

> Exceptions to Countrywide Home Loans' underwriting guidelines
> may be made if compensating factors are demonstrated by a
> prospective borrower.

(*Id.* at S-34.)

### (q)    SAMI 2006-AR3

250.    For the SAMI 2006-AR3 offering, EMC purchased 86.12% of the mortgage loans

backing the securities (based on total principal balance) from Countrywide; 10.32% of the

mortgage loans from Bank of America, N.A. ("Bank of America"); and the remaining mortgage

loans from various originators, each of which originated less than 10% of the loans.

251.    The Prospectus Supplement for the SAMI 2006-AR3 offering made specific

representations about Countrywide's and Bank of America's underwriting standards.

252.    With respect to loans originated by Countrywide, the Prospectus Supplement represented that Countrywide's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

(SAMI 2006-AR3 Prospectus Supplement dated April 27, 2006, at S-69.)

253.    The Prospectus Supplement further provided that Countrywide calculated a borrower's DTI ratio to ensure that the borrower could make his or her monthly payments:

> [A] prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

(*Id.*)

254.    To confirm a borrower's ability to repay, the Prospectus Supplement also stated that Countrywide collected information about the borrower's income:

> As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

(*Id.* at S-68.)

-82-

255.   Additionally, the Prospectus Supplement represented that Countrywide allowed exceptions to its underwriting guidelines only when there were sufficient compensating factors:

> Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

(*Id.* at S-69.)

256.   Finally, with respect to loans originated by Bank of America, the Prospectus Supplement represented that Bank of America's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> These underwriting standards applied by Bank of America in originating or acquiring mortgage loans are intended to evaluate the applicants' repayment ability, credit standing, and the adequacy of the mortgage property as collateral for the mortgage loan.

(*Id.* at S-77.)

### (r)   **SAMI 2006-AR5**

257.   For the SAMI 2006-AR5 offering, EMC purchased all of the mortgage loans backing the securities from American Home Mortgage Investment Corporation ("AHMIC").

258.   The Prospectus Supplement for the SAMI 2006-AR5 offering made specific representations about AHMIC's underwriting standards.

259.   The Prospectus Supplement represented that AHMIC's underwriting guidelines generally followed or were similar to Fannie Mae and Freddie Mac underwriting guidelines:

> The mortgage loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines established by American Home. Conforming conventional loans must generally be approved by the Desktop Underwriter and Loan Prospector automated underwriting systems

-83-

of Fannie Mae and Freddie Mac . . . American Home's non-conforming underwriting guidelines are similar to those of the government sponsored enterprises Fannie Mae and Freddie Mac, but these loans are "non-conforming" in that they may not conform to the maximum loan amounts and in some cases to the underwriting guidelines of Fannie Mae and Freddie Mac.

(SAMI 2006-AR5 Prospectus Supplement dated May 30, 2006, at S-47.)

260.   The Prospectus Supplement further represented that AHMIC adhered to

conservative underwriting standards to ensure a borrower's ability and willingness to repay and

the adequacy of the collateral:

American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations. Exceptions to the underwriting standards may be permitted where compensating factors are present . . . American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

(*Id.* at S-47-48.)

261.   The Prospectus Supplement provided that AHMIC calculated a borrower's DTI

ratio to ensure that the borrower could make his or her monthly payments:

In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

(*Id.* at S-49.)

-84-

262.   The Prospectus Supplement also stated that AHMIC required extensive documentation even for its non-conforming loans:

> Non-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac, in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the information on the application such as income, assets, other liabilities, etc. Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require.

(*Id.* at S-48.)

### (s)   SAMI 2006-AR6

263.   For the SAMI 2006-AR6 offering, EMC purchased all of the mortgage loans backing the securities from Countrywide.

264.   The Prospectus Supplement for the SAMI 2006-AR6 offering made specific representations about Countrywide's underwriting standards.

265.   The Prospectus Supplement represented that Countrywide's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

(SAMI 2006-AR6 Prospectus Supplement dated August 3, 2006, at S-43.)

