(*Id.* at S-28.)

### (c)   **WMALT 2006-AR5**

322.   For the WMALT 2006-AR5 offering, WMMSC purchased 28.09% of the

mortgage loans backing the securities (based on total principal balance) from First Magnus

Financial Corporation ("FMFC"); 17.06% of the mortgage loans from Residential Funding

Corporation ("RFC"); 12.41% of the mortgage loans from Alliance Bancorp; 9.77% of the

mortgage loans from First Horizon Home Loans ("FHHL"); and the remaining mortgage loans

from various originators, each of which originated less than 10% of the loans.  All of the

mortgage loans in the WMALT 2006-AR5 offering were purportedly originated in accordance

with WMMSC's and WaMu Bank's underwriting guidelines.

323.   The Prospectus Supplement for the WMALT 2006-AR5 offering made specific

representations about WMMSC's and WaMu Bank's underwriting standards.

324.   The Prospectus Supplement represented that WMMSC's and WaMu Bank's

standards were consistently applied to confirm a borrower's ability to repay and to produce

performing loans:

> The sponsor's underwriting standards and Washington Mutual
> Bank's underwriting guidelines generally are intended to evaluate
> the prospective borrower's credit standing and repayment ability
> and the value and adequacy of the mortgaged property as
> collateral.

(WMALT 2006-AR5 Prospectus Supplement dated June 26, 2006, at S-47.)

325.   The Prospectus Supplement further provided that, under WMMSC's and WaMu

Bank's guidelines, the originators calculated a borrower's DTI ratio to ensure that the borrower

could make his or her monthly payments:

> [I]n evaluating a prospective borrower's ability to repay a
> mortgage loan, the loan underwriter considers the ratio of the
> borrower's mortgage payments, real property taxes and other

-101-

> monthly housing expenses to the borrower's gross income
> (referred to as the 'housing-to-income ratio' or 'front end ratio'),
> and the ratio of the borrower's total monthly debt (including non-
> housing expenses) to the borrower's gross income (referred to as
> the 'debt-to-income ratio' or 'back end ratio').

(*Id.* at S-48.)

326.   The Prospectus Supplement also stated that the originators applied conservative

underwriting guidelines even to loans originated under their limited documentation programs:

> Generally, a reduced documentation program is available to
> borrowers with certain loan-to-value ratios, loan amounts, and
> credit scores.  A reduced documentation program places increased
> reliance on the value and adequacy of the mortgaged property as
> collateral, the borrower's credit standing and (in some cases) the
> borrower's assets . . . In all cases, the borrower's employment is
> verified with the employer by telephone.

(*Id.* at S-49.)

327.   Finally, the Prospectus Supplement represented that the originators allowed

exceptions to their underwriting standards only when there were sufficient compensating factors:

> Exceptions to the underwriting standards described above may be
> made on a case-by-case basis if compensating factors are present.
> In those cases, the basis for the exception is documented.
> Compensating factors may include, but are not limited to, low
> loan-to-value ratio, low debt-to-income ratio, good credit standing,
> the availability of other liquid assets, stable employment and time
> in residence at the prospective borrower's current address.

(*Id.* at S-49-50.)

### (d)   WaMu 2006-AR7

328.   For the WaMu 2006-AR7 offering, the mortgage loans were originated by

WMMSC and various other originators.  All of the mortgage loans in the WaMu 2006-AR7

offering were purportedly originated in accordance with WMMSC's and WaMu Bank's

underwriting guidelines.

329.   The Prospectus Supplement for the WaMu 2006-AR7 offering made specific representations about WMMSC's and WaMu Bank's underwriting standards.

330.   The Prospectus Supplement represented that WMMSC's and WaMu Bank's standards were consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> The sponsor's underwriting standards and Washington Mutual Bank's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

(WaMu 2006-AR7 Prospectus Supplement dated June 26, 2003, at S-38.)

331.   The Prospectus Supplement further provided that, under WMMSC's and WaMu Bank's guidelines, the originators calculated a borrower's DTI ratio to ensure that the borrower could make his or her monthly payments:

> In evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the 'housing-to-income ratio' or 'front end ratio'), and the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the 'debt-to-income ratio' or 'back end ratio').

(*Id.* at S-39.)

332.   The Prospectus Supplement also stated that the originators applied conservative underwriting guidelines even to loans originated under their low documentation programs:

> The sponsor's low documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets.  It is available to borrowers with certain loan-to-value ratios, loan amounts and credit scores . . . The borrower's stated income must be reasonable for the borrower's occupation and assets (as determined in the underwriter's discretion).  Assets

> may be verified for higher risk transactions and when exceptions
> are approved, such as when specific loan-to-value ratios or loan
> amount limits are exceeded.

(*Id.* at S-40.)

333.    Finally, the Prospectus Supplement represented that the originators allowed

exceptions to their underwriting standards only when there were sufficient compensating factors:

> Exceptions to the underwriting standards described above may be
> made on a case-by-case basis if compensating factors are present.
> In those cases, the basis for the exception is documented.
> Compensating factors may include, but are not limited to, low
> loan-to-value ratio, low debt-to-income ratio, good credit standing,
> the availability of other liquid assets, stable employment and time
> in residence at the prospective borrower's current address.

(*Id.* at S-40.)

### (e)    WaMu 2007-HE2

334.    For the WaMu 2007-HE2 offering, WaMu Bank purchased the mortgage loans

from various originators.  All of the mortgage loans in the WaMu 2007-HE2 offering were

purportedly originated in accordance with WaMu Bank's underwriting guidelines.

335.    The Prospectus Supplement for the WaMu 2007-HE2 offering made specific

representations about WaMu Bank's underwriting standards.

336.    The Prospectus Supplement represented that WaMu Bank's standards were

consistently applied to confirm a borrower's ability to repay and to produce performing loans:

> The [WaMu Bank] sub-prime underwriting standards are primarily
> intended to evaluate the prospective borrower's credit standing and
> repayment ability as well as the value and adequacy of the
> mortgaged property as collateral.

(WaMu 2007-HE2 Prospectus Supplement dated April 5, 2007, at S-29.)

337.   The Prospectus Supplement further provided that, under WaMu Bank's

guidelines, the originators calculated a borrower's DTI ratio to ensure that the borrower could

make his or her monthly payments:

> During the underwriting or re-underwriting process, the sponsor
> reviews and verifies the prospective borrower's sources of income
> (only under the full documentation residential loan program),
> calculates the amount of income from all such sources indicated on
> the loan application, reviews the credit history and credit score(s)
> of the prospective borrower and calculates the debt-to-income ratio
> to determine the prospective borrower's ability to repay the loan,
> and determines whether the mortgaged property complies with the
> [WaMu Bank] sub-prime underwriting standards.

(*Id.* at S-29-30.)

338.   The Prospectus Supplement also stated that the originators applied conservative

underwriting guidelines even to loans originated under their low documentation programs:

> Under the limited documentation residential loan program, salaried
> prospective borrowers or self-employed prospective borrowers are
> generally required to submit their most recent six months of
> personal bank statements or business bank statements.  Under the
> limited documentation and stated income documentation
> residential loan programs, the prospective borrower's employment
> and income sources must be stated on the prospective borrower's
> application.  The prospective borrower's income as stated must be
> reasonable for the related occupation and such determination as to
> reasonableness is subject to the loan underwriter's discretion . . .
> Verification of employment is required for salaried prospective
> borrowers.  Maximum loan-to-value ratios under the stated income
> documentation residential loan programs are generally lower than
> those permitted under the full documentation and limited
> documentation residential loan programs.

(*Id.* at S-31.)

339.   Finally, the Prospectus Supplement represented that the originators allowed

exceptions to their underwriting standards only when there were sufficient compensating factors:

> On a case-by-case basis and only with the approval of an employee
> with appropriate risk level authority, the sponsor may determine

that, based upon compensating factors, a prospective borrower not
strictly qualifying under the [WaMu Bank] sub-prime underwriting
risk category guidelines warrants an underwriting exception.
Compensating factors may include, but are not limited to, low
loan-to-value ratio, low debt-to-income ratio, good credit history,
stable employment and time in residence at the prospective
borrower's current address.

(*Id.*)

**B.      Defendants' Abandonment and Disregard of Underwriting Standards to
Generate a Large Volume of Loans for Securitization and Sale to Investors**

340.    The securitization process incentivized the JPMorgan Defendants, the Bear

Stearns Defendants, and the WaMu Defendants to abandon or disregard underwriting standards

so that they could originate and purchase huge volumes of low-quality loans to securitize.

341.    As the private residential mortgage-backed securities market expanded, the

traditional "originate to hold" model morphed into the "originate to distribute" model. Under the

"originate to distribute" model, mortgage companies, such as the JPMorgan Defendants, the Bear

Stearns Defendants, and the WaMu Defendants, no longer held the mortgage loans to maturity.

Rather, they purported to shift the risk of loss to the investors who purchased an interest in the

securitized pool of loans.

