meet the requirements of Fannie Mae and Freddie Mac. Fannie
Mae and Freddie Mac require, among other things, that the
appraiser, or its agent on its behalf, personally inspect the property
inside and out, verify whether the property was in good condition
and verify that construction, if new, had been substantially
completed. The appraisal generally will have been based on prices
obtained on recent sales of comparable properties, determined in
accordance with Fannie Mae and Freddie Mac guidelines.

479.     These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

480.     However, MassMutual's forensic review revealed that these representations were

false. The true LTV ratios for the mortgage loans at origination were actually much higher than

represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 77.83% (Group I) 78.23% (Group II) | 88.17% (Group I) 86.01% (Group II) |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 0.03% (1 loan) (Group I) 0% (0 loans) (Group II) | 29.66% (518 loans) (Group I) 21.14% (243 loans) (Group II) |

481.     In total, 44% of the loans tested were shown to have appraisals that were inflated

by 10% or more, and 37% of the loans tested had LTV ratios that were 10 or more points higher

than represented. These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the Bear Stearns Defendants' representations relating to

appraisal practices were false. Independent appraisers following proper practices would not

systematically generate appraisals that deviate so significantly (and so consistently upward) from

the true values of the appraised properties.

482.   The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

### (j)   BSMF 2006-AR3

483.   The Prospectus Supplement for BSMF 2006-AR3 represented that the weighted average LTV ratios of the Group I and Group II mortgage loans were 77.40% and 78.08%, respectively.  It also represented that no Group I and only one Group II mortgage loan had an LTV ratio above 90% at origination, which represented 0% and 0.06% of the Group I and Group II mortgage pools, respectively.

484.   In addition, the Prospectus Supplement represented that, under EMC's underwriting guidelines, the value of a property securing a mortgage loan was ascertained through an independent appraisal:

> Each mortgaged property has been appraised by a qualified independent appraiser who is approved by each lender.  All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation.  Each appraisal must meet the requirements of Fannie Mae and Freddie Mac.  Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed.  The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines.

-152-

485.   These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

486.   However, MassMutual's forensic review revealed that these representations were false.  The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 77.40% (Group I) 78.08% (Group II) | 89.66% (Group I) 87.03% (Group II) |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 0% (0 loans) (Group I) 0.06% (1 loan) (Group II) | 33.54% (344 loans) (Group I) 24.81% (245 loans) (Group II) |

487.   In total, 49% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 39% of the loans tested had LTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

488.   The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence,

-153-

they knew that the appraisals bore no reasonable relationship to the actual data and

characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were

unjustified, unreasonable, and inaccurate.

(k)     **BSARM 2007-2**

489.    The Prospectus Supplement for BSARM 2007-2 represented that the weighted

average LTV ratio of the mortgage loans at origination was 74.10%.  It also represented that only

34 mortgage loans had LTV ratios above 90% at origination, which represented just 0.87% of the

collateral pool.

490.    In addition, the Prospectus Supplement represented that Countrywide, which

originated a percentage of the underlying mortgage loans, generally ascertained the value of a

property securing a mortgage loan through an independent appraisal:

> Except with respect to the mortgage loans originated pursuant to its
> Streamlined Documentation Program, whose values were
> confirmed with a Fannie Mae proprietary automated valuation
> model, Countrywide Home Loans obtains appraisals from
> independent appraisers or appraisal services for properties that are
> to secure mortgage loans.  The appraisers inspect and appraise the
> proposed mortgaged property and verify that the property is in
> acceptable condition.  Following each appraisal, the appraiser
> prepares a report which includes a market data analysis based on
> recent sales of comparable homes in the area and, when deemed
> appropriate, a replacement cost analysis based on the current cost
> of constructing a similar home.  All appraisals are required to
> conform to Fannie Mae or Freddie Mac appraisal standards then in
> effect.

491.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

492.    However, MassMutual's forensic review revealed that these representations were

false.  The true LTV ratios for the mortgage loans at origination were actually much higher than

represented, as shown in the chart below:

-154-

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 74.10% | 85.02% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 0.87% (34 loans) | 16.25% (413 loans) |

493.    In total, 41% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 30% of the loans tested had LTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

494.    The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

### (l)    BSABS 2007-1

495.    The Prospectus Supplement for BSABS 2007-1 represented that the weighted average CLTV ratio of the mortgage loans at origination was 82.59%.  It also represented that

-155-

only 271 mortgage loans had CLTV ratios above 90% at origination, which represented 24.64%

of the collateral pool.

496.   In addition, the Prospectus Supplement represented that the various originators

used an independent appraisal to ascertain the value of a property underlying a mortgage loan:

> Mortgaged properties that are to secure mortgage loans generally
> are appraised by qualified independent appraisers.  These
> appraisals are required to conform to the Uniform Standard of
> Professional Appraisal Practice adopted by the Appraisal
> Standards Board of the Appraisal Foundation and are generally on
> forms acceptable to Fannie Mae and Freddie Mac.