266.   The Prospectus Supplement further provided that Countrywide calculated a borrower's DTI ratio to ensure that the borrower could make his or her monthly payments:

> [A] prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and

-85-

the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

(*Id.*)

267.    To confirm a borrower's ability to repay, the Prospectus Supplement also stated that Countrywide collected information about the borrower's income:

> As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

(*Id.* at S-42.)

268.    Finally, the Prospectus Supplement represented that Countrywide allowed exceptions to its underwriting standards only when there were sufficient compensating factors:

> Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

(*Id.* at S-43.)

### (t)    **SAMI 2006-AR7**

269.    For the SAMI 2006-AR7 offering, EMC purchased all of the mortgage loans backing the securities from Countrywide.

270.    The Prospectus Supplement for the SAMI 2006-AR7 offering made specific representations about Countrywide's underwriting standards.

-86-

271.     The Prospectus Supplement represented that Countrywide's underwriting

standards were consistently applied to confirm a borrower's ability to repay and to produce

performing loans:

> Countrywide Home Loans' underwriting standards are applied by
> or on behalf of Countrywide Home Loans to evaluate the
> prospective borrower's credit standing and repayment ability and
> the value and adequacy of the mortgaged property as collateral.

(SAMI 2006-AR7 Prospectus Supplement dated August 31, 2006, at S-45.)

272.     The Prospectus Supplement further provided that Countrywide calculated a

borrower's DTI ratio to ensure that the borrower could make his or her monthly payments:

> [A] prospective borrower must generally demonstrate that the ratio
> of the borrower's monthly housing expenses (including principal
> and interest on the proposed mortgage loan and, as applicable, the
> related monthly portion of property taxes, hazard insurance and
> mortgage insurance) to the borrower's monthly gross income and
> the ratio of total monthly debt to the monthly gross income (the
> "debt-to-income" ratios) are within acceptable limits.

(*Id.*)

273.     To confirm a borrower's ability to repay, the Prospectus Supplement also stated

that Countrywide collected information about the borrower's income:

> As part of its evaluation of potential borrowers, Countrywide
> Home Loans generally requires a description of income.  If
> required by its underwriting guidelines, Countrywide Home Loans
> obtains employment verification providing current and historical
> income information and/or a telephonic employment confirmation.
> Such employment verification may be obtained, either through
> analysis of the prospective borrower's recent pay stub and/or W-2
> forms for the most recent two years, relevant portions of the most
> recent two years' tax returns, or from the prospective borrower's
> employer, wherein the employer reports the length of employment
> and current salary with that organization.  Self-employed
> prospective borrowers generally are required to submit relevant
> portions of their federal tax returns for the past two years.

(*Id.* at S-44.)

274.   Finally, the Prospectus Supplement represented that Countrywide allowed

exceptions to its underwriting standards only when there were sufficient compensating factors:

> Exceptions to Countrywide Home Loans' underwriting guidelines
> may be made if compensating factors are demonstrated by a
> prospective borrower.

(*Id.* at S-45.)

### (u)   SAMI 2006-AR8

275.   For the SAMI 2006-AR8 offering, EMC purchased 51.87% of the mortgage loans

backing the securities (based on total principal balance) from Countrywide; 23.55% of the

mortgage loans from SouthStar Funding, LLC ("SouthStar"); and the remaining mortgage loans

from various originators, each of which originated less than 10% of the loans.

276.   The Prospectus Supplement for the SAMI 2006-AR8 offering made specific

representations about Countrywide's and SouthStar's underwriting standards.

277.   With respect to loans originated by Countrywide, the Prospectus Supplement

represented that Countrywide's underwriting standards were consistently applied to confirm a

borrower's ability to repay and to produce performing loans:

> Countrywide Home Loans' underwriting standards are applied by
> or on behalf of Countrywide Home Loans to evaluate the
> prospective borrower's credit standing and repayment ability and
> the value and adequacy of the mortgaged property as collateral.