342.    The new distribution model was highly profitable for the JPMorgan Defendants,

the Bear Stearns Defendants, the WaMu Defendants , and other mortgage companies. By

securitizing and selling mortgage loans to investors through underwriters, mortgage companies

received immediate payment for the loans, shifted the loans off their books, and were able to

issue more loans. The securitization process enabled the mortgage companies to earn most of

their income from transaction and loan-servicing fees. Because the mortgage companies did not

have to bear the risk of loss, they had an unchecked incentive to originate more and more loans

to feed into the securitization machine.

343.    The Attorney General for the Commonwealth of Massachusetts explained this

unchecked incentive in her investigation into the subprime mortgage industry:

> Historically, the vast majority of home mortgages were written by banks
> which held the loans in their own portfolios, knew their borrowers, and
> earned profit by writing good loans and collecting interest over many
> years.  Those banks had to live with their "bad paper" and thus had a
> strong incentive to avoid making bad loans.  In recent years, however, the
> mortgage market has been driven and funded by the sale and securitization
> of the vast majority of loans.  Lenders now frequently make mortgage
> loans with the intention to promptly sell the loan and mortgage to one or
> more entities. . . . The lenders' incentives thus changed from writing good
> loans to writing a huge volume of loans to re-sell, extracting their profit at
> the front end, with considerably less regard to the ultimate performance of
> the loans.

344.    Ben Bernanke, Chairman of the Federal Reserve Bank, also explained the

incentive to abandon underwriting standards in Congressional testimony:

> When an originator sells a mortgage and its servicing rights, depending on
> the terms of the sale, much or all of the risks are passed on to the loan
> purchaser.  Thus, originators who sell loans may have less incentive to
> undertake careful underwriting than if they kept the loans. Moreover, for
> some originators, fees tied to loan volume made loan sales a higher
> priority than loan quality.  This misalignment of incentives, together with
> strong investor demand for securities with high yields, contributed to the
> weakening of underwriting standards.

345.    To take advantage of the exploding market for residential mortgage-backed

securities, the JPMorgan Defendants, the Bear Stearns Defendants, and the WaMu Defendants

abandoned or disregarded underwriting guidelines and failed to conduct adequate due diligence

so that they could originate and purchase as many loans as possible for securitization. Indeed,

even when perfunctory due diligence revealed non-compliant loans, the Defendants "waived" the

loans into the securitizations anyway.

346.    Unbeknownst to MassMutual, the JPMorgan Defendants, the Bear Stearns

Defendants, and the WaMu Defendants originated or purchased loans that had been issued to

borrowers regardless of their ability to pay.  The loans were often issued on the basis of

overstated incomes, inflated appraisals, false verifications of employment, or exceptions to underwriting criteria that had no proper justification.

### C.   Widespread Defaults That Confirm Defendants' Abandonment and Disregard of Their Underwriting Standards

347.    Even though the Certificates purchased by MassMutual were supposed to be long-term, stable investments, just a few years after their issuance, a high percentage of the mortgage loans backing the offerings have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders, including MassMutual. The following table contains the most recent performance data available for the loan pools:

| Offering | Number of Loans in Pool at Closing | Current Number of Loans in Pool | Number of Loans Liquidated or Foreclosed Upon | Number of Loans in Default or Delinquent | % of Loans Liquidated, Foreclosed Upon, in Default or Delinquent |
|---|---|---|---|---|---|
| JPMMT 2005-ALT1 | 2,195 | 796 | 377 | 54 | 19.64% |
| JPALT 2006-A1 | 2,645 | 817 | 656 | 105 | 28.77% |
| JPMAC 2006-CH1 | 3,330 | 1,209 | 715 | 190 | 27.18% |
| JPMAC 2006-CH2 | 10,334 | 3,834 | 3,079 | 691 | 36.48% |
| BSARM 2005-10 | 4,096 | 1,711 | 317 | 96 | 10.08% |
| BALTA 2006-6 | 4,487 | 1,077 | 1,831 | 295 | 47.38% |
| BALTA 2006-7 | 2,871 | 878 | 932 | 190 | 39.08% |
| BSABS 2006-AC4 | 1,674 | 666 | 464 | 59 | 31.24% |
| BSABS 2006-AQ1 | 2,225 | 459 | 971 | 235 | 54.20% |
| BSMF 2006-SL1 | 8,447 | 1,097 | 4,305 | 330 | 54.87% |
| BSMF 2006-AC1 | 1,224 | 446 | 435 | 37 | 38.56% |
| BSMF 2006-AR1 | 2,746 | 688 | 1,332 | 320 | 60.16% |
| BSMF 2006-AR2 | 2,951 | 801 | 1,382 | 350 | 58.69% |
| BSMF 2006-AR3 | 2,088 | 594 | 1,002 | 245 | 59.72% |
| BSARM 2007-2 | 2,572 | 1,094 | 608 | 256 | 33.59% |
| BSABS 2007-1 | 1,088 | 186 | 498 | 297 | 73.07% |
| BSABS 2007-AC2 | 1,804 | 781 | 580 | 131 | 39.41% |
| BSABS 2007-HE3 | 4,445 | 1,367 | 1,724 | 600 | 52.28% |
| BSMF 2007-AR1 | 2,814 | 863 | 1,376 | 322 | 60.34% |
| SAMI 2005-AR8 | 2,591 | 622 | 761 | 310 | 41.34% |
| SAMI 2006-AR3 | 6,328 | 1,155 | 1,866 | 547 | 38.13% |
| SAMI 2006-AR5 | 2,153 | 543 | 538 | 67 | 28.10% |
| SAMI 2006-AR6 | 3,776 | 974 | 1,255 | 451 | 45.18% |
| SAMI 2006-AR7 | 7,125 | 1,865 | 2,476 | 1,066 | 49.71% |
| SAMI 2006-AR8 | 5,028 | 1,497 | 1,852 | 524 | 47.26% |
| SAMI 2007-AR1 | 2,172 | 686 | 898 | 242 | 52.49% |
| GMFT 2006-AR1 | 3,618 | 761 | 1,326 | 172 | 41.40% |
| GMFT 2006-AR3 | 6,321 | 1,489 | 2,341 | 356 | 42.67% |

| Offering | Number of Loans in Pool at Closing | Current Number of Loans in Pool | Number of Loans Liquidated or Foreclosed Upon | Number of Loans in Default or Delinquent | % of Loans Liquidated, Foreclosed Upon, in Default or Delinquent |
|---|---|---|---|---|---|
| WaMu 2005-AR1 | 1,124 | 257 | 123 | 71 | 17.26% |
| WMALT 2006-AR1 | 1,643 | 312 | 410 | 93 | 30.61% |
| WMALT 2006-AR5 | 3,289 | 656 | 1,135 | 207 | 40.80% |
| WaMu 2006-AR7 | 1,897 | 871 | 439 | 298 | 38.85% |
| WaMu 2007-HE2 | 6,768 | 1,946 | 2,782 | 748 | 52.16% |

348.    Defaults are usually caused by a large and unexpected disruption to a borrower's income. In a properly underwritten pool of loans, one would not expect to see such a large spike of defaults occurring shortly after origination, because it is unlikely that many borrowers would all incur a sudden and unexpected change to their repayment ability so soon after purchasing a home. Indeed, economic studies have confirmed that high default rates early in a loan's life are highly correlated with misrepresentations in the loan files. This makes sense – when borrowers are put in loan products they cannot actually afford, they quickly and predictably fall behind on their payments.

349.    Not only have the loans backing MassMutual's Certificates experienced extraordinary rates of default, the Certificates' ratings have significantly deteriorated. Many of MassMutual's Certificates initially received the highest possible ratings – Standard & Poor's ("S&P") AAA rating, or its equivalent from the other rating agencies. According to its website, "[a]n obligation rated 'AAA' has the highest rating assigned by Standard & Poor's. The obligor's capacity to meet its financial commitment on the obligation is extremely strong." Moody's similarly describes its highest rating, Aaa, as meaning that the investment is "judged to be of the highest quality, with minimal credit risk." This is the same rating typically given to bonds backed by the full faith and credit of the U.S. government, such as treasury bills. Historically, an AAA-rated security had an expected loss rate of less than 0.05%.