497.   These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

498.   However, MassMutual's forensic review revealed that these representations were

false.  The true CLTV ratios for the mortgage loans at origination were actually much higher

than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average CLTV Ratio of the Mortgage Loans at Origination | 82.59% | 97.08% |
| Percentage of Mortgage Loans with CLTV Ratio Greater than 90% at Origination | 24.64% (271 loans) | 37.83% (366 loans) |

499.   In total, 30% of the loans tested were shown to have appraisals that were inflated

by 10% or more, and 43% of the loans tested had CLTV ratios that were 10 or more points

higher than represented.  These results not only demonstrate that the loan statistics in the

Offering Materials were false, but also that the Bear Stearns Defendants' representations relating

-156-

to appraisal practices were false. Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

500. The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the CLTV ratio and appraisal representations. Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties. They therefore knew that the appraisals and CLTV ratios were unjustified, unreasonable, and inaccurate.

### (m)   **BSABS 2007-AC2**

501. The Prospectus Supplement for BSABS 2007-AC2 represented that the weighted average LTV ratio of the mortgage loans at origination was 76.11%. It also represented that only 60 mortgage loans had LTV ratios above 90% at origination, which represented just 2.92% of the collateral pool.

502. In addition, the Prospectus Supplement represented that the value of a property securing a mortgage loan was ascertained through an independent appraisal:

> Each mortgaged property has been appraised by a qualified independent appraiser who is approved by each lender. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines.

503.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

504.    However, MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 76.11% | 87.98% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 2.92% (60 loans) | 16.23% (293 loans) |

505.    In total, 46% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 39% of the loans tested had LTV ratios that were 10 or more points higher than represented. These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to appraisal practices were false. Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

506.    The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations. Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and

-158-

characteristics of the properties. They therefore knew that the appraisals and LTV ratios were

unjustified, unreasonable, and inaccurate.

### (n)   BSABS 2007-HE3

507.    The Prospectus Supplement for BSABS 2007-HE3 represented that the weighted

average LTV ratio of the mortgage loans at origination was 82.93%. It also represented that only

1,356 mortgage loans had LTV ratios above 90% at origination, which represented 22.55% of

the collateral pool.

508.    In addition, the Prospectus Supplement represented that independent appraisals

were obtained for the mortgaged properties:

> Mortgaged properties that are to secure mortgage loans generally
> are appraised by qualified independent appraisers. These
> appraisers inspect and appraise the subject property and verify that
> the property is in acceptable condition. Following each appraisal,
> the appraiser prepares a report that includes a market value
> analysis based on recent sales of comparable homes in the area
> and, when deemed appropriate, market rent analysis based on the
> rental of comparable homes in the area. All appraisals are required
> to conform to the Uniform Standard of Professional Appraisal
> Practice adopted by the Appraisal Standards Board of the
> Appraisal Foundation and are generally on forms acceptable to
> Fannie Mae and Freddie Mac.

509.    The Prospectus Supplement also represented that PCC, which originated a

percentage of the underlying mortgage loans, employed a stringent appraisal review process:

> As lenders that generally specialize in loans made to credit
> impaired borrowers, PCC implemented an appraisal review process
> to support the value used to determine the LTV ratio. PCC used a
> variety of steps in its appraisal review process in order to attempt
> to ensure the accuracy of the value provided by the initial
> appraiser. This includes obtaining an independent automated
> property review on a majority of the loans that it originates. PCC's
> review process required a written review on every appraisal report
> either by a qualified independent underwriter or by a staff
> appraiser. PCC employed several methods to determine which
> appraisals are higher risk and attempted to direct those reviews to
> one of its staff appraisers. The criteria for identifying higher risk

appraisal reports included those properties receiving lower scores from the automated property review, properties with larger loan amounts and those units and properties that fail a scoring template used by the internal underwriting staff. PCC also employed an appraisal review staff consisting mostly of staff appraisers. As part of their review process, the review department where available, verified the subject property's sales history, those of comparable properties as well as reviews additional comparable data. In some cases the value of the property used to determine the LTV ratio was reduced where it was determined by PCC's staff appraisers that the original appraised value cannot be supported.

510.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

511.    However, MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 82.93% | 93.48% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 22.55% (1,356 loans) | 42.52% (1,535 loans) |

512.    In total, 57% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 45% of the loans tested had LTV ratios that were 10 or more points higher than represented. These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to appraisal practices were false. Independent appraisers following proper practices would not

-160-

systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

513. The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations. Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties. They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

### (o)   BSMF 2007-AR1

514. The Prospectus Supplement for BSMF 2007-AR1 represented that the weighted average LTV ratios of the Group I and Group II mortgage loans were 77.45% and 77.73%, respectively. It also represented that only one Group I and three Group II mortgage loans had LTV ratios above 90% at origination, which represented 0.09% of each collateral pool.

515. In addition, the Prospectus Supplement represented that, under EMC's underwriting guidelines, the value of a property securing a mortgage loan was ascertained through an independent appraisal:

> Each mortgaged property has been appraised by a qualified independent appraiser who is approved by each lender. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines.

-161-

516.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

517.    However, MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 77.45% (Group I) 77.73% (Group II) | 91.23% (Group I) 88.89% (Group II) |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 0.09% (1 loan) (Group I) 0.09% (3 loans) (Group II) | 40.68% (274 loans) (Group I) 29.47% (576 loans) (Group II) |

518.    In total, 53% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 43% of the loans tested had LTV ratios that were 10 or more points higher than were represented. These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false. Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

519.    The Bear Stearns Defendants had full access to the appraisal records and all data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations. Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew

that the appraisals bore no reasonable relationship to the actual data and characteristics of the

properties.  They therefore knew that the appraisals and LTV ratios were unjustified,

unreasonable, and inaccurate.