(SAMI 2006-AR8 Prospectus Supplement dated October 27, 2006, at S-49.)

278.   The Prospectus Supplement further provided that Countrywide calculated a

borrower's DTI ratios to ensure that the borrower could make his or her monthly payments:

> [A] prospective borrower must generally demonstrate that the ratio
> of the borrower's monthly housing expenses (including principal
> and interest on the proposed mortgage loan and, as applicable, the
> related monthly portion of property taxes, hazard insurance and
> mortgage insurance) to the borrower's monthly gross income and

the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

(*Id.*)

279.   To confirm a borrower's ability to repay, the Prospectus Supplement also stated that Countrywide collected information about the borrower's income:

> As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income.  If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization.  Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

(*Id.* at S-48.)

280.   What is more, the Prospectus Supplement represented that Countrywide allowed exceptions to its underwriting standards only when there were sufficient compensating factors:

> Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

(*Id.* at S-49.)

281.   With respect to loans originated by SouthStar, the Prospectus Supplement represented that SouthStar's underwriting standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> SouthStar's Underwriting Guidelines are applied to evaluate an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan made by SouthStar.

(*Id.* at S-54.)

-89-

282.  The Prospectus Supplement further provided that SouthStar verified a borrower's income to ensure that the borrower could make his or her monthly payments:

> SouthStar also evaluates the applicant's income to determine its stability, probability of continuation, and adequacy to service the proposed SouthStar debt payment. SouthStar's guidelines for verifying an applicant's income and employment are generally as follows. For salaried applicants, SouthStar typically requires a written verification of employment from the applicant's employer, or a copy of the applicant's two most recent IRS form 1040 or W-2, a current pay stub with year-to-date earnings, and a verbal verification of employment. For non-salaried applicants, including self-employed applicants, SouthStar requires copies of the applicant's two most recent federal tax returns, along with all supporting schedules. A self-employed applicant is generally required to submit a signed year-to-date profit and loss statement.

(*Id.*)

283.  To further confirm a borrower's financial health, the Prospectus Supplement also stated that SouthStar verified information about the borrower's liquid assets:

> SouthStar verifies the applicant's liquid assets to ensure that the client has adequate liquid assets to apply toward any required down payment, closing costs, prepaid interest and at least two months' worth of cash reserves.

(*Id.*)

284.  Additionally, the Prospectus Supplement represented that SouthStar investigated a borrower's significant outstanding debt:

> In evaluating the applicant's ability and willingness to repay the proposed loan, SouthStar reviews the applicant's credit history and outstanding debts, as reported on the credit report. If an existing mortgage or other significant debt listed on the loan application is not adequately reported on the credit report, SouthStar may request a written or oral verification of the balance and payment history of such debt from the servicer of such debt.

(*Id.*)

(v)    **SAMI 2007-AR1**

285.    For the SAMI 2007-AR1 offering, EMC purchased 43.54% of the mortgage loans

backing the securities (based on total principal balance) from SouthStar; 16.46% of the mortgage

loans from Countrywide; 13.53% of the mortgage loans from ACT Mortgage Capital ("ACT");

9.91% of the mortgage loans from Opteum Financial Services, LLC; and the remaining mortgage

loans from various originators, each of which originated less than 10% of the loans.

286.    The Prospectus Supplement for the SAMI 2007-AR1 offering made specific

representations about SouthStar's, Countrywide's, and ACT's underwriting standards.

287.    With respect to loans acquired from SouthStar, the Prospectus Supplement

represented that SouthStar's underwriting standards were consistently applied to confirm a

borrower's ability to repay and to produce performing loans:

> SouthStar's Underwriting Guidelines are applied to evaluate an
> applicant's credit standing, financial condition, and repayment
> ability, as well as the value and adequacy of the mortgaged
> property as collateral for any loan made by SouthStar.

(SAMI 2007-AR1 Prospectus Supplement dated January 29, 2007, at S-57.)