350.    Because of the high delinquency and default rates on the underlying loans, the

majority of MassMutual's Certificates have been downgraded to "junk-bond" ratings, as can be

seen in the following table:

| Certificate | Original S&P Rating | Current S&P Rating | Original Moody's Rating | Current Moody's Rating |
|---|---|---|---|---|
| JPMMT 2005-ALT1, 1A1 | AAA | CCC | Not Rated | Not Rated |
| JPALT 2006-A1, 1A1 | AAA | CCC | Aaa | Caa2 |
| JPMAC 2006-CH1, M9 | BBB- | CC | Baa3 | C |
| JPMAC 2006-CH2, AF6 | AAA | AAA | Aaa | Aaa |
| JPMAC 2006-CH2, MF9 | BBB- | N/A[1] | Baa3 | N/A |
| JPMAC 2006-CH2, MV8 | BBB | N/A | Baa2 | N/A |
| JPMAC 2006-CH2, MV9 | BBB- | N/A | Baa3 | N/A |
| BSARM 2005-10, A3 | AAA | BBB+ | Not Rated | Not Rated |
| BALTA 2006-6, 2B3 | BBB | N/A | Baa2 | N/A |
| BALTA 2006-7, 1B2 | BBB- | N/A | Baa3 | N/A |
| BSABS 2006-AC4, B3 | BBB | N/A | Baa2 | N/A |
| BSABS 2006-AQ1, 2M5 | NR | N/A | A2 | N/A |
| BSMF 2006-SL1, B2 | BBB | N/A | Baa2 | N/A |
| BSMF 2006-AC1, B1 | BBB+ | N/A | Baa1 | N/A |
| BSMF 2006-AR1, 1A1 | AAA | B | Aaa | Caa3 |
| BSMF 2006-AR1, 2A1 | AAA | BBB- | Aaa | Caa3 |
| BSMF 2006-AR2, 2B3 | BBB | N/A | A3 | N/A |
| BSMF 2006-AR3, 2B3 | BBB | N/A | A3 | N/A |
| BSMF 2006-AR3, 2B4 | BBB- | N/A | Baa1 | N/A |
| BSARM 2007-2, 1A1 | AAA | CCC | Aaa | Caa3 |
| BSABS 2007-1, A2 | AAA | B- | Aaa | Ba3/*- |
| BSABS 2007-AC2, A2 | AAA | D | Aaa | C |
| BSABS 2007-HE3, 1A4 | AAA | B- | Aaa | C |
| BSMF 2007-AR1, 2B4 | BBB- | N/A | Baa1 | N/A |
| SAMI 2005-AR8, A1A | AAA | CCC | Aaa | Caa3 |
| SAMI 2006-AR3, 12A2 | AAA | CCC | Aaa | Caa3 |
| SAMI 2006-AR5, 1A1 | AAA | AA | Aaa | Caa2 |
| SAMI 2006-AR5, 2A1 | AAA | AAA | Aaa | Caa1 |
| SAMI 2006-AR5, 4A1 | AAA | A+ | Aaa | Ca |
| SAMI 2006-AR6, 2A1 | AAA | CCC | Aaa | Caa3 |
| SAMI 2006-AR7, 1A1A | AAA | CCC | Aaa | Caa3 |
| SAMI 2006-AR7, B6 | BBB | N/A | Baa2 | N/A |
| SAMI 2006-AR7, B7 | BBB- | N/A | Baa3 | N/A |
| SAMI 2006-AR8, 1B8 | BBB | N/A | Baa1 | N/A |
| SAMI 2006-AR8, 1B9 | BBB- | N/A | Baa3 | N/A |
| SAMI 2007-AR1, 2B4 | BBB- | N/A | Baa1 | N/A |
| GMFT 2006-AR1, A1A | AAA | BBB | Aaa | Caa2 |
| GMFT 2006-AR3, 4A1 | AAA | BBB- | Aaa | Caa2 |
| WaMu 2005-AR1, A1A | AAA | CCC | Aaa | Caa3 |
| WMALT 2006-AR1, A1A | AAA | CCC | Aaa | Caa3 |
| WMALT 2006-AR5, 4A1B | AAA | D | Aaa | C |

---

[1]  Certificates marked "N/A" have been entirely written off due to losses and therefore have no rating.

| Certificate | Original S&P Rating | Current S&P Rating | Original Moody's Rating | Current Moody's Rating |
|---|---|---|---|---|
| WaMu 2006-AR7, C1B2 | AAA | CC | Aaa | C |
| WaMu 2007-HE2, 2A4 | AAA | CCC | Aaa | Ca |

351.    The poor performance of the loan pools and the rapidly dropping credit ratings of

the Certificates have caused a massive decline in the market values of the Certificates.

According to the most recent data, the Certificates should be worth approximately $360 million,

but their market value is substantially lower – approximately $205 million.

352.    The economic downturn cannot explain the abnormally high percentage of

defaults, foreclosures, and delinquencies observed in the loan pools.  Loan pools that were

properly underwritten and contained loans with the represented characteristics would have

experienced substantially fewer payment problems and substantially lower percentages of

defaults, foreclosures, and delinquencies.  The dismal performance of the mortgage loans

underlying MassMutual's Certificates is itself strong evidence that they were improperly

underwritten, and that they did not have the credit risk characteristics Defendants claimed.  The

defaults and related drop in market value thus are due to Defendants' wrongdoing, and not

because of a general change in economic conditions.

**D.      Defendants' Own Documents and Testimony from Former Employees That Confirm the Abandonment and Disregard of Underwriting Standards**

**(1)      JPMorgan Securitizations**

353.    Many of the mortgage loans backing the JPMorgan Certificates that MassMutual

purchased were originated by CHF, the home mortgage division of Defendant JPMC Bank.

Overall, 81.7% of all the mortgage loans underlying the JPMorgan securitizations were

originated  by CHF, far more than any other originator.

354.    CHF's departure from underwriting standards has been confirmed by James

Dimon, CEO of JPMorgan Chase.  Mr. Dimon testified under oath to the FCIC on January 13,

-111-

2010 that "the underwriting standards of our mortgage business should have been higher. We have substantially enhanced our mortgage underwriting standards, essentially returning to traditional 80 percent loan to value ratios and requiring borrowers to document their income."

355.    CHF also relied heavily on third parties to originate loans. Mr. Dimon testified that these broker-loans performed markedly worse: "We've also closed down most—almost all of the business originated by mortgage brokers where credit losses have generally been over two times worse than the business we originate ourselves," and admitted that "there were some unscrupulous mortgage salesmen and mortgage brokers."

356.    According to an article in *Bloomberg* on February 17, 2010, Mr. Dimon believed, at least from late 2006, that JPMorgan's mortgage backed securities were a bad investment, and attempted to rid JPMorgan of such risk. The article noted that "[i]n October 2006, Mr. Dimon, JPMorgan's CEO, told William King, then its head of securitized products, that [JPMorgan] needed to start selling its subprime-mortgage positions."

357.    The problems with CHF's origination business admitted to by Mr. Dimon have been corroborated and expanded upon in many different investigations of JPMorgan entities and numerous legal actions that have been brought against them as a result. On information and belief, witnesses will testify in this action that, during the relevant period:

- CHF underwriters faced intense pressure to close loans at any cost, primarily because their salaries were dependent upon the quantity of loans they originated. This pressure for volume resulted in underwriting errors.

- CHF management would often override the decisions of underwriters to reject a loan, falsifying income information, removing harmful background documentation, and seeking altered appraisal values, in order to push the application through.

- CHF management would also work with underwriters, instructing them on how to find a way to successfully close a loan, such as calculating an LTV

ratio or an income level that was needed for a particular loan to close.

- CHF underwriters would use lax income verification techniques, were discouraged from verifying income information, and were encouraged to make exceptions for the "reasonableness" of the income stated on applications.

- CHF underwriters were often not provided with all of the relevant borrower information, and certain data, such as credit scores and income, were susceptible to manipulation, especially with low documentation loans.

358.    An internal CHF memorandum outlining "cheats and tricks" to gain approval for

risky mortgage loans from the "Zippy system" – a CHF automated loan underwriting system –

further demonstrates CHF's abandonment of underwriting guidelines.  This memorandum

advised CHF personnel to inflate the borrowers' income or otherwise falsify loan applications.

The memorandum exhorted brokers to "Never Fear!!"  If Zippy rejects a "stated income/stated

asset" loan application, "Zippy can be adjusted (just ever so slightly)."  The memorandum

encouraged brokers to game the Zippy system because "[i]t's super easy!  Give it a try!"  The

document instructed brokers not to break down income by base, overtime, commissions, or

bonuses, but to lump it all into base income.  The memorandum also recommended that "[i]f

your borrower is getting a gift, add it to the bank account along with the rest of the assets.  Be

sure to remove any mention of gift funds[.]"  As an additional technique to attain approval for

these risky loans, the author counseled "resubmitting with slightly higher income.  Inch it up

$500 to see if you can get the findings you want.  Do the same for assets."

**(2)    Bear Stearns Securitizations**

359.    Recently discovered documents show that BSC quietly changed its internal

protocols in 2005 to allow EMC to securitize loans before the expiration of the 30- to 90-day

early payment default period following the acquisition of a loan by EMC.  This change enabled

EMC to offload defective loans onto investors like MassMutual, while enhancing earnings by

increasing the volume of its securitizations.

360.    BSC's prior policy had been to keep loans in inventory until the early payment

default period was over.  Seasoning loans during this period prevented EMC from securitizing

loans that, according to its internal guidelines, were likely to "contain some form of

misrepresentations and should not have been made."  As increasing numbers of loans purchased

by EMC began to default, however, BSC abandoned the policy, securitizing the loans as quickly

as possible – before a default or delinquency would render them unsecuritizable.