(p)    **SAMI 2005-AR8**

520.    The Prospectus Supplement for SAMI 2005-AR8 represented that the weighted

average LTV ratio of the mortgage loans at origination was 76.27%.  It also represented that only

76 mortgage loans had LTV ratios above 90% at origination, which represented just 2.55% of the

collateral pool.

521.    In addition, the Prospectus Supplement represented that Countrywide, which

originated the underlying mortgage loans, generally ascertained the value of a property securing

a mortgage loan through an independent appraisal:

> Except with respect to the mortgage loans originated pursuant to its
> Streamlined Documentation Program, whose values were
> confirmed with a Fannie Mae proprietary automated valuation
> model, Countrywide Home Loans obtains appraisals from
> independent appraisers or appraisal services for properties that are
> to secure mortgage loans.  The appraisers inspect and appraise the
> proposed mortgaged property and verify that the property is in
> acceptable condition.  Following each appraisal, the appraiser
> prepares a report which includes a market data analysis based on
> recent sales of comparable homes in the area and, when deemed
> appropriate, a replacement cost analysis based on the current cost
> of constructing a similar home.  All appraisals are required to
> conform to Fannie Mae or Freddie Mac appraisal standards then in
> effect.

522.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

523.    However, MassMutual's forensic review revealed that these representations were

false.  The true LTV ratios for the mortgage loans at origination were actually much higher than

represented, as shown in the chart below:

-163-

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 76.27% | 86.00% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 2.55% (76 loans) | 23.77% (607 loans) |

524.    In total, 42% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 36% of the loans tested had LTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to appraisal practices were false.  Appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

525.    The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

### (q)    SAMI 2006-AR3

526.    The Prospectus Supplement for SAMI 2006-AR3 represented that the weighted average LTV ratios of the Group I, Group II, and Group III mortgage loans were 76.42%,

73.85%, and 71.87%, respectively. It also represented that only 289 Group I, 36 Group II, and 6 Group III mortgage loans had LTV ratios above 90% at origination, which represented just 4.07%, 2.21%, and 0.66% of the Group I, Group II, and Group III mortgage pools, respectively.

527.    Additionally, the Prospectus Supplement represented that Countrywide, which originated a percentage of the underlying mortgage loans, generally ascertained the value of a property securing a mortgage loan through an independent appraisal:

> Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

528.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

529.    However, MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 76.42% (Group I) 73.85% (Group II) 71.87% (Group III) | 91.19% (Group I) 83.96% (Group II) 80.97% (Group III) |

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 4.07% (289 loans) (Group I)<br>2.21% (36 loans) (Group II)<br>0.66% (6 loans) (Group III) | 26.87% (1,230 loans) (Group I)<br>19.64% (204 loans) (Group II)<br>18.94% (135 loans) (Group III) |

530.    In total, 45% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 39% of the loans tested had LTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to appraisal practices were false.  Appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

531.    The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

(r)    **SAMI Series 2006-AR5**

532.    The Prospectus Supplement for SAMI 2006-AR5 represented that the weighted average LTV ratio of the mortgage loans at origination was 73.32%.  It also represented that only 55 mortgage loans had LTV ratios above 90% at origination, which represented just 1.48% of the collateral pool.

-166-

533.    In addition, the Prospectus Supplement represented that AHMIC, which originated the underlying mortgage loans, generally ascertained the value of a property securing a mortgage loan using a standard industry appraisal process:

> Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter.

534.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

535.    However, MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 73.32% | 94.34% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 1.48% (55 loans) | 27.90% (601 loans) |

536.   In total, 55% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 47% of the loans tested had LTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to appraisal practices were false.  Appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

537.   The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

(s)   **SAMI Series 2006-AR6**

538.   The Prospectus Supplement for SAMI 2006-AR6 represented that the weighted average LTV ratio of the mortgage loans at origination was 74.77%.  It also represented that only 95 mortgage loans had LTV ratios above 90% at origination, which represented just 1.68% of the collateral pool.

539.   Additionally, the Prospectus Supplement represented that Countrywide, which originated the underlying mortgage loans, generally ascertained the value of a property securing a mortgage loan through an independent appraisal:

>   Except with respect to the mortgage loans originated pursuant to its
>   Streamlined Documentation Program, whose values were
>   confirmed with a Fannie Mae proprietary automated valuation

model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

540.   These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

541.   However, MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 74.77% | 88.71% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 1.68% (95 loans) | 25.19% (943 loans) |

542.   In total, 50% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 42% of the loans tested had LTV ratios that were 10 or more points higher than represented. These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to appraisal practices were false. Independent appraisers following proper practices would not

-169-

systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

543.    The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

(t)    **SAMI Series 2006-AR7**

544.    The Prospectus Supplement for SAMI 2006-AR7 represented that the weighted average LTV ratio of the mortgage loans at origination was 75.68%.  It also represented that only 229 mortgage loans had LTV ratios above 90% at origination, which represented just 2.11% of the collateral pool.