288.    The Prospectus Supplement further provided that SouthStar verified a borrower's

income to ensure that the borrower could make his or her monthly payments:

> SouthStar also evaluates the applicant's income to determine its
> stability, probability of continuation, and adequacy to service the
> proposed SouthStar debt payment. SouthStar's guidelines for
> verifying an applicant's income and employment are generally as
> follows. For salaried applicants, SouthStar typically requires a
> written verification of employment from the applicant's employer,
> or a copy of the applicant's two most recent IRS form 1040 or W-
> 2, a current pay stub with year-to-date earnings, and a verbal
> verification of employment. For non-salaried applicants, including
> self-employed applicants, SouthStar requires copies of the
> applicant's two most recent federal tax returns, along with all
> supporting schedules. A self-employed applicant is generally
> required to submit a signed year-to-date profit and loss statement.

(*Id.* at S-58.)

289.   To evaluate a borrower's financial health, the Prospectus Supplement also stated

that SouthStar verified information about the borrower's liquid assets:

> SouthStar verifies the applicant's liquid assets to ensure that the
> client has adequate liquid assets to apply toward any required
> down payment, closing costs, prepaid interest and at least two
> months' worth of cash reserves.

(*Id.* at 57.)

290.   Additionally, the Prospectus Supplement stated that SouthStar investigated a

borrower's significant outstanding debt:

> In evaluating the applicant's ability and willingness to repay the
> proposed loan, SouthStar reviews the applicant's credit history and
> outstanding debts, as reported on the credit report.  If an existing
> mortgage or other significant debt listed on the loan application is
> not adequately reported on the credit report, SouthStar may request
> a written or oral verification of the balance and payment history of
> such debt from the servicer of such debt.

(*Id.*)

291.   With respect to loans acquired from Countrywide, the Prospectus Supplement

represented that Countrywide's underwriting standards were consistently applied to confirm a

borrower's ability to repay and to produce performing loans:

> Countrywide Home Loans' underwriting standards are applied by
> or on behalf of Countrywide Home Loans to evaluate the
> prospective borrower's credit standing and repayment ability and
> the value and adequacy of the mortgaged property as collateral.

(*Id.* at S-52.)

292.   The Prospectus Supplement further provided that Countrywide calculated a

borrower's DTI ratio to ensure that the borrower could make his or her monthly payments:

> [A] prospective borrower must generally demonstrate that the ratio
> of the borrower's monthly housing expenses (including principal
> and interest on the proposed mortgage loan and, as applicable, the

related monthly portion of property taxes, hazard insurance and
mortgage insurance) to the borrower's monthly gross income and
the ratio of total monthly debt to the monthly gross income (the
"debt-to-income" ratios) are within acceptable limits.

(*Id.*)

293.    To confirm a borrower's ability to repay, the Prospectus Supplement also stated

that Countrywide collected information about the borrower's income:

As part of its evaluation of potential borrowers, Countrywide
Home Loans generally requires a description of income. If
required by its underwriting guidelines, Countrywide Home Loans
obtains employment verification providing current and historical
income information and/or a telephonic employment confirmation.
Such employment verification may be obtained, either through
analysis of the prospective borrower's recent pay stub and/or W-2
forms for the most recent two years, relevant portions of the most
recent two years' tax returns, or from the prospective borrower's
employer, wherein the employer reports the length of employment
and current salary with that organization. Self-employed
prospective borrowers generally are required to submit relevant
portions of their federal tax returns for the past two years.

(*Id.* at S-51.)

294.    Finally, the Prospectus Supplement also represented that Countrywide allowed

exceptions to its underwriting standards only when there were sufficient compensating factors:

Exceptions to Countrywide Home Loans' underwriting guidelines
may be made if compensating factors are demonstrated by a
prospective borrower.

(*Id.* at S-52.)