361.    Not only did this approach allow the Bear Stearns Defendants to offload defective

loans onto unsuspecting investors like MassMutual, it produced an additional benefit:  extra

profit on the defaulted loans.  As the defective loans securitized by EMC began to default *en*

*masse*, EMC turned around and made repurchase claims on the loan originators.  But EMC did

not notify the Certificateholders of this.  Instead of requiring the originators to repurchase the

loans, which would have forced EMC to repurchase the loans from the Certificateholders, EMC

sought cash settlements for a fraction of the repurchase price.  This arrangement helped EMC

maintain its relationship with the originators, who continued to feed the Bear Stearns mortgage

securitization pipeline, while also allowing EMC to covertly pocket additional profits at the

expense of Certificateholders, such as MassMutual.  As a BSC Managing Director explained in a

recently disclosed email:  "It is very important to try to down bid items rather than have [the

originator] buy them back.  That is how we pay for the lights."

362.    The Bear Stearns Defendants thus had a strong economic incentive to continue

including large numbers of defective loans in securities sold to investors like MassMutual.  For

this reason, BSC executives, such as Defendant Jeffrey Verschleiser, forcefully advocated

packaging loans purchased by EMC into securities as quickly as possible.  In a recently

published June 13, 2006 email, Mr. Verschleiser asserted that his office needed "to be certain we

can securitize the loans with 1 month [early payment default] before the [early payment default]

period expires."  Similarly, newly discovered documents show that, in or about December 2005,

Mr. Verschleiser ordered Bear Stearns' deal managers and traders to start securitizing all "the

subprime loans closed in December for the conduit" by January.

363.    By 2006, the accrued number of non-compliant loans purchased by EMC was so

high that its quality control and claims departments were overwhelmed by the sheer volume of

repurchase claims that needed to be processed.  A recently discovered February 28, 2006 internal

audit report identified "a significant backlog for collecting from and submitting" 9,000

outstanding repurchase claims to sellers, worth over $720 million.  The report went on to

conclude that the procedures in place were insufficient to process, collect, resolve, and monitor

so many claims.

364.    Over time, the number of repurchase claims made by EMC to sellers of defective

mortgage loans continued to rise.  Through October 31, 2005, EMC had resolved a total of $1.7

billion in claims.  But in 2006 alone, EMC submitted $2.5 billion in claims, an increase of 78%

from the prior year, and resolved $1.7 billion of claims, an increase of over 227% from the

previous year.

365.    EMC's internal reports show that it submitted repurchase claims against

originators on the grounds that: (a) borrowers failed to disclose existing liabilities at the time of

origination; and (b) the loans violated underwriting guidelines and were originated through

fraud, error, negligence, misrepresentation or material omission.  On information and belief, at

least some of EMC's repurchase claims involved loans in the mortgage pools underlying the

Bear Stearns Certificates purchased by MassMutual.

366.    Internal communications confirm that EMC was securitizing large numbers of

defective loans amid a break-down in its due diligence processes.  In a recently discovered

March 2006 email, BSC Vice President Robert Durden admitted that many loans purchased by

EMC were securitized without any due diligence clearance: "I agree the flow loans were not

flagged appropriately and we securitized many of them which are still to this day not cleared.  I

think the ball was dropped big time on the flow processes involved in the post close [due

diligence], from start to finish."

367.    Recently disclosed documents also reveal that a quality control sampling review

commissioned by EMC concluded that a substantial percentage of the loans it securitized were

defective.  EMC hired a third party firm, Adfitech, Inc. ("Adfitech"), to "review loans to evaluate

if they meet investor quality guidelines, if sound underwriting judgment was used, and if the loan

is devoid of all misrepresentation or fraud characteristics."  Based on its analysis of a sample of

EMC's loans, Adfitech discovered that 38.8% of the loans were defective under EMC's quality

control guidelines.  On information and belief, some of these defective loans tested by Adfitech

were included in the Bear Stearns securitizations.  The results of Adfitech's loan analysis further

highlight the material misrepresentations regarding loan quality and underwriting guidelines that

pervaded the Bear Stearns Offering Materials.

368.    Recently released documents show that Bear Stearns also ignored numerous

warnings during the relevant period from the head of its due diligence department, John

Mongelluzzo.  The Bear Stearns Defendants routinely ignored reports of non-compliant loans

submitted by third-party due diligence firms, overriding and waiving the defects to purchase the

loans for securitization. The Bear Stearns Defendants directed due diligence managers to destroy

the "daily reports" submitted by third-party due diligence firms to conceal the high incidence of

overrides and waivers leading up to its final purchase decisions. Records from one of the due

diligence firms show that Bear Stearns waived defective loans into securitizations up to 56% of

the time in the third quarter of 2006.

369.    Mr. Mongelluzzo repeatedly warned Bear Stearns about the high incidence of

overrides. At one point, he proposed bringing due diligence in-house to more effectively screen

out defective loans. This proposal was rejected. Instead, Bear Stearns steadily reduced its due

diligence standards. According to a former EMC mortgage analyst, Matt Van Leeuwen, who

was with the company between 2004 and 2006: (a) Bear Stearns pushed EMC analysts to

perform their loan analyses of the underlying mortgages in only one to three days so that Bear

Stearns would not have to hold the loans on its books; (b) EMC analysts were encouraged to

falsify loan data (such as FICO scores) if that information was missing from the loan file and the

mortgage originators did not respond to requests for information; (c) the documentation level

(*i.e.*, no documentation, partial documentation) of the loans was often incorrectly identified; and

(d) rather than going back to the mortgage originator for clarification, such as verification of

income, Bear Stearns would avoid investigating and make the loan "fit."

370.    Mr. Mongelluzzo's warnings during the period at issue about the due diligence

failures in Bear Stearns' securitization process, combined with the explicit rejection of his

proposals to fix these problems, show that the Bear Stearns Defendants' representations

concerning their underwriting and securitization practices were false.

### (3)    WaMu Securitizations

371.    In 2005, with the market for conventional, fixed-rate loans drying up, WaMu

formalized a strategy to move away from low risk to high risk home loans. As James G.

Vanasek, WaMu Bank's former Chief Credit Officer/Chief Risk Officer, testified to the Senate

Permanent Subcommittee on Investigations ("PSI"), WaMu Bank's focus had shifted by mid-

2005 "to becoming more of a higher risk, sub-prime lender . . . This effort was characterized by

statements advocating that the company become either via acquisition or internal growth a

dominant sub-prime lender." Documents recently released by the PSI show that, in April 2006,

the President of WaMu's Home Loans Division gave a presentation to the WaMu Board of

Directors entitled "Shift to Higher Margin Products." The presentation showed that the least

profitable loans were government-backed and fixed loans; the most profitable were Option

ARM, Home Equity, and Subprime Loans.  Subprime loans, at 150 basis points, were eight times

more profitable than fixed loans at 19 basis points.

372.    In its push to generate more risky loan products, WaMu Bank pressed its sales

agents to pump out loans while disregarding underwriting guidelines.  WaMu Bank gave

mortgage brokers handsome commissions for selling the riskiest loans, which carried higher fees,

bolstering profits and ultimately the compensation of the bank's executives.  "It was the Wild

West," said Steven M. Knobel, founder of an appraisal company, Mitchell, Maxwell & Jackson,

which did business with WaMu until 2007.  "If you were alive, they would give you a loan.

Actually, I think if you were dead, they would still give you a loan."  Indeed, Mr. Vanasek

testified that "[b]ecause of the compensation systems rewarding volume vs. quality and the

independent structure of the loan originators, I am confident that at times borrowers were

coached to fill out applications with overstated incomes or net worth adjusted to meet the

minimum underwriting policy requirements."

373.    WaMu's own recently released internal documents confirm these accounts.  In

2003, WaMu held focus groups with borrowers, loan officers, and mortgage brokers to determine

how to sell its Option ARM product. An Option ARM loan is typically a 30-year ARM that initially offers the borrower four monthly payment options: a specified minimum payment (which was typically lower than the interest payment and therefore caused the loan to grow, referred to as negative amortization), an interest-only payment, a 15-year fully amortizing payment, and a 30-year fully amortizing payment. A 2003 report summarizing the focus group research stated: "Few participants fully understood the Option ARM. . . . Participants generally chose an Option ARM because it was recommended to them by their Loan Consultant. . . . Only a couple of people had any idea how the interest rate on their loan was determined." It said that while borrowers "generally thought that negative amortization was a moderately or very bad concept," this perception could be turned around by mentioning "that price appreciation would likely overcome any negative amortization." The report concluded: "[T]he best selling point for the Option ARM loan was [borrowers] being shown how much lower their monthly payment would be . . . versus a fixed-rate loan." Significantly, the majority of the WaMu securitizations at issue here securitized Option ARM loans.