545.    Additionally, the Prospectus Supplement represented that Countrywide, which originated the underlying mortgage loans, generally ascertained the value of a property securing a mortgage loan through an independent appraisal:

> Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans.  The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition.  Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home.  All appraisals are required to

conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

546.   These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

547.   However, MassMutual's forensic review revealed that these representations were false.  The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 75.68% | 90.10% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 2.11% (229 loans) | 28.81% (2,033 loans) |

548.   In total, 53% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 45% of the loans tested had LTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to appraisal practices were false.  Appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

549.   The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these

Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties. They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

### (u)  SAMI 2006-AR8

550.    The Prospectus Supplement for SAMI 2006-AR8 represented that the weighted average LTV ratio of the mortgage loans at origination was 76.43%. It also represented that only 108 mortgage loans had LTV ratios above 90% at origination, which represented just 1.54% of the collateral pool.

551.    Additionally, the Prospectus Supplement represented that Countrywide, which originated a percentage of the underlying mortgage loans, generally ascertained the value of a property securing a mortgage loan through an independent appraisal:

> Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

552.    The Prospectus Supplement also represented that SouthStar, which originated a percentage of the underlying mortgage loans, ascertained the value of a property securing a mortgage loan through an independent appraisal:

> In determining adequacy of the property as collateral for the loan, a Fannie Mae/Freddie Mac URAR appraisal of the property is

performed by an independent appraiser approved by SouthStar.
The appraiser is required to inspect the property and verify that it is
in good condition and that any construction or renovation, if new,
has been completed. The appraisal report indicates a value for the
property and provides information concerning marketability, the
neighborhood, the property site, interior and exterior
improvements, and the condition of the property.

553.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

554.    However, MassMutual's forensic review revealed that these representations were

false. The true LTV ratios for the mortgage loans at origination were actually much higher than

represented, as shown in the chart below:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 76.43% | 89.60% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 1.54% (108 loans) | 29.04% (1,454 loans) |

555.    In total, 52% of the loans tested were shown to have appraisals that were inflated

by 10% or more, and 44% of the loans tested had LTV ratios that were 10 or more points higher

than represented. These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the Bear Stearns Defendants' representations relating to

appraisal practices were false. Independent appraisers following proper practices would not

systematically generate appraisals that deviate so significantly (and so consistently upward) from

the true values of the appraised properties.

556.   The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

(v)   <b>SAMI 2007-AR1</b>

557.   The Prospectus Supplement for SAMI 2007-AR1 represented that the weighted average LTV ratios of the Group I and Group II mortgage loans were 77.54% and 77.96%, respectively.  It also represented that only 28 Group I and six Group II mortgage loans had LTV ratios above 90% at origination, which represented just 2.08% and 0.31% of the Group I and Group II mortgage pools, respectively.

558.   In addition, the Prospectus Supplement represented that SouthStar, which originated a percentage of the underlying mortgage loans, ascertained the value of a property securing a mortgage loan via an independent appraisal:

> In determining adequacy of the property as collateral for the loan, a Fannie Mae/Freddie Mac URAR appraisal of the property is performed by an independent appraiser approved by SouthStar. The appraiser is required to inspect the property and verify that it is in good condition and that any construction or renovation, if new, has been completed.  The appraisal report indicates a value for the property and provides information concerning marketability, the neighborhood, the property site, interior and exterior improvements, and the condition of the property.

559.   The Prospectus Supplement also represented that Countrywide, which originated a percentage of the mortgage loans, generally ascertained the value of a property securing a mortgage loan through an independent appraisal:

-174-

Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

560.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

561.    However, MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 77.54% (Group I) 77.96% (Group II) | 90.17% (Group I) 90.91% (Group II) |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 2.08% (28 loans) (Group I) 0.31% (6 loans) (Group II) | 31.60% (341 loans) (Group I) 28.89% (286 loans) (Group II) |

562.    In total, 52% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 43% of the loans tested had LTV ratios that were 10 or more points higher than represented. These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to

-175-

appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

563.    The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

(w)    **GMFT 2006-AR1**

564.    The Prospectus Supplement for GMFT 2006-AR1 represented that the weighted average LTV ratio of the mortgage loans at origination was 77.10%.  It also represented that only five mortgage loans had LTV ratios above 90% at origination, which represented just 0.12% of the collateral pool.

565.    In addition, the Prospectus Supplement represented that all properties were independently appraised in the following manner:

> In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing.  All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac.  The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property is in a good condition and verify that construction, if new, has been substantially completed.

566.   These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

567.   However, MassMutual's forensic review revealed that these representations were false.   The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 77.10% | 85.57% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 0.12% (5 loans) | 21.77% (788 loans) |

568.   In total, 39% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 33% of the loans tested had LTV ratios that were 10 or more points higher than represented.   These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to appraisal practices were false.   Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

569.   The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.   Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence,

they knew that the appraisals bore no reasonable relationship to the actual data and

characteristics of the properties. They therefore knew that the appraisals and LTV ratios were

unjustified, unreasonable, and inaccurate.

(x)    <u>GMFT 2006-AR3</u>

570.    The Prospectus Supplement for GMFT 2006-AR3 represented that the weighted

average LTV ratio of the mortgage loans at origination was 77.21%. It also represented that only

11 mortgage loans had LTV ratios above 90% at origination, which represented just 0.11% of the

collateral pool.