295.    With respect to loans acquired from ACT, the Prospectus Supplement represented

that ACT practiced conservative underwriting standards that were consistently applied to

confirm a borrower's ability to repay and to produce performing loans:

ACT Mortgage Capital follows the most prudent underwriting and
appraisal practices in the mortgage industry to ensure that ACT
Mortgage Capital's decisions regarding extensions of credit are

-93-

based on an Applicant's creditworthiness and capacity, as well as
the value of any collateral that is offered to secure the credit.

(*Id.* at S-59.)

296.   The Prospectus Supplement further provided that ACT verified a borrower's

income and DTI ratio to ensure that the borrower could make his or her monthly payments:

> ACT Mortgage Capital evaluates how the Loan will be repaid, and
> whether the amount of an Applicant's debt is reasonable given the
> Applicant's income (debt-to-income ratio) . . . The income must be
> sufficient to cover housing and living expenses, other fixed
> expenses such as credit card and car payments, and the projected
> monthly payment on the proposed Loan.  Qualifying debt-to-
> income ratios will vary based on the Loan product requested.
> Verification of income and employment are generally made
> through the use of copies of the Applicant's most recent two years
> of tax returns (IRS 1040) or W-2, a current pay stub with year-to-
> date earnings, and for some products, 12 months of personal bank
> statements (Self-Employed Applicants only).

(*Id.* at S-60.)

297.   To evaluate a borrower's financial health, the Prospectus Supplement also stated

that ACT evaluated information about the borrower's liquid assets:

> ACT Mortgage Capital will evaluate and may verify liquid assets
> to ensure there are sufficient funds to close the Loan.  Applicants
> may also be required to document other liquid assets in an amount
> equal to two to eight months of loan payments as reserves.
> Verification includes validating that the funds have been seasoned
> for at least 60 days.

(*Id.* at S-61.)

### (w)   **GMFT 2006-AR1**

298.   For the GMFT 2006-AR1 offering, all of the mortgage loans were originated by

GreenPoint.  The Prospectus Supplement for this offering represented that GreenPoint followed

specific underwriting guidelines to ensure the quality of the loans being originated, as described

below.

-94-

299. The Prospectus Supplement represented that GreenPoint's underwriting process would be applied to "evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral," and that "[a]ll of the mortgage loans have been originated generally in accordance with the following underwriting guidelines established by GreenPoint." (GMFT 2006-AR1 Prospectus Supplement dated February 27, 2006, at S-26, 28.)

300. The Prospectus Supplement further represented that:

> GreenPoint's Underwriting Guidelines require that the underwriters be satisfied that the value of the property being financed supports, and will continue to support, the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values.

(*Id.*)

301. To ensure the borrower's ability to repay the loan, the Prospectus Supplement represented that:

> [a]s part of its evaluation of potential borrowers, GreenPoint generally requires a description of the borrower's income. If required by its underwriting guidelines, GreenPoint obtains employment verification providing current and historical income information and/or a telephonic employment confirmation.

(*Id.* at S-26.)

302. As to other forms of income verification, the Prospectus Supplement represented that GreenPoint's alternative documentation programs were limited to borrowers who possessed certain risk reducing factors:

> Under limited documentation programs, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower, than on verified income of the borrower. Mortgage loans underwritten under this type of program are generally limited to borrowers with credit histories that demonstrate an established ability to repay

-95-

> indebtedness in a timely fashion . . . Permitted maximum loan-to-
> value ratios (including secondary financing) under limited
> documentation programs are generally more restrictive than
> mortgage loans originated with full documentation requirements.
> Under no documentation programs . . . [e]mphasis is placed on the
> value and adequacy of the mortgaged property as collateral and the
> credit history of the prospective borrower, rather than on verified
> income and assets of the borrower. . . . Mortgage loans
> underwritten under no documentation programs are generally
> limited to borrowers with favorable credit histories and who satisfy
> other standards for limited documentation programs.

(*Id.* at S-28-29.)

303.    The Prospectus Supplement further represented that "[e]xceptions to the

[GreenPoint] guidelines are permitted where compensating factors are present." (*Id.* at S-28.)