374.    Fay Chapman, WaMu's former Chief Legal Officer, candidly admitted to the *Seattle Times*, that "[m]ortgage brokers put people into the product [Option ARM] who shouldn't have been." Another former WaMu employee, Renee Larsen, related that borrowers did not know they were getting cheated because the Option ARM loan was so difficult to understand. Yet sales of these high-risk loans soared. In 2003, WaMu originated $32.3 billion of Option ARM loans. By 2005, that number had doubled to $64.1 billion.

375.    WaMu designed its employee compensation structure to favor these types of high-risk loans. In a document entitled "2007 Product Strategy," WaMu noted that it must "maintain a compensation structure that supports the high margin product strategy." A compensation grid

-119-

from 2007 shows the company paid the highest commissions on Option ARMs, subprime loans and home-equity loans:  A $300,000 Option ARM, for example, would earn a $1,200 commission, versus $960 for a fixed-rate loan of the same amount.  The rates increased as a consultant made more loans; some regularly pulled down six-figure incomes.  Likewise, a WaMu "Retail Loan Consultant 2007 Incentive Plan" explained that "[i]ncentive tiers reward high margin products . . . such as the Options ARM, Non-prime referrals and Home Equity Loans . . . WaMu also provides a 15 bps 'kicker' for selling 3 year prepayment penalties."

376.    The reason WaMu could originate so many high–risk loans was because its underwriting guidelines became so loose as to render them effectively meaningless.  In a recently-surfaced internal newsletter dated October 31, 2005, risk managers were told they needed to "shift (their) ways of thinking" away from acting as a "regulatory burden" on the company's lending operations and toward being a "customer service" that supported WaMu's five-year growth plan.  Melissa Martinez, WaMu's Chief Compliance and Risk Oversight Officer, reportedly told risk managers that they were to rely less on examining borrowers' documentation individually and more on automated processes.

377.    On September 28, 2007, WaMu's Corporate Credit Review ("CCR") Team circulated an internal report on first payment defaults in Wholesale Specialty Lending.  The recently-released report determined that "[c]redit weakness and underwriting deficiencies is a repeat finding with CCR.."  It additionally concluded that fraud detection tools "are not being utilized effectively by the Underwriters and Loan Coordinator," and "the credit infrastructure is not adhering to the established process and controls."

378.    In early 2008, Radian Guaranty Inc., one of WaMu Bank's loan insurers, issued a similar report to WaMu Bank with the results of its review conducted from August 13, 2007 to

September 28, 2007. The objectives of the review were, *inter alia,* to determine WaMu Bank's "compliance with Radian's underwriting guidelines and eligible loan criteria," and "to assess the quality of the lender's underwriting decisions." Radian gave WaMu Bank an overall rating of "Unacceptable." Of 133 loans reviewed, it found 11 loans or 8% had "insufficient documents to support the income used to qualify the borrower and exceptions to approved guidelines." Of the 10 delinquent loans it reviewed, it found that half had "questionable property values, occupancy and possible strawbuyers [sic]." Likewise, in a February 20, 2008 e-mail to Mr. Rotella and Mr. Killinger, WaMu's Chief Enterprise Risk Officer admitted to "poor underwriting which in some cases causes our origination data to be suspect particularly with respect to DTI [Debt To Income]."

379.    Nancy Erken, a former WaMu loan consultant in Seattle, told the *Seattle Times* in December 2009, that "[t]he big saying was 'A skinny file is a good file." She would "take the files over to the processing center in Bellevue and they'd tell me 'Nancy, why do you have all this stuff in here? We're just going to take this stuff and throw it out," she said. Fay Chapman, WaMu's Chief Legal Officer from 1997 to 2007, relayed that, on one occasion, "[s]omeone in Florida made a second-mortgage loan to O.J. Simpson, and I just about blew my top, because there was this huge judgment against him from his wife's parents." When Ms. Chapman asked how they could possibly foreclose it, "they said there was a letter in the file from O.J. Simpson saying 'the judgment is no good, because I didn't do it.'"

380.    According to Tom Golon, a former senior home loan consultant for WaMu in Seattle, Countrywide "was held up as the competitor, because they would do anything – low-doc, no-doc, subprime, no money down." The WaMu staff was subjected to "total blanketing – e-

mails, memos, meetings set up so people understood that this was what the company wanted them to do."

381.    Various witnesses with direct experience in WaMu's underwriting operations will also testify that, during the relevant period, exceptions to WaMu's already loose underwriting guidelines were the rule.  For example, in testimony before the PSI, Mr. Vanasek admitted that adherence to policy "was a continual problem at Washington Mutual where line managers particularly in the mortgage area not only authorized but encouraged policy exceptions."

382.    WaMu's appetite for volume also led it to ignore the rampant fraud that infected its origination business.  Perhaps the most compelling evidence involves two top loan producers at two different WaMu offices, called Montebello and Downey, in Southern California.  Each of those loan officers made hundreds of millions of dollars in home loans each year and consistently won recognition for their efforts.  In 2005, an internal WaMu review found that loans from those two offices had "an extremely high incidence of confirmed fraud (58% for [Downey], 83% for [Montebello])."  The review found that "an extensive level of loan fraud exists in the Emerging Markets CFCs [Customer Fulfillment Centers], virtually all of it stemming from employees in these areas circumventing bank policy surrounding loan verification and review."  The review went on:  "Based on the consistent and pervasive pattern of activity among these employees, we are recommending firm action be taken to address these particular willful behaviors on the part of the employees named."  But virtually none of the proposed recommendations were implemented.

383.    Recently published WaMu internal documents show that, toward the end of 2006 and the beginning of 2007, WaMu Bank started to see rising delinquency and default rates in its

mortgage loans, particularly among Option ARM loans. WaMu thus made a decision to off-load

these loans through securitization and sale to investors.

384.    In a recently published October 17, 2006 presentation to WaMu Bank's Board of

Directors, David Schneider, the former President of WaMu Home Loans, described one of

WaMu Bank's "Mitigating Procedures" as "[p]eriodic non performing asset sales to manage

credit risk."

385.    It has also been freshly discovered that, on February 14, 2007, David Beck, at the

time an Executive Vice President at Defendant WCC, sent an e-mail to Mr. Schneider and

Cheryl Feltgen, Chief Credit Officer for Home Loans, observing that "[t]he performance of

newly minted option arm loans is causing us problems . . . We should address selling 1Q as soon

as we can before we loose [sic] the oppty."

386.    In response, Ms. Feltgen advised that:

> California, Option ARMs, large loan size ($1 to $2.5 million) have
> been the fastest increasing delinquency rates in the SFR [Single
> Family Residential] portfolio. . . . Our California concentration
> is getting close to 50% and many submarkets within California
> actually have declining house prices according to the most recent
> OFHEO data from third quarter of 2006. There is a meltdown in
> the subprime market which is creating a "flight to quality." . . .
> There is still strong interest around the world in US residential
> mortgages. Gain on sale margins for Option ARMs are attractive.
> This seems to me to be a great time to sell as many Option ARMs
> as we possibly can. [CEO] Kerry Killinger was certainly
> encouraging us to think seriously about it at the MBR last week.

387.    Ms. Feltgen then forwarded these e-mails to additional WaMu executives, noting:

"We are contemplating selling a larger portion of our Option ARMs than we have in the recent

past. Gain on sale is attractive and this could be a way to address California concentration, rising

delinquencies, falling house prices in California with a favorable arbitrage given that the market

seems not yet to be discounting a lot for those factors." As noted above, the majority of the

-123-

WaMu securitizations that are the subject of this action securitized the very types of deteriorating loans that Ms Feltgen and other senior WaMu executives identified – Option ARM loans originated from 2005 through 2007 with high concentrations in California.

388. In response to Ms. Feltgen's e-mail, on February 20, 2007, Robert Shaw, Senior Credit Officer at WaMu, circulated an analysis of the delinquency rates in WaMu's investment portfolio. Mr. Shaw explained that the results "show that seven combined factors contain $8.3 billion HFI [Hold for Investment] Option ARM balances which experienced above-average increases in the 60+ delinquency rate during the last 12 months (a 821% increase, or 10 times faster than the average increase of 70%)." Accordingly, Mr. Shaw "recommend[ed] that we select loans with some or all of these characteristics to develop a HFS [Hold for Sale] pool."

389. Not only did WaMu Defendants decide to sell defective loans to unsuspecting investors, but they also sold fraudulent loans. An internal September 2008 review found that controls intended to prevent the sale of fraudulent loans to investors were "not currently effective" and there was no "systematic process to prevent a loan . . . confirmed to contain suspicious activity from being sold to an investor." In other words, even where a loan was marked with a red flag indicating fraud, that did not stop the loan from being sold to investors. The 2008 review found that, of 25 loans tested, "11 reflected a sale date after the completion of the investigation which confirmed fraud. There is evidence that this control weakness has existed for some time."

390. In only one of the astonishing exchanges during the PSI's recent hearings, David Beck, the WCC executive in charge of securitizations, flatly admitted that its securitizations were tainted by fraud and underwriting deficiencies.