571.    In addition, the Prospectus Supplement represented that all properties were

independently appraised in the following manner:

> In determining the adequacy of the property as collateral, an
> independent appraisal is generally made of each property
> considered for financing. All appraisals are required to conform to
> the Uniform Standards of Professional Appraisal Practice adopted
> by the Appraisal Standards Board of the Appraisal Foundation.
> Each appraisal must meet the requirements of Fannie Mae and
> Freddie Mac. The requirements of Fannie Mae and Freddie Mac
> require, among other things, that the appraiser, or its agent on its
> behalf, personally inspect the property inside and out, verify
> whether the property is in a good condition and verify that
> construction, if new, has been substantially completed.

572.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

573.    However, MassMutual's forensic review revealed that these representations were

false. The true LTV ratios for the mortgage loans at origination were actually much higher than

represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 77.21% | 85.91% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 0.11% (11 loans) | 22.53% (1,424 loans) |

574.   In total, 42% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 35% of the loans tested had LTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the Bear Stearns Defendants' representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

575.   The Bear Stearns Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

### (3)     WaMu Securitizations

#### (a)     <u>WaMu 2005-AR1</u>

576.    The Prospectus Supplement for WaMu 2005-AR1 represented that the weighted average LTV ratio of the mortgage loans at origination was 69.3%. It also represented that no mortgage loans had an LTV ratio above 90% at origination.

577.    In addition, the Prospectus represented that the originators generally ascertained the value of a property securing a mortgage loan through an independent appraisal process:

> The Company's underwriting standards generally follow guidelines acceptable to Fannie Mae and Freddie Mac. In determining the adequacy of the property as collateral, an independent appraisal is made of each property considered for financing. The appraiser is required to inspect the property and verify that it is in good condition and that construction, if new, has been completed. The appraisal is based on the appraiser's judgment of values, giving appropriate weight to both the market value of comparable homes and the cost of replacing the property.

578.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

579.    However, MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 69.3% | 83.42% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 0% (0 loans) | 19.05% (1,043 loans) |

580.    In total, 37% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 32% of the loans tested had LTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the WaMu Defendants' representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

581.    The WaMu Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

(b)    **WMALT 2006-AR1**

582.    The Prospectus Supplement for WMALT 2006-AR1 represented that the weighted average LTV ratio of the mortgage loans at origination was 75.3%.  It also represented that only 19 mortgage loans had LTV ratios above 90% at origination, which represented just 0.91% of the collateral pool.

583.    Additionally, the Prospectus Supplements represented that the originators generally ascertained the value of a property securing a mortgage loan through a standard industry appraisal process:

> The adequacy of the mortgaged property as collateral generally is
> determined by an appraisal made in accordance with pre-

-181-

established appraisal guidelines. At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to Fannie Mae and/or Freddie Mac . . . . Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed.

584.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

585.    However, MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 75.3% | 85.06% |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 0.91% (19 loans) | 17.63% (289 loans) |

586.    In total, 34% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 28% of the loans tested had LTV ratios that were 10 or more points higher than represented. These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the WaMu Defendants' representations relating to appraisal practices were false. Appraisers following proper practices would not systematically generate

-182-

appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

587.    The WaMu Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

### (c)    WMALT 2006-AR5

588.    The Prospectus Supplement for WMALT 2006-AR5 represented that the weighted average CLTV ratios of the Group 1, Group 2, Group 3, Group 4, and Group 5 mortgage loans were 76.8%, 77.3%, 76.4%, 77.2%, and 91.5%, respectively.  It also represented that only seven Group 1, five Group 2, 18 Group 3, 11 Group 4, and 200 Group 5 mortgage loans had CLTV ratios above 90% at origination, which represented 41.72%, 1.69%, 1.44%, 1.40%, and 36.52% of the Group 1, Group 2, Group 3, Group 4, and Group 5 mortgage pools, respectively.

589.    Additionally, the Prospectus Supplement represented that the originators generally ascertained the value of a property securing a mortgage loan through a standard industry appraisal process:

> The adequacy of the mortgaged property as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines.  At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to Fannie Mae and/or Freddie Mac . . . Such guidelines generally

require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed.

590.   These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

591.   However, MassMutual's forensic review revealed that these representations were false.  The true CLTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Weighted Average CLTV Ratio of the Mortgage Loans at Origination | 76.8% (Group 1)<br>77.3% (Group 2)<br>76.4% (Group 3)<br>77.2% (Group 4)<br>91.5% (Group 5) | 92.27% (Group 1)<br>86.18% (Group 2)<br>87.97% (Group 3)<br>95.88% (Group 4)<br>105.26% (Group 5) |
| Percentage of Mortgage Loans with CLTV Ratio Greater than 90% at Origination | 1.72% (7 loans) (Group 1)<br>1.69% (5 loans) (Group 2)<br>1.44% (18 loans) (Group 3)<br>1.40% (11 loans) (Group 4)<br>36.52% (200 loans) (Group 5) | 34.61% (125 loans) (Group 1)<br>29.04% (81 loans) (Group 2)<br>32.61% (348 loans) (Group 3)<br>37.45% (378 loans) (Group 4)<br>72.30% (385 loans) (Group 5) |

592.   In total, 50% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 48% of the loans tested had CLTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the WaMu Defendants' representations relating to appraisal practices were false.  Appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

593.   The WaMu Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the CLTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and CLTV ratios were unjustified, unreasonable, and inaccurate.