304.    Finally, the Prospectus Supplement represented that GreenPoint acquires certain

mortgages from correspondent lenders.  In order to maintain quality control over these loans:

> GreenPoint conducts a quality control review of a sample of the
> mortgage loans.  The number of loans reviewed in the quality
> control process varies based on a variety of factors, including
> GreenPoint's prior experience with the correspondent lender and
> the results of the quality control review process itself.

(*Id.* at S-29.)

### (x)    GMFT 2006-AR3

305.    For the GMFT 2006-AR3 offering, all of the mortgage loans were originated by

GreenPoint.  The Prospectus Supplement for this offering represented that GreenPoint followed

specific underwriting guidelines to ensure the quality of the loans being originated, as described

below.

306.    The Prospectus Supplement represented that GreenPoint's underwriting process

would be applied to "evaluate the prospective borrower's credit standing and repayment ability

and the value and adequacy of the mortgaged property as collateral," and that "[a]ll of the

mortgage loans have been originated generally in accordance with the following underwriting

guidelines established by GreenPoint." (GMFT 2006-AR3 Prospectus Supplement dated April

27, 2006, at S-28-29.)

      307.    The Prospectus Supplement further represented that:

> GreenPoint's Underwriting Guidelines require that the
> underwriters be satisfied that the value of the property being
> financed supports, and will continue to support, the outstanding
> loan balance, and provides sufficient value to mitigate the effects
> of adverse shifts in real estate values.

(*Id.*)

      308.    To ensure the borrower's ability to repay the loan, the Prospectus Supplement

represented that:

> [a]s part of its evaluation of potential borrowers, GreenPoint
> generally requires a description of the borrower's income.  If
> required by its underwriting guidelines, GreenPoint obtains
> employment verification providing current and historical income
> information and/or a telephonic employment confirmation.

(*Id.*)

      309.    As to other forms of income verification, the Prospectus Supplement represented

that GreenPoint's alternative documentation programs were limited to borrowers who possessed

certain risk reducing factors:

> Under limited documentation programs, more emphasis is placed
> on the value and adequacy of the mortgaged property as collateral,
> credit history and other assets of the borrower, than on verified
> income of the borrower.  Mortgage loans underwritten under this
> type of program are generally limited to borrowers with credit
> histories that demonstrate an established ability to repay
> indebtedness in a timely fashion  . . . Permitted maximum loan-to-
> value ratios (including secondary financing) under limited
> documentation programs are generally more restrictive than
> mortgage loans originated with full documentation requirements.
> Under no documentation programs . . . [e]mphasis is placed on the
> value and adequacy of the mortgaged property as collateral and the
> credit history of the prospective borrower, rather than on verified
> income and assets of the borrower . . . Mortgage loans

> underwritten under no documentation programs are generally
> limited to borrowers with favorable credit histories and who satisfy
> other standards for limited documentation programs.

(*Id.*)

310.   The Prospectus Supplement further represented that "[e]xceptions to the

[GreenPoint] guidelines are permitted where compensating factors are present." (*Id.* at S-29.)

311.   Finally, the Prospectus Supplement represented that GreenPoint acquired certain

mortgages from correspondent lenders.  In order to maintain quality control over these loans:

> GreenPoint conducts a quality control review of a sample of the
> mortgage loans.  The number of loans reviewed in the quality
> control process varies based on a variety of factors, including
> GreenPoint's prior experience with the correspondent lender and
> the results of the quality control review process itself.

(*Id.* at S-30.)

### (3)   WaMu Defendants' Representations

#### (a)   <u>WaMu 2005-AR1</u>

312.   For the WaMu 2005-AR1 offering, the mortgage loans were originated by

WMMSC and various other originators.  All of the mortgage loans in the WaMu 2005-AR1

offering were purportedly originated in accordance with WMMSC's underwriting guidelines.

313.   The Prospectus for the WaMu 2005-AR1 offering made specific representations

about WMMSC's underwriting standards.