> Senator Levin: Purchasers of these securities were relying on you to provide truthful information. You knew about it. (Referring to fraudulent loans in securities). Wasn't that your job?
>
> David Beck: I understood there was fraud.
>
> . . .
>
> Senator Coburn: Were you aware ever that the loans underlying the securities were having problems?
>
> Mr. Beck: I knew we had underwriting problems.

391.   Needless to say, none of this was disclosed to investors, such as MassMutual. The WaMu Defendants did not disclose that WaMu Bank was pushing high risk loans onto borrowers who could not afford them. Nor did they disclose that WaMu Bank had effectively lowered its underwriting standards to such an extent as to render them meaningless, or that they were granting exceptions without regard to loan quality. Likewise, the WaMu Defendants did not disclose that they were selling underperforming assets in order to shift "credit risk" off their books. It goes without saying that had MassMutual known these facts, it never would have acquired the WaMu Certificates.

## V.   MISREPRESENTATIONS ABOUT APPRAISALS AND LOAN-TO-VALUE RATIOS REVEALED BY A FORENSIC REVIEW OF THE MORTGAGE LOANS

### A.   Appraisal and LTV Testing

392.   MassMutual commissioned a forensic review of the mortgage loans underlying the Certificates to determine whether the characteristics of the mortgage loans, as represented in the Offering Materials, were accurate.

393.   As part of the forensic review, data relating to the collateral loans underlying each of the securitizations was gathered from multiple public sources, including assessor, DMV, credit, and tax records, as well as proprietary sources such as loan servicing, securitization, and

mortgage application records.  The data relating to individual mortgage loans was then compared to the representations made in the Offering Materials.

394.    The forensic review tested the appraised values and loan-to-value ratio ("LTV") of each property, as represented in the Offering Materials, through an industry-standard automated valuation model ("AVM").

395.    The LTV is the ratio of a mortgage loan's original principal balance to the appraised value of the mortgaged property.  This ratio was material to MassMutual and other investors because higher ratios are correlated with a higher risk of default.  A borrower with a small equity position in a property has less to lose if he or she defaults on the loan.  There is also a greater likelihood that a foreclosure will result in a loss for the lender if the borrower fully leveraged the property.  LTV is a common metric for analysts and investors to evaluate the price and risk of mortgage-backed securities.

396.    For each of the loans reviewed, the underlying property was valued by an industry-standard AVM.  AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination, portfolio review, and servicing.  AVMs have become ubiquitous enough that their testing and use is specifically outlined in regulatory guidance and discussed in the Dodd-Frank Act.  AVMs rely upon similar data as in-person appraisals—primarily county assessor records, tax rolls, and data on comparable properties.  AVMs produce independent, statistically-derived valuation estimates by applying modeling techniques to this data.  The AVM that MassMutual used incorporates a database of 500 million mortgage transactions covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States.  Independent testing services have determined that this AVM is the most accurate of all such models.

-126-

397.    For purposes of MassMutual's forensic review, a retrospective AVM was conducted for each loan to calculate the value of the underlying property at the time each loan was originated.  The inputs for each calculation included, *inter alia*, (1) any subsequent sale prices of the target property, (2) sale prices and appraisals of comparable properties in the neighborhood, and (3) changes in home price indices over time.

398.    Applying the AVM results to the available data for the loans underlying the Certificates shows that the appraised values given to the properties were often significantly higher than what the properties were actually worth.  This affected the LTV ratios by decreasing the actual value of the properties relative to the loan amounts, which increased the overall ratios. This overvaluation affected numerous statistics in the Offering Materials, as described in detail for each transaction in the next section (Section V.B).

**B.      Specific Misrepresentations in the Offering Materials**

      **(1)      JPMorgan Securitizations**

            **(a)      JPMMT 2005-ALT1**

399.    The Prospectus Supplement for JPMMT 2005-ALT1 represented that the weighted average LTV ratio of the mortgage loans at origination was 77.78%.  It also represented that only 171 mortgage loans had LTV ratios above 90% at origination, which represented just 5% of the collateral pool.

400.    In addition, the Prospectus Supplement represented that PHH, which originated a percentage of the underlying mortgage loans, appraised all properties in the following manner:

> In determining the adequacy of the property as collateral for a first lien mortgage loan, a Fannie Mae/Freddie Mac conforming appraisal of the property is performed by an independent appraiser selected by PHH . . . The appraiser is required to inspect the property and verify that it is in good condition and that construction or renovation, if new, has been completed.  The appraisal report indicates a value for the property and provides

-127-

information concerning marketability, the neighborhood, the
property site, interior and exterior improvements, and the condition
of the property.

401.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

402.    However, MassMutual's forensic review revealed that these representations were

false.  The true LTV ratios for the mortgage loans at origination were actually much higher than

represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 77.78% | 83.87% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination[2] | 5.00% (171 loans) | 16.70% (404 loans) |

403.    In total, 29% of the loans tested were shown to have appraisals that were inflated

by 10% or more, and 25% of the loans tested had LTV ratios that were 10 or more points higher

than represented.  These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the JPMorgan Defendants' representations relating to appraisal

practices were false.  Independent appraisers following proper practices would not systematically

generate appraisals that deviate so significantly (and so consistently upward) from the true values

of the appraised properties.

---

[2] The percentages shown are based on the total outstanding principal balance of the loans.

404.    The JPMorgan Defendants had full access to the appraisal records and all the data

relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to

verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants'

involvement in originating and securitizing the loans and conducting due diligence, they knew

that the appraisals bore no reasonable relationship to the actual data and characteristics of the

properties.  They therefore knew that the appraisals and LTV ratios were unjustified,

unreasonable, and inaccurate.

### (b)    JPALT 2006-A1

405.    The Prospectus Supplement for JPALT 2006-A1 represented that the weighted

average LTV ratios of the Pool 1, Pool 2, Pool 3, Pool 4, and Pool 5 mortgage loans were

77.87%, 76.48%, 71.53%, 71.90%, and 72.30%, respectively.  It also represented that only 112

Pool 1, 51 Pool 2, 51 Pool 3, 51 Pool 4, and 51 Pool 5 mortgage loans had LTV ratios above

90% at origination, which represented just 7.13%, 3.83%, 0.36%, 1.60%, and 0.71% of Pool 1,

Pool 2, Pool 3, Pool 4, and Pool 5, respectively.

406.    In addition, the Prospectus Supplement represented the manner in which

properties were appraised under the standard underwriting procedures:

> The adequacy of the mortgaged property as security for repayment
> of the related mortgage loan will generally have been determined
> by an appraisal in accordance with pre-established appraisal
> procedure guidelines for appraisals established by or acceptable to
> the originator.  All appraisals conform to the Uniform Standards of
> Professional Appraisal Practice adopted by the Appraisal
> Standards Board of the Appraisal Foundation and must be on
> forms acceptable to Fannie Mae and/or Freddie Mac.

407.    With respect to PHH, which originated a percentage of the underlying mortgage

loans, the Prospectus Supplement represented that independent appraisals were obtained:

> In determining the adequacy of the property as collateral for a first
> lien mortgage loan, a Fannie Mae/Freddie Mac conforming

-129-

> appraisal of the property is performed by an independent appraiser
> selected by PHH . . . The appraiser is required to inspect the
> property and verify that it is in good condition and that
> construction or renovation, if new, has been completed.  The
> appraisal report indicates a value for the property and provides
> information concerning marketability, the neighborhood, the
> property site, interior and exterior improvements, and the condition
> of the property.

408.    With respect to CHF, which originated a percentage of the underlying mortgage

loans, the Prospectus Supplement represented that independent appraisals were obtained as well:

> The appraisal is conducted by an independent fee appraiser.  The
> person conducting the appraisal personally visits the property and
> estimates its market value on the basis of comparable properties.
> The independent appraisers do not receive any compensation
> dependent upon either the amount of the loan or its consummation.

409.    With respect to WMMSC, which originated a portion of the mortgage loans, the

Prospectus Supplement represented that all properties were appraised in the following manner:

> The adequacy of the mortgaged property as collateral generally is
> determined by an appraisal made in accordance with pre-
> established appraisal guidelines.  At origination, all appraisals are
> required to conform to the Uniform Standards of Professional
> Appraisal Practice adopted by the Appraisal Standards Board of
> the Appraisal Foundation, and are made on forms acceptable to
> Fannie Mae and/or Freddie Mac.  Appraisers may be staff
> appraisers employed by Washington Mutual Bank or independent
> appraisers selected in accordance with the pre-established appraisal
> guidelines.  Such guidelines generally require that the appraiser, or
> an agent on its behalf, personally inspect the property and verify
> whether the property is in adequate condition and, if the property is
> new construction, whether it is substantially completed.

(*Id.* at S-45.)