### (d)   <u>WaMu 2006-AR7</u>

594.   The Prospectus Supplement for WaMu 2006-AR7 represented that the weighted average LTV ratios of the Group 1, Group 2, and Group 3 mortgage loans were 71.0%, 70.8%, and 68.9%, respectively.  It also represented that only three Group 1, three Group 2, and one Group 3 mortgage loans had LTV ratios above 90% at origination, which represented just 0.34%, 0.13%, and 0.22% of the Group 1, Group 2, and Group 3 mortgage pools, respectively.

595.   Additionally, the Prospectus Supplements represented that the originators generally ascertained the value of a property securing a mortgage loan through a standard industry appraisal process:

> The adequacy of the mortgaged property as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines.  At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to Fannie Mae and/or Freddie Mac . . . Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed.

596.   These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

-185-

597.    However, MassMutual's forensic review revealed that these representations were false.  The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 71.0% (Group 1)<br>70.8% (Group 2)<br>68.9% (Group 3) | 84.06% (Group 1)<br>83.64% (Group 2)<br>86.70% (Group 3) |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 0.34% (3 loans) (Group 1)<br>0.13% (3 loans) (Group 2)<br>0.22% (1 loan) (Group 3) | 16.93% (68 loans) (Group 1)<br>17.69% (168 loans) (Group 2)<br>14.67% (49 loans) (Group 3) |

598.    In total, 39% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 32% of the loans tested had LTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the WaMu Defendants' representations relating to appraisal practices were false.  Appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

599.    The WaMu Defendants had full access to the appraisal records and all the data relating to the mortgage loans.  They had an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the

properties. They knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

(e)  **WaMu 2007-HE2 Trust**

600.  The Prospectus Supplement for WaMu 2007-HE2 represented that the weighted average LTV ratios of the Group I and Group II mortgage loans were 79.59% and 82.34%, respectively. It also represented that only 196 Group I and 119 Group II mortgage loans had LTV ratios above 90% at origination, which represented just 6.64% and 4.81% of the Group I and Group II mortgage pools, respectively.

601.  Additionally, the Prospectus Supplement represented that the originators generally ascertained the value of a property securing a mortgage loan through an independent appraisal process:

> The adequacy of the mortgaged property as collateral is generally determined by an appraisal of the mortgaged property that generally conforms to Fannie Mae and Freddie Mac appraisal standards and a review of that appraisal. The mortgaged properties are appraised by licensed independent appraisers who have satisfied the servicer's appraiser screening process . . . Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.

602.  These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

603.  However, MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the mortgage loans at origination were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV Ratio of the Mortgage Loans at Origination | 79.59% (Group I) 82.34% (Group II) | 92.28% (Group I) 91.31% (Group II) |
| Percentage of Mortgage Loans with LTV Ratio Greater than 90% at Origination | 6.64% (196 loans) (Group I) 4.81% (119 loans) (Group II) | 35.29% (909 loans) (Group I) 36.92% (923 loans) (Group II) |

604.    In total, 57% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 42% of the loans tested had LTV ratios that were 10 or more points higher than represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the WaMu Defendants' representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

605.    The WaMu Defendants had full access to the appraisal records and all the data relating to the mortgage loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV ratio and appraisal representations.  Based on these Defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the appraisals bore no reasonable relationship to the actual data and characteristics of the properties.  They therefore knew that the appraisals and LTV ratios were unjustified, unreasonable, and inaccurate.

606.    The above analysis demonstrates not only the falsity of Defendants' representations concerning LTV and CLTV ratios, but also the falsity of their representations

-188-

concerning adherence to underwriting standards and practices. Had Defendants and the relevant third-party originators adhered to the underwriting guidelines disclosed in the Offering Materials, MassMutual's statistical loan-by-loan review would not have uncovered such significant and unidirectional discrepancies between the represented ratios and the actual ratios.

## VI.   MISREPRESENTATIONS ABOUT OWNER-OCCUPANCY STATISTICS REVEALED BY A FORENSIC REVIEW OF THE MORTGAGE LOANS

### A.   Owner-Occupancy Testing

607.   The forensic review commissioned by MassMutual also tested the accuracy of the representations of owner occupancy in the Offering Materials.

608.   Owner-occupancy statistics were material to MassMutual and other investors because high owner-occupancy rates would have made the Certificates safer investments than Certificates backed by second homes or investment properties. Homeowners who reside in mortgaged properties are less likely to default than owners who purchase homes as investments or second homes and live elsewhere.

609.   MassMutual's forensic review tested the accuracy of the representations of owner occupancy in the Offering Materials. To determine whether a given borrower actually occupied the property as claimed, MassMutual investigated tax information for the loans. One would expect that a borrower residing at a property would have the tax bills sent to that address, and would take applicable tax exemptions available to residents of that property. If a borrower had his or her tax records sent to another address, that is evidence that the borrower was not actually residing at the mortgaged property. If a borrower declined to make certain tax exemption elections that depend on the borrower living at the property, that also is evidence the borrower was living elsewhere. MassMutual also reviewed: (1) borrower credit records, because one would expect that people have bills sent to their primary address. If a borrower was telling

creditors to send bills to another address, even six months after buying the property, that is evidence the borrower was living elsewhere; (2) property records, because it is unlikely that a borrower lives in any one property if in fact that borrower owns multiple properties. It is even more unlikely that the borrower resides at the mortgaged property if a concurrently owned separate property did not have its own tax bills sent to the property included in the mortgage pool; and (3) records of other liens, because if the property was subject to additional liens but those materials were sent elsewhere, that is evidence the borrower was not living at the mortgaged property. If the other lien involved a conflicting declaration of residency, that too would be evidence that the borrower did not live in the subject property.