314.   The Prospectus represented that WMMSC's standards were consistently applied

to confirm a borrower's ability to repay and to produce performing loans:

> The Company's underwriting standards are intended to evaluate
> the prospective Mortgagor's credit standing and repayment ability,
> and the value and adequacy of the proposed Mortgaged Property as
> collateral.

(WaMu 2005-AR1 Prospectus dated February 10, 2004, at 18.)

315.    The Prospectus also stated that the originators applied conservative underwriting

guidelines even to loans originated under their low documentation programs:

> For a mortgage loan originated under a Limited Documentation
> Origination Program to qualify for purchase by the Company, the
> prospective mortgagor must have a good credit history and be
> financially capable of making a larger cash down payment, in a
> purchase, or be willing to finance less of the appraised value, in a
> refinancing, than would otherwise be required by the Company.
> Currently, the Company's underwriting standards provide that only
> mortgage loans with certain loan-to-value ratios will qualify for
> purchase.

(*Id.* at 18.)

### (b)    **WMALT 2006-AR1**

316.    For the WMALT 2006-AR1 offering, WMMSC purchased 35.2% of the mortgage

loans backing the securities (based on total principal balance) from Countrywide; 23.3% of the

mortgage loans from MortgageIT, Inc. ("MortgageIT"); 18.2% of the mortgage loans from

Alliance Bancorp; and the remaining mortgage loans from various originators, each of which

originated less than 10% of the loans.  All of the mortgage loans in the WMALT 2006-AR1

offering were purportedly originated in accordance with WMMSC's and WaMu Bank's

underwriting guidelines.

317.    The Prospectus Supplement for the WMALT 2006-AR1 offering made specific

representations about WMMSC's and WaMu Bank's underwriting standards.

318.    The Prospectus Supplement represented that WMMSC's and WaMu Bank's

standards were consistently applied to confirm a borrower's ability to repay and to produce

performing loans:

> The sponsor's underwriting standards and Washington Mutual
> Bank's underwriting guidelines generally are intended to evaluate
> the prospective borrower's credit standing and repayment ability
> and the value and adequacy of the mortgaged property as
> collateral.

(WMALT 2006-AR1 Prospectus Supplement dated January 25, 2006, at S-26.)

319.    The Prospectus Supplement further provided that, under WMMSC's and WaMu

Bank's guidelines, the originators calculated a borrower's DTI ratio to ensure that the borrower

could make his or her monthly payments:

> [I]n evaluating a prospective borrower's ability to repay a
> mortgage loan, the loan underwriter considers the ratio of the
> borrower's mortgage payments, real property taxes and other
> monthly housing expenses to the borrower's gross income
> (referred to as the 'housing-to-income ratio' or 'front end ratio'),
> and the ratio of the borrower's total monthly debt (including non-
> housing expenses) to the borrower's gross income (referred to as
> the 'debt-to-income ratio' or 'back end ratio').

(*Id.* at S-27.)

320.    The Prospectus Supplement also stated that the originators applied conservative

underwriting guidelines even to loans originated under their limited documentation programs:

> Generally, a reduced documentation program is available to
> borrowers with certain loan-to-value ratios, loan amounts, and
> credit scores.  A reduced documentation program places increased
> reliance on the value and adequacy of the mortgaged property as
> collateral, the borrower's credit standing and (in some cases) the
> borrower's assets . . . In all cases, the borrower's employment is
> verified with the employer by telephone.

(*Id.* at S-28.)

321.    Finally, the Prospectus Supplement represented that the originators allowed

exceptions to their underwriting standards only when there were sufficient compensating factors:

> Exceptions to the underwriting standards described above may be
> made on a case-by-case basis if compensating factors are present.
> In those cases, the basis for the exception is documented.
> Compensating factors may include, but are not limited to, low
> loan-to-value ratio, low debt-to-income ratio, good credit standing,
> the availability of other liquid assets, stable employment and time
> in residence at the prospective borrower's current address.

-100-