410.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

411.    However, MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 77.87% (Pool 1)<br>76.48% (Pool 2)<br>71.53% (Pool 3)<br>71.90% (Pool 4)<br>72.30% (Pool 5) | 89.48% (Pool 1)<br>83.47% (Pool 2)<br>83.83% (Pool 3)<br>84.77% (Pool 4)<br>80.58% (Pool 5) |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 7.13% (112 loans) (Pool 1)<br>3.83% (51 loans) (Pool 2)<br>0.36% (51 loans) (Pool 3)<br>1.60% (51 loans) (Pool 4)<br>0.71% (51 loans) (Pool 5) | 24.29% (277 loans) (Pool 1)<br>17.43% (123 loans) (Pool 2)<br>17.97% (29 loans) (Pool 3)<br>18.22% (78 loans) (Pool 4)<br>11.98% (28 loans) (Pool 5) |

412.    In total, 38% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 34% of the loans tested had LTV ratios that were 10 or more points higher than represented. These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the JPMorgan Defendants' representations relating to appraisal practices were false. Appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

413.    The JPMorgan Defendants had full access to the appraisal records and all the data relating to the mortgage loans. They had an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations. Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the

properties. They knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

### (c)   JPMAC 2006-CH1

414.   The Prospectus Supplement for JPMAC 2006-CH1 represented that the weighted average LTV ratio of the mortgage loans at origination was 78.48%. It also represented that only 628 mortgage loans had LTV ratios above 90% at origination, which represented 16.21% of the collateral pool.

415.   In addition, the Prospectus Supplement represented that JPMC Bank appraised all properties in the following manner:

> The value of each property proposed as security for a mortgage loan is determined by either a full appraisal, an automated valuation model ("AVM"), a limited appraisal conducted on a drive-by basis, or a statistical valuation. Two full appraisals are generally required if the mortgage loan exceeds $500,000.

416.   These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

417.   However, MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 78.48% | 87.74% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 16.21% (628 loans) | 36.38% (1,129 loans) |

-132-

418.    In total, 38% of the loans tested had LTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the JPMorgan Defendants' representations relating to appraisal practices were false.  Appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

419.    The JPMorgan Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

### (d)    JPMAC 2006-CH2

420.    The Prospectus Supplement for JPMAC 2006-CH2 represented that the weighted average LTV ratio of the mortgage loans at origination was 77.51%.  It also represented that only 815 mortgage loans had LTV ratios above 90% at origination, which represented just 6.80% of the collateral pool.

421.    In addition, the Prospectus Supplement represented that JPMC Bank appraised all properties in the following manner:

> The value of each property proposed as security for a mortgage loan is determined by either a full appraisal, an automated valuation model ("AVM"), a limited appraisal conducted on a drive-by basis, or a statistical valuation.  Two full appraisals are generally required if the mortgage loan exceeds $500,000 and

beginning with loans originated on or after April 23, 2006,
$650,000.

(*Id.* at S-83.)

422.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

423.    However, MassMutual's forensic review revealed that these representations were

false.  The true LTV ratios for the mortgage loans at origination were actually much higher than

represented, as shown in the chart below:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 77.51% | 87.07% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 6.80% (815 loans) | 31.58% (2,952 loans) |

424.    In total, 40% of the loans tested had LTV ratios that were 10 or more points

higher than represented.  These results not only demonstrate that the loan statistics in the

Offering Materials were false, but also that the JPMorgan Defendants' representations relating to

appraisal practices were false.  Appraisers following proper practices would not systematically

generate appraisals that deviate so significantly (and so consistently upward) from the true values

of the appraised properties.

425.    The JPMorgan Defendants had full access to the appraisal records and all the data

relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to

verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants'

-134-

involvement in originating and securitizing the loans and conducting due diligence, they knew

that the appraisals bore no reasonable relationship to the actual data and characteristics of the

properties. They therefore knew that the estimations of the properties' values were not justified,

unreasonable, and inaccurate.

(2)    **Bear Stearns Securitizations**

(a)    <u>**BSARM 2005-10**</u>

426.    The Prospectus Supplement for BSARM 2005-10 represented that the weighted

average LTV ratio of the mortgage loans at origination was 67.51%. It also represented that only

three mortgage loans had LTV ratios above 90% at origination, which represented just 0.06% of

the collateral pool.

427.    In addition, the Prospectus represented that appraisals were obtained by licensed

appraisers or through automated valuation systems to ensure that the value of the mortgaged

property supported the outstanding loan balance:

> Mortgaged properties generally will be appraised by licensed
> appraisers or through an automated valuation system. A licensed
> appraiser will generally address neighborhood conditions, site and
> zoning status and condition and valuation of improvements. In the
> case of mortgaged properties secured by single family loans, the
> appraisal report will generally include a reproduction cost analysis
> (when appropriate) based on the current cost of constructing a
> similar home and a market value analysis based on recent sales of
> comparable homes in the area. With respect to multifamily
> properties, commercial properties and mixed-use properties, the
> appraisal must specify whether an income analysis, a market
> analysis or a cost analysis was used. . . . In any case, the value of
> the property being financed, as indicated by the appraisal, must
> support, and support in the future, the outstanding loan balance.
> All appraisals by licensed appraisers are required to be on forms
> acceptable to Fannie Mae or Freddie Mac. Automated valuation
> systems generally rely on publicly available information regarding
> property values . . . .

428.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

429.   However, MassMutual's forensic review revealed that these representations were false.   The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 67.51% | 76.48% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 0.06% (3 loans) | 7.74% (326 loans) |

430.   In total, 28% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 22% of the loans tested had LTV ratios that were 10 or more points higher than represented.   These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the JPMorgan Defendants' representations relating to appraisal practices were false.   Appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

431.   The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.   Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and

-136-

characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were

unjustified, unreasonable, and inaccurate.

### (b)    BALTA 2006-6

432.    The Prospectus Supplement for BALTA 2006-6 represented that the weighted

average LTV ratios of the Group I, Group II, and Group III mortgage loans were 75.69%,

73.23%, and 75.10%, respectively.  It also represented that only four Group I, one Group II, and

12 Group III mortgage loans had LTV ratios above 90% at origination, which represented just

0.11%, 0.05%, and 0.45% of the Group I, Group II, and Group III mortgage pools, respectively.

433.    In addition, the Prospectus Supplement represented that the value of a property

securing an EMC loan was ascertained through an independent appraisal:

> Each mortgaged property has been appraised by a qualified
> independent appraiser who is approved by each lender.  All
> appraisals are required to conform to the Uniform Standards of
> Professional Appraisal Practice adopted by the Appraisal
> Standards Board of the Appraisal Foundation.  Each appraisal must
> meet the requirements of Fannie Mae and Freddie Mac.  Fannie
> Mae and Freddie Mac require, among other things, that the
> appraiser, or its agent on its behalf, personally inspect the property
> inside and out, verify whether the property was in good condition
> and verify that construction, if new, had been substantially
> completed.  The appraisal generally will have been based on prices
> obtained on recent sales of comparable properties, determined in
> accordance with Fannie Mae and Freddie Mac guidelines.

434.    The Prospectus Supplement also represented that Countrywide, which originated

a percentage of the underlying mortgage loans, generally ascertained the value of a property

securing a mortgage loan through an independent appraisal:

> Except with respect to the mortgage loans originated pursuant to its
> Streamlined Documentation Program, whose values were
> confirmed with a Fannie Mae proprietary automated valuation
> model, Countrywide Home Loans obtains appraisals from
> independent appraisers or appraisal services for properties that are
> to secure mortgage loans.  The appraisers inspect and appraise the
> proposed mortgaged property and verify that the property is in

acceptable condition.  Following each appraisal, the appraiser
prepares a report which includes a market data analysis based on
recent sales of comparable homes in the area and, when deemed
appropriate, a replacement cost analysis based on the current cost
of constructing a similar home.  All appraisals are required to
conform to Fannie Mae or Freddie Mac appraisal standards then in
effect.

435.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

436.    However, MassMutual's forensic review revealed that these representations were

false.  The true LTV ratios for the mortgage loans at origination were actually much higher than

represented, as shown in the chart below:

|  | As Represented in the<br>Offering Materials | Actual Values Per<br>Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 75.69% (Group I)<br>73.23% (Group II)<br>75.10% (Group III) | 90.51% (Group I)<br>87.65% (Group II)<br>87.10% (Group III) |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 0.11% (4 loans) (Group I)<br>0.05% (1 loan) (Group II)<br>0.45% (12 loans) (Group III) | 22.56% (344 loans) (Group I)<br>18.25% (91 loans) (Group II)<br>19.92% (367 loans) (Group III) |

437.    In total, 43% of the loans tested were shown to have appraisals that were inflated

by 10% or more, and 33% of the loans tested had LTV ratios that were 10 or more points higher

than represented.  These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the Bear Stearns Defendants' representations relating to

appraisal practices were false.  Independent appraisers following proper practices would not

systematically generate appraisals that deviate so significantly (and so consistently upward) from

the true values of the appraised properties.