610.    If a property fails more than one of the above tests, that is strong evidence the borrower did not in fact reside at the mortgaged property. As described more fully in the next section (Section VI.B), the results of MassMutual's loan-level analysis of true owner-occupancy rates on the mortgage loans underlying its Certificates show that, despite the prospectus representations, a much higher percentage of borrowers did not occupy the mortgaged properties than was represented.

**B.    Specific Misrepresentations in the Offering Materials.**

(1)    **JPMorgan Securitizations**

(a)    **JPMMT 2005-ALT1**

611.    As shown in the chart below, the Offering Materials for the JPMMT 2005-ALT1 securitization represented that 1,825 of the underlying mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 10.52% of these loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 1,825 loans being owner occupied, as represented in the Offering Materials, only 1,633 were:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 1,825 loans (83.14%)[3] | 1,633 loans (74.40%) |

**(b)   JPALT 2006-A1**

612.   As shown in the chart below, the Offering Materials for the JPALT 2006-A1

securitization represented that 697 of the underlying Pool 1 mortgage loans, 544 of the

underlying Pool 2 mortgage loans, 186 of the underlying Pool 3 mortgage loans, 336 of the

underlying Pool 4 mortgage loans, and 197 of the underlying Pool 5 mortgage loans were for

primary residences, *i.e.* owner-occupied properties.  In MassMutual's subsequent loan-level

analysis, however, 11.05% of the Pool 1 loans, 11.21% of the Pool 2 loans, 16.67% of the Pool 3

loans, 11.01% of the Pool 4 loans and 11.68% of the Pool 5 loans failed multiple tests for owner

occupancy.  Thus, as shown in the chart below, the representations in the Offering Materials

were inaccurate:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 697 loans (65.14%) (Pool 1)<br>544 loans (77.71%) (Pool 2)<br>186 loans (92.54%) (Pool 3)<br>336 loans (76.89%) (Pool 4)<br>197 loans (83.12%) (Pool 5) | 620 loans (57.94%) (Pool 1)<br>483 loans (69.00%) (Pool 2)<br>155 loans (77.11%) (Pool 3)<br>299 loans (68.42%) (Pool 4)<br>174 loans (73.42%) (Pool 5) |

---

[3] The percentages shown are based on the total number of loans.

### (c)   JPMAC 2006-CH1

613.   As shown in the chart below, the Offering Materials for the JPMAC 2006-CH1 securitization represented that 3,062 of the underlying mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 11.43% of these loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 3,062 loans being owner occupied, as represented in the Offering Materials, only 2,712 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 3,062 loans (91.95%) | 2,712 loans (81.44%) |

### (d)   JPMAC 2006-CH2

614.   As shown in the chart below, the Offering Materials for the JPMAC 2006-CH2 securitization represented that 9,769 of the underlying mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 11.98% of these loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 9,769 loans being owner occupied, as represented in the Offering Materials, only 8,559 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 9,769 loans (94.53%) | 8,599 loans (83.21%) |

(2) **Bear Stearns Securitizations**

(a) <u>**BSARM 2005-10**</u>

615. As shown in the chart below, the Offering Materials for the BSARM 2005-10 securitization represented that 3,694 of the mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 15.00% of these loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 3,694 loans being owner occupied, as represented in the Offering Materials, only 3,140 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 3,694 loans (90.19%) | 3,140 loans (76.66%) |

(b) <u>**BALTA 2006-6**</u>

616. As shown in the chart below, the Offering Materials for the BALTA 2006-6 securitization represented that 1,127 of the Group I mortgage loans, 408 of the Group II mortgage loans, and 1,668 of the Group III mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 16.42% of these Group I loans, 15.59% of these Group II loans, and 15.24% of these Group III loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 1,127 Group I loans, 408 Group II loans, and 1,668 Group III loans being owner occupied, as represented in the Offering Materials, only 942 Group I, 344 Group II, and 1,414 Group III loans were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 1,127 loans (58.67%) (Group I) 408 loans (78.31%) (Group II) 1,668 loans (81.33%) (Group III) | 942 loans (49.04%) (Group I) 344 loans (66.03%) (Group II) 1,414 loans (68.94%) (Group III) |

(c)   **BALTA 2006-7**

617.    As shown in the chart below, the Offering Materials for the BALTA 2006-7 securitization represented that 792 of the Group I mortgage loans and 1,278 of the Group II mortgage loans were for primary residences, *i.e.* owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 17.42% of these Group I loans and 14.63% of these Group II loans failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead of 792 Group I loans and 1,278 Group II loans being owner occupied, as represented in the Offering Materials, only 654 Group I and 1,091 Group II loans were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 792 loans (68.04%) (Group I) 1,278 loans (74.78%) (Group II) | 654 loans (56.19%) (Group I) 1,091 loans (63.84%) (Group II) |