-138-

438.   The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

(c)   **BALTA 2006-7**

439.   The Prospectus Supplement for BALTA 2006-7 represented that the weighted average LTV ratios of the Group I and Group II mortgage loans were 75.47% and 76.84%, respectively.  It also represented that only 23 Group I and 215 Group II mortgage loans had LTV ratios above 90% at origination, which represented just 0.97% and 7.20% of the Group I and Group II mortgage pools, respectively.

440.   In addition, the Prospectus Supplement represented that EMC's underwriting guidelines required that the value of a property securing a mortgage loan be ascertained through an independent appraisal:

> Each mortgaged property has been appraised by a qualified independent appraiser who is approved by each lender.  All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation.  Each appraisal must meet the requirements of Fannie Mae and Freddie Mac.  Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed.  The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines.

441.    The Prospectus Supplement also represented that Countrywide, which originated a percentage of the underlying mortgage loans, generally ascertained the value of a property securing a mortgage loan through an independent appraisal:

> Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

442.    The Prospectus Supplement further represented that HomeBanc, which originated a percentage of the underlying mortgage loans, required that the value of a property securing a mortgage loan be ascertained through an independent appraisal:

> Each full and partial appraisal is performed by an independent appraiser that HBMC approves. The appraiser is required to inspect the property and verify that it is in good condition, and that construction or renovation, if applicable, has been completed. The appraisal report indicates a value for the property and provides information concerning marketability, the neighborhood, the property site, interior and exterior improvements and the condition of the property.

443.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

444.    However, MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 75.47% (Group I)<br>76.84% (Group II) | 93.37% (Group I)<br>89.02% (Group II) |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 0.97% (23 loans) (Group I)<br>7.20% (215 loans) (Group II) | 28.95% (302 loans) (Group I)<br>27.10% (509 loans) (Group II) |

445.   In total, 46% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 37% of the loans tested had LTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

446.   The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

**(d)   BSABS 2006-AC4**

447.   The Prospectus Supplement for BSABS 2006-AC4 represented that the weighted average LTV ratio of the mortgage loans at origination was 75.21%.  It also represented that only

-141-

12 mortgage loans had LTV ratios above 90% at origination, which represented just 0.85% of the collateral pool.

448.    In addition, the Prospectus Supplement represented that the value of a property securing a mortgage loan was ascertained through an independent appraisal:

> Each mortgaged property has been appraised by a qualified independent appraiser who is approved by each lender.  All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation.  Each appraisal must meet the requirements of Fannie Mae and Freddie Mac.  Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed.  The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines.

449.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

450.    However, MassMutual's forensic review revealed that these representations were false.  The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 75.21% | 84.53% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 0.85% (12 loans) | 14.81% (198 loans) |

451.   In total, 37% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 28% of the loans tested had LTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

452.   The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

### (e)   **BSABS 2006-AQ1**

453.   The Prospectus Supplement for BSABS 2006-AQ1 represented that the weighted average LTV ratios of the Group I and Group II mortgage loans were 80.97% and 92.28%, respectively.  It also represented that 244 Group I and 348 Group II mortgage loans had LTV ratios above 90% at origination, which represented 13.42% and 53.89% of the Group I and Group II mortgage pools, respectively.

454.   In addition, the Prospectus Supplement represented that the Ameriquest Loan Sellers, which originated the underlying mortgage loans, required a two-tiered appraisal process to ascertain the value of the property securing a mortgage loan:

-143-

The Ameriquest Underwriting Guidelines are applied in
accordance with a procedure which complies with applicable
federal and state laws and regulations and requires (i) an appraisal
of the mortgaged property which conforms to the Uniform
Standards of Professional Appraisal Practice and are generally on
forms similar to those acceptable to Fannie Mae and Freddie Mac
and (ii) a review of such appraisal, which review may be
conducted by a representative of the Ameriquest Loan Sellers or a
fee appraiser and may include a desk review of the original
appraisal or a drive-by review appraisal of the mortgaged property.

455.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

456.    However, MassMutual's forensic review revealed that these representations were

false.  The true LTV ratios for the mortgage loans at origination were actually much higher than

represented, as shown in the chart below:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 80.97% (Group I) 92.28% (Group II) | 90.92% (Group I) 106.11% (Group II) |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 13.42% (244 loans) (Group I) 53.89% (348 loans) (Group II) | 36.44% (519 loans) (Group I) 77.79% (526 loans) (Group II) |

457.    In total, 49% of the loans tested were shown to have appraisals that were inflated

by 10% or more, and 45% of the loans tested had LTV ratios that were 10 or more points higher

than represented.  These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the Bear Stearns Defendants' representations relating to

appraisal practices were false.  Independent appraisers following proper practices would not

systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

458.   The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

### (f)   BSMF 2006-SL1

459.   The Prospectus Supplement for BSMF 2006-SL1 represented that the weighted average CLTV ratio of the mortgage loans at origination was 97.13%.  It also represented that none of the loans would have a CLTV ratio above 100% at origination.

460.   In addition, the Prospectus Supplement represented that the value of a property securing a mortgage loan was ascertained through an independent appraisal:

> Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers.  These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition.  Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, market rent analysis based on the rental of comparable homes in the area.  All appraisals are required to conform to the Uniform Standard of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac.

461.   These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

-145-

462.   However, MassMutual's forensic review revealed that these representations were false.  The true CLTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average CLTV of the Mortgage Loans | 97.13% | 111.22% |
| Percentage of Mortgage Loans with CLTV of Greater than 100% | 0% (0 loans) | 32.25% (2,356 loans) |

463.   In total, 42% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 41% of the loans tested had CLTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

464.   The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the CLTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and CLTV ratios were unjustified, unreasonable, and inaccurate.

-146-

**(g)**    **BSMF 2006-AC1**

465.    The Prospectus Supplement for BSMF 2006-AC1 represented that the weighted average LTV ratio of the mortgage loans at origination was 75.51%. It also represented that only 12 mortgage loans had LTV ratios above 90% at origination, which represented just 0.95% of the collateral pool.

466.    In addition, the Prospectus Supplement represented that the value of a property securing a mortgage loan was ascertained through an independent appraisal:

> Each mortgaged property has been appraised by a qualified independent appraiser who is approved by each lender. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines.

467.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

468.    However, MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 75.51% | 84.87% |

| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 0.95% (12 loans) | 14.87% (136 loans) |
| --- | --- | --- |

469.    In total, 35% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 26% of the loans tested had LTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

470.    The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans.  They had an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

### (h)    BSMF 2006-AR1

471.    The Prospectus Supplement for BSMF 2006-AR1 represented that the weighted average LTV ratios of the Group I and Group II mortgage loans were 77.78% and 78.11%, respectively.  It also represented that only three Group I and no Group II mortgage loans had LTV ratios above 90% at origination, which represented just 0.15% and 0% of the Group I and Group II mortgage pools, respectively.

472.   In addition, the Prospectus Supplement represented that, under EMC's underwriting guidelines, the value of a property securing a mortgage loan was ascertained through an independent appraisal:

> Each mortgaged property has been appraised by a qualified independent appraiser who is approved by each lender. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines.

473.   These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

474.   However, MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 77.78% (Group I) 78.11% (Group II) | 88.20% (Group I) 85.93% (Group II) |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 0.15% (3 loans) (Group I) 0% (0 loans) (Group II) | 29.84% (341 loans) (Group I) 22.63% (343 loans) (Group II) |

475.   In total, 42% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 34% of the loans tested had LTV ratios that were 10 or more points higher

-149-

than represented.  These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the Bear Stearns Defendants' representations relating to

appraisal practices were false.  Independent appraisers following proper practices would not

systematically generate appraisals that deviate so significantly (and so consistently upward) from

the true values of the appraised properties.

476.    The Bear Stearns Defendants had full access to the appraisal records and all the

data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence

to verify the accuracy of the LTV ratio and appraisal representations.  Based on these

Defendants' involvement in originating and securitizing the loans and conducting due diligence,

they knew that the appraisals bore no reasonable relationship to the actual data and

characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were

unjustified, unreasonable, and inaccurate.

    **(i)**  **BSMF 2006-AR2**

477.    The Prospectus Supplement for BSMF 2006-AR2 represented that the weighted

average LTV ratios of the Group I and Group II mortgage loans were 77.83% and 78.23%,

respectively.  It also represented that only one Group I and no Group II mortgage loans had an

LTV ratio above 90% at origination, which represented just 0.03% and 0% of the Group I and

Group II mortgage pools, respectively.

478.    In addition, the Prospectus Supplement represented that, under EMC's

underwriting guidelines, the value of a property securing a mortgage loan was ascertained

through an independent appraisal:

> Each mortgaged property has been appraised by a qualified
> independent appraiser who is approved by each lender.  All
> appraisals are required to conform to the Uniform Standards of
> Professional Appraisal Practice adopted by the Appraisal
> Standards Board of the Appraisal Foundation.  Each appraisal must