(d)   **BSABS 2006-AC4**

618.    As shown in the chart below, the Offering Materials for the BSABS 2006-AC4 securitization represented that 993 of the mortgage loans were for primary residences, *i.e.* owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 11.88% of these loans failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead of 993 loans being owner occupied, as represented in the Offering Materials, only 875 were:

-194-

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 993 loans (59.32%) | 875 loans (52.27%) |

(e)   **BSABS 2006-AQ1**

619.   As shown in the chart below, the Offering Materials for the BSABS 2006-AQ1 securitization represented that 1,354 of the Group I mortgage loans and 543 of the Group II mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 11.96% of these Group I loans and 11.07% of these Group II loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 1,354 Group I loans and 543 Group II loans being owner occupied, as represented in the Offering Materials, only 1,192 Group I and 483 Group II loans were:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 1,354 loans (88.55%) (Group I) 543 loans (83.80%) (Group II) | 1,192 loans (77.96%) (Group I) 483 loans (74.54%) (Group II) |

(f)   **BSABS 2006-SL1**

620.   As shown in the chart below, the Offering Materials for the BSMF 2006-SL1 securitization represented that 4,660 of the mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 10.77% of these loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 4,660 loans being owner occupied, as represented in the Offering Materials, only 4,158 were:

-195-

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 4,660 loans (55.17%) | 4,158 loans (49.22%) |

### (g)   BSMF 2006-AC1

621.   As shown in the chart below, the Offering Materials for the BSMF 2006-AC1 securitization represented that 712 of the mortgage loans were for primary residences, *i.e.* owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 13.06% of these loans failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead of 712 loans being owner occupied, as represented in the Offering Materials, only 619 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 712 loans (58.17%) | 619 loans (50.57%) |

### (h)   BSMF 2006-AR1

622.   As shown in the chart below, the Offering Materials for the BSMF 2006-AR1 securitization represented that 1,055 of the Group I mortgage loans and 1,440 of the Group II mortgage loans were for primary residences, *i.e.* owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 15.17% of these Group I loans and 11.81% of these Group II loans failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead of 1,055 Group I loans and 1,440 Group II loans being owner occupied, as represented in the Offering Materials, only 895 Group I and 1,270 Group II loans were:

-196-

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 1,055 loans (88.21%) (Group I) 1,440 loans (92.90%) (Group II) | 895 loans (74.83%) (Group I) 1,270 loans (81.94%) (Group II) |

### (i)   BSMF 2006-AR2

623.   As shown in the chart below, the Offering Materials for the BSMF 2006-AR2 securitization represented that 1,529 of the Group I mortgage loans and 1,160 of the Group II mortgage loans were for primary residences, *i.e.* owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 14.00% of these Group I loans and 9.74% of these Group II loans failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead of 1,529 Group I loans and 1,160 Group II loans being owner occupied, as represented in the Offering Materials, only 1,325 Group I and 1,047 Group II loans were:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 1,529 loans (88.64%) (Group I) 1,160 loans (94.62%) (Group II) | 1,315 loans (76.23%) (Group I) 1,047 loans (85.40%) (Group II) |

### (j)   BSMF 2006-AR3

624.   As shown in the chart below, the Offering Materials for the BSMF 2006-AR3 securitization represented that 969 of the Group I mortgage loans and 945 of the Group II mortgage loans were for primary residences, *i.e.* owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 11.87% of these Group I loans and 10.05% of these Group II loans failed multiple tests for owner occupancy.  Thus, as shown in the chart below,

instead of 969 Group I loans and 945 Group II loans being owner occupied, as represented in the

Offering Materials, only 854 Group I and 850 Group II loans were:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 969 loans (90.06%) (Group I)<br>945 loans (93.38%) (Group II) | 854 loans (79.37%) (Group I)<br>850 loans (83.99%) (Group II) |

### (k)   BSARM 2007-2

625.    As shown in the chart below, the Offering Materials for the BSARM 2007-2

securitization represented that 1,887 of the mortgage loans were for primary residences, *i.e.*

owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 13.20%

of these loans failed multiple tests for owner occupancy. Thus, as shown in the chart below,

instead of 1,887 loans being owner occupied, as represented in the Offering Materials, only

1,638 were:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 1,887 loans (73.37%) | 1,638 loans (63.69%) |

### (l)   BSABS 2007-1

626.    As shown in the chart below, the Offering Materials for the BSABS 2007-1

securitization represented that 930 of the mortgage loans were for primary residences, *i.e.* owner-

occupied properties. In MassMutual's subsequent loan-level analysis, however, 8.39% of these

loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of

930 loans being owner occupied, as represented in the Offering Materials, only 852 were:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 930 loans (85.48%) | 852 loans (78.31%) |

### (m)   BSABS 2007-AC2

627.   As shown in the chart below, the Offering Materials for the BSABS 2007-AC2 securitization represented that 1,321 of the mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 8.81% of these loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 1,321 loans being owner occupied, as represented in the Offering Materials, only 1,205 were:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 1,321 loans (73.23%) | 1,205 loans (66.80%) |

### (n)   BSABS 2007-HE3

628.   As shown in the chart below, the Offering Materials for the BSABS 2007-HE3 securitization represented that 4,155 of the mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 9.72% of these loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 4,155 loans being owner occupied, as represented in the Offering Materials, only 3,751 were:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 4,155 loans (94.48%) | 3,751 loans (85.28%) |