(o)    **BSMF 2007-AR1**

629.    As shown in the chart below, the Offering Materials for the BSMF 2007-AR1

securitization represented that 610 of the Group I mortgage loans and 1,920 of the Group II

mortgage loans were for primary residences, *i.e.* owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 12.46% of these Group I loans and 11.72% of these

Group II loans failed multiple tests for owner occupancy.  Thus, as shown in the chart below,

instead of 610 Group I loans and 1,920 Group II loans being owner occupied, as represented in

the Offering Materials, only 534 Group I and 1,695 Group II loans were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Number of Loans Secured by Primary Residences | 610 loans (87.14%) (Group I) 1,920 loans (90.82%) (Group II) | 534 loans (76.29%) (Group I) 1,695 loans (80.18%) (Group II) |

(p)    **SAMI 2005-AR8**

630.    As shown in the chart below, the Offering Materials for the SAMI 2005-AR8

securitization represented that 2,060 of the mortgage loans were for primary residences, *i.e.*

owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 16.84%

of these loans failed multiple tests for owner occupancy.  Thus, as shown in the chart below,

instead of 2,060 loans being owner occupied, as represented in the Offering Materials, only

1,713 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Number of Loans Secured by Primary Residences | 2,060 loans (79.51%) | 1,713 loans (66.11%) |

(q)   <b>SAMI 2006-AR3</b>

631.    As shown in the chart below, the Offering Materials for the SAMI 2006-AR3

securitization represented that 3,635 of the Group I mortgage loans, 852 of the Group II

mortgage loans, and 425 of the Group III mortgage loans were for primary residences, *i.e.*

owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 16.37%

of these Group I loans, 11.46% of these Group II loans, and 23.60% of these Group III loans

failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead of 3,635

Group I loans, 852 Group II loans, and 425 Group III loans being owner occupied, as represented

in the Offering Materials, only 3,040 Group I, 754 Group II, and 325 Group III loans were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Number of Loans Secured by Primary Residences | 3,635 loans (79.44%) (Group I) 852 loans (81.92%) (Group II) 425 loans (59.69%) (Group III) | 3,040 loans (66.43%) (Group I) 754 loans (72.50%) (Group II) 325 loans (45.65%) (Group III) |

(r)   <b>SAMI 2006-AR5</b>

632.    As shown in the chart below, the Offering Materials for the SAMI 2006-AR5

securitization represented that 1,546 of the mortgage loans were for primary residences, *i.e.*

owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 17.08%

of these loans failed multiple tests for owner occupancy.  Thus, as shown in the chart below,

instead of 1,546 loans being owner occupied, as represented in the Offering Materials, only

1,282 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 1,546 loans (71.81%) | 1,282 loans (59.54%) |

### (s)    SAMI 2006-AR6

633.    As shown in the chart below, the Offering Materials for the SAMI 2006-AR6 securitization represented that 2,812 of the mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 17.63% of these loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 2,812 loans being owner occupied, as represented in the Offering Materials, only 2,316 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 2,812 loans (74.49%) | 2,316 loans (61.35%) |

### (t)    SAMI 2006-AR7

634.    As shown in the chart below, the Offering Materials for the SAMI 2006-AR7 securitization represented that 5,581 of the mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 17.55% of these loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 5,581 loans being owner occupied, as represented in the Offering Materials, only 4,602 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 5,581 loans (77.31%) | 4,602 loans (63.75%) |

### (u)   SAMI 2006-AR8

635.   As shown in the chart below, the Offering Materials for the SAMI 2006-AR8

securitization represented that 4,060 of the mortgage loans were for primary residences, *i.e.*

owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 15.07%

of these loans failed multiple tests for owner occupancy.  Thus, as shown in the chart below,

instead of 4,060 loans being owner occupied, as represented in the Offering Materials, only

3,448 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 4,060 loans (80.65%) | 3,448 loans (68.49%) |

### (v)   SAMI 2007-AR1

636.   As shown in the chart below, the Offering Materials for the SAMI 2007-AR1

securitization represented that 920 of the Group I mortgage loans and 972 of the Group II

mortgage loans were for primary residences, *i.e.* owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 15.22% of these Group I loans and 13.27% of these

Group II loans failed multiple tests for owner occupancy.  Thus, as shown in the chart below,

instead of 920 Group I loans and 972 Group II loans being owner occupied, as represented in the

Offering Materials, only 780 Group I and 843 Group II loans were:

-203-

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 920 loans (83.11%) (Group I)<br>972 loans (91.27%) (Group II) | 780 loans (70.46%) (Group I)<br>843 loans (79.15%) (Group II) |

### (w)   GMFT 2006-AR1

637.    As shown in the chart below, the Offering Materials for the GMFT 2006-AR1 securitization represented that 2,063 of the mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 17.12% of these loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 2,063 loans being owner occupied, as represented in the Offering Materials, only 1,710 were:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 2,063 loans (57.02%) | 1,710 loans (47.26%) |

### (x)   GMFT 2006-AR3

638.    As shown in the chart below, the Offering Materials for the GMFT 2006-AR3 securitization represented that 3,493 of the mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 10.36% of these loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 3,493 loans being owner occupied, as represented in the Offering Materials, only 3,131 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 3,493 loans (55.26%) | 3,131 loans (49.53%) |

### (3)    WaMu Securitizations

#### (a)    WaMu 2005-AR1

639.    As shown in the chart below, the Offering Materials for the WaMu 2005-AR1 securitization represented that 5,040 of the mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 15.01% of these loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 5,040 loans being owner occupied, as represented in the Offering Materials, only 4,283 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 5,040 loans (92.07%) | 4,283 loans (78.24%) |

#### (b)    WMALT 2006-AR1

640.    As shown in the chart below, the Offering Materials for the WMALT 2006-AR1 securitization represented that 1,285 of the mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 10.34% of these loans failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 1,285 loans being owner occupied, as represented in the Offering Materials, only 1,152 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 1,285 loans (78.40%) | 1,152 loans (70.29%) |

### (c)   WMALT 2006-AR5

641.   As shown in the chart below, the Offering Materials for the WMALT 2006-AR5 securitization represented that 310 of the Group 1 mortgage loans, 192 of the Group 2 mortgage loans, 857 of the Group 3 mortgage loans, 926 of the Group 4 mortgage loans, and 481 of the Group 5 mortgage loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 21.54% of these Group 1 loans, 15.63% of these Group 2 loans, 14.78% of these Group 3 loans, 15.53% of these Group 4 loans, and 18.26% of these Group 5 loans failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead of 310 Group 1 loans, 192 Group 2 loans, 857 Group 3 loans, 926 Group 4 loans, and 481 Group 5 loans being owner occupied, as represented in the Offering Materials, only 243 Group 1, 162 Group 2, 730 Group 3, 782 Group 4, and 393 Group 5 loans were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 310 loans (81.36%) (Group 1) | 243 loans (63.78%) (Group 1) |
|  | 192 loans (68.33%) (Group 2) | 162 loans (57.65%) (Group 2) |
|  | 857 loans (79.94%) (Group 3) | 730 loans (68.10%) (Group 3) |
|  | 926 loans (91.77%) (Group 4) | 782 loans (77.50%) (Group 4) |
|  | 481 loans (88.10%) (Group 5) | 393 loans (71.98%) (Group 5) |

### (d)   WaMu 2006-AR7

642.   As shown in the chart below, the Offering Materials for the WaMu 2006-AR7 securitization represented that 344 of the Group 1 mortgage loans, 842 of the Group 2 mortgage

loans, and 328 of the Group 3 mortgage loans were for primary residences, *i.e.* owner-occupied

properties.  In MassMutual's subsequent loan-level analysis, however, 19.48% of these Group 1

loans, 16.15% of these Group 2 loans, and 16.77% of these Group 3 loans failed multiple tests

for owner occupancy.  Thus, as shown in the chart below, instead of 344 Group 1 loans, 842

Group 2 loans, and 328 Group 3 loans being owner occupied, as represented in the Offering

Materials, only 277 Group 1, 706 Group 2, and 273 Group 3 loans were:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 344 loans (80.00%) (Group 1) 842 loans (80.27%) (Group 2) 328 loans (78.47%) (Group 3) | 277 loans (64.42%) (Group 1) 706 loans (67.30%) (Group 2) 273 loans (65.31%) (Group 3) |

### (e)   WaMu 2007-HE2 Trust

643.   As shown in the chart below, the Offering Materials for the WaMu 2007-HE2

securitization represented that 2,905 of the Group I mortgage loans and 2,984 of the Group II

mortgage loans were for primary residences, *i.e.* owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 14.92% of these Group I loans and 19.84% of these

Group II loans failed multiple tests for owner occupancy.  Thus, as shown in the chart below,

instead of 2,905 Group I loans and 2,984 Group II loans being owner occupied, as represented in

the Offering Materials, only 2,472 Group I and 2,392 Group II loans were:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Secured by Primary Residences | 2,905 loans (91.79%) (Group I) 2,984 loans (83.87%) (Group II) | 2,472 loans (78.10%) (Group I) 2,392 loans (67.23%) (Group II) |

644.    The above analysis demonstrates that not only were Defendants' representations concerning owner-occupancy of the properties underlying the securitized mortgage loans false, but also that the stated underwriting guidelines were abandoned.  Had Defendants and the relevant third party originators adhered to the underwriting guidelines as disclosed in the Offering Materials, MassMutual's loan-level review would not have revealed the consistent and significant exaggeration of the number of properties that were purportedly owner-occupied.

## VII.    LIABILITY OF THE SPONSORS, DEPOSITORS, UNDERWRITERS, AND TRUSTS AS SELLERS OF SECURITIES TO MASSMUTUAL

645.    The Defendants that qualify as sellers of securities under the Massachusetts Uniform Securities Act are the Sponsors (JPM Mortgage Acquisition, EMC, Alesco, WMMSC, and WaMu Bank (now JPMC Bank)), the Depositors (JPMAC, SAMI, BSABS, WMMSC, and WMAAC), the Underwriters (J.P. Morgan Securities (both in its own capacity and as successor to BSC) and WCC), and the Trusts.  Each of these is primarily liable for misrepresentations in the Offering Materials under Massachusetts General Laws, Chapter 110A, Section 410(a)(2).

646.    As the Sponsors and/or Sellers for the securitizations at issue, JPM Mortgage Acquisition, EMC, Alesco, WMMSC, and WaMu Bank (now JPMC Bank) originated or acquired the mortgage loans that were pooled together in the securitizations, and then sold, transferred, or otherwise conveyed title to those loans to the Depositors pursuant to Pooling and Servicing Agreements.  JPM Mortgage Acquisition, EMC, Alesco, WMMSC, and WaMu Bank (now JPMC Bank) had responsibility for preparing the Offering Materials that were used to solicit purchases of the Certificates, and were identified on the Prospectuses and Prospectus Supplements.  JPM Mortgage Acquisition, EMC, Alesco, WMMSC, and WaMu Bank (now JPMC Bank) profited from the sales of the Certificates.

647.    As the Depositors for the securitizations at issue, JPMAC, SAMI, BSABS, WMMSC, and WMAAC purchased the mortgage loans from the Sponsors  pursuant to the Pooling and Servicing Agreements.  The Depositors then sold, transferred, or otherwise conveyed the mortgage loans to the Trusts, which held the loans as collateral for the Certificates. The Depositors shared responsibility for preparing the Offering Materials that were used to solicit purchases of the Certificates, and were identified on the Prospectuses and Prospectus Supplements.  In addition, the Depositors were responsible for registering the offerings with the SEC.  The Depositors profited from the sales of the Certificates.

648.    The Trusts issued the Certificates that were sold to investors, including MassMutual.  The Trusts had no autonomy or assets of their own, but were mere agents of the Depositors created for the sole purposes of holding the pools of mortgage loans assembled by the Sponsors and Depositors and issuing the Certificates for sale to the investors.

649.    The Sponsors, Depositors, and Trusts used the Underwriters J.P. Morgan Securities (both in its own capacity and as successor to BSC) and WCC to market and sell the Certificates.  The Underwriters were responsible for underwriting and managing the sale of Certificates, including screening the mortgage loans for compliance with the appropriate underwriting guidelines.  The Underwriters profited from the sales of the Certificates.

650.    The Sponsors, Depositors, Underwriters, and Trusts successfully solicited MassMutual's purchase of the Certificates at issue.  The Underwriters transferred title in the Certificates to MassMutual.

VIII.   **LIABILITY OF THE SPONSORS, DEPOSITORS, AND OFFICER DEFENDANTS AS CONTROL PERSONS**

A.      **JPMorgan Securitizations**

**JPM Mortgage Acquisition**

651.    JPM Mortgage Acquisition, as the Sponsor for each of the four JPMorgan securitizations at issue, had day-to-day control over the related Depositor and, through the Depositor, the JPMorgan Trusts.  JPM Mortgage Acquisition acquired and selected the loans that would be securitized and determined the terms under which those loans were sold to the Depositor and then to the JPMorgan Trusts.  JPM Mortgage Acquisition also determined and approved the structure of the securitizations and the manner in which the Depositor and the JPMorgan Trusts sold the JPMorgan Certificates, and controlled the disclosures made in connection with each JPMorgan offering at issue.

**JPMAC**

652.    JPMAC, as the Depositor for each of the four JPMorgan securitizations at issue, had day-to-day control over the JPMorgan Trusts.  JPMAC created the JPMorgan Trusts and used them as agents to hold the pools of underlying mortgage loans and issue the JPMorgan Certificates for sale to investors.  JPMAC formed the pools of mortgage loans underlying the JPMorgan Certificates, and determined the tranches of interests in the pools and their various levels of seniority.  JPMAC then transferred the pools to the JPMorgan Trusts, which had no discretion or control over the mortgages in the pool.  JPMAC also controlled the disclosures made in connection with each JPMorgan offering at issue.

**David M. Duzyk**

653.    As the head of JPMorgan's Securitization-Underwriting Group during the relevant period, Defendant David M. Duzyk had intimate knowledge and control over

JPMorgan's securitizations. As the President (Principal Executive Officer) and a Director of JPMAC during the relevant period, Duzyk was also intimately involved in the management of this primary violator and had control over it. Duzyk also had control over the JPMorgan securitizations at issue, as evidenced by his signature on the registration statements for all four securitizations.

### Louis Schioppo, Jr.

654.    As the Chief Financial Officer of JPMorgan Chase during the relevant period, Defendant Louis Schioppo, Jr. had intimate knowledge and control over JPMorgan's finances. As the Controller and Chief Financial Officer (Principal Financial and Accounting Officer) of JPMAC during the relevant period, Schioppo also had intimate knowledge and control over the finances of this primary violator, including revenue generation from securitizations. Schioppo also executed control over the JPMorgan securitizations at issue, as evidenced by his signature on the registration statements for all four securitizations.

### William A. King

655.    As the global co-head of securitized products at JPMorgan Chase during the relevant period, Defendant William A. King had intimate knowledge and control over JPMorgan's securitizations. As a director of JPMAC during the relevant period, King was also involved in the management of this primary violator and exercised control over it. As evidenced by his signature on the registration statements, King also had control over the following two JPMorgan securitizations at issue in this case: JPMMT 2005-ALT1 and JPALT 2006-A1.

### B.    Bear Stearns Securitizations

### EMC

656.    EMC, as the Sponsor and/or Seller for 23 of the 24 Bear Stearns securitizations at issue, had day-to-day control over the related Depositors and, through the Depositors, the Bear

Stearns Trusts. EMC acquired and selected the loans that would be securitized and determined the terms under which those loans were sold to the Depositors and then to the Bear Stearns Trusts. EMC also determined and approved the structure of the securitizations and the manner in which the Depositors and the Bear Stearns Trusts sold the related Bear Stearns Certificates, and controlled the disclosures made in connection with the 23 Bear Stearns offering at issue.

**Alesco**

657.    Alesco, as the Sponsor of the BSARM 2007-2 offering, had day-to-day control over the related Depositor and, through the Depositor, the BSARM 2007-2 Trust. Alesco acquired and selected the loans that would be securitized and determined the terms under which those loans were sold to the Depositor and then to the BSARM 2007-2 Trust. Alesco also determined and approved the structure of the securitization and the manner in which the Depositor and the BSARM 2007-2 Trust sold the BSARM 2007-2 Certificates, and controlled the disclosures made in connection with the BSARM 2007-2 offering.

**SAMI**

658.    SAMI, as the Depositor for 16 of the 24 Bear Stearns securitizations at issue (BSARM 2005-10; BALTA 2006-6; BALTA 2006-7; BSMF 2006-AR1; BSMF 2006-AR2; BSMF 2006-AR3; BSARM 2007-2; BSMF 2007-AR1; SAMI 2005-AR8; SAMI 2006-AR3; SAMI 2006-AR5; SAMI 2006-AR6; SAMI 2006-AR7; SAMI 2006-AR8; SAMI 2007-AR1; and GMFT 2006-AR3), had day-to-day control over each of the 16 Bear Stearns Trusts. SAMI created the 16 Bear Stearns Trusts and used them as agents to hold the pools of underlying mortgage loans and issue the related Bear Stearns Certificates for sale to investors. SAMI formed the pools of mortgage loans underlying the related Bear Stearns Certificates, and determined the tranches of interests in the pools and their various levels of seniority. SAMI then

-212-

transferred the pools to the 16 Bear Stearns Trusts, which had no discretion or control over the mortgages in the pool.  SAMI also controlled the disclosures made in connection with each of the 16 Bear Stearns offerings.

**BSABS**

659.    BSABS, as the Depositor for eight of the 24 Bear Stearns securitizations at issue (BSABS 2006-AC4; BSABS 2006-AQ1; BSMF 2006-SL1; BSMF 2006-AC1; BSABS 2007-1; BSABS 2007-AC2; BSABS 2007-HE3; and GMFT 2006-AR1), had day-to-day control over each of the eight Bear Stearns Trusts.  BSABS created the eight Bear Stearns Trusts and used them as agents to hold the pools of underlying mortgage loans and issue the related Bear Stearns Certificates for sale to investors.  BSABS formed the pools of mortgage loans underlying the related Bear Stearns Certificates, and determined the tranches of interests in the pools and their various levels of seniority.  BSABS then transferred the pools to the eight Bear Stearns Trusts, which had no discretion or control over the mortgages in the pool.  BSABS also controlled the disclosures made in connection with each of the eight Bear Stearns offerings.

**Jeffrey L. Verschleiser**

660.    As a Senior Managing Director and head of the Asset Backed Securities and Whole-loan Desk at BSC (now J.P. Morgan Securities) during the relevant period, Defendant Jeffrey L. Verschleiser had intimate knowledge of and control over BSC's securitizations, and exercised control over this primary violator.  As the President (Principal Executive Officer) of SAMI during the relevant period, Verschleiser also exercised control over this primary violator.  Verschleiser's control is confirmed by his signature on the registration statements for each Bear Stearns offering where SAMI acted as Depositor, namely:

BSARM 2005-10; BALTA 2006-6; BALTA 2006-7; BSMF 2006-AR1; BSMF 2006-AR2; BSMF 2006-AR3; BSARM 2007-2; BSMF 2007-AR1; SAMI 2005-AR8; SAMI 2006-AR3; SAMI 2006-AR5; SAMI 2006-AR6; SAMI 2006-AR7; SAMI 2006-AR8; SAMI 2007-AR1; and GMFT 2006-AR3.

**Michael B. Nierenberg**

661.    As a Senior Managing Director and head of the Adjustable Rate Mortgage and Collateralized Debt Obligation Desk at BSC (now J.P. Morgan Securities) during the relevant period, Defendant Michael B. Nierenberg controlled the securitization of Bear Stearns' ARMs and Alt-A loans, and exercised control over this primary violator. As the Treasurer (Principal Financial Officer and Principal Accounting Officer) of SAMI during the relevant period, Nierenberg was also intimately familiar with the operations of this primary violator and exercised control over its accounting functions. Nierenberg's control is confirmed by his signature on the registration statements for each Bear Stearns offering where SAMI acted as Depositor, namely:

BSARM 2005-10; BALTA 2006-6; BALTA 2006-7; BSMF 2006-AR1; BSMF 2006-AR2; BSMF 2006-AR3; BSARM 2007-2; BSMF 2007-AR1; SAMI 2005-AR8; SAMI 2006-AR3; SAMI 2006-AR5; SAMI 2006-AR6; SAMI 2006-AR7; SAMI 2006-AR8; SAMI 2007-AR1; and GMFT 2006-AR3.

**Jeffrey Mayer**

662.    Defendant Jeffrey Mayer was a Senior Managing Director and co-head of the Fixed-Income Desk at BSC (now J.P. Morgan Securities) during the relevant period. As head of

the fixed-income group that was responsible for mortgages and mortgage-backed securities,

Mayer was intimately involved in BSC's acquisition, securitization, and trading of mortgages,

and exercised control over this primary violator. As an inside Director of SAMI during the

relevant period, Mayer also exercised control over this primary violator. Mayer's control is

evidenced by his signature on the registration statements for each Bear Stearns offering where

SAMI acted as Depositor, namely:

> BSARM 2005-10; BALTA 2006-6; BALTA 2006-7; BSMF 2006-
>
> AR1; BSMF 2006-AR2; BSMF 2006-AR3; BSARM 2007-2;
>
> BSMF 2007-AR1; SAMI 2005-AR8; SAMI 2006-AR3; SAMI
>
> 2006-AR5; SAMI 2006-AR6; SAMI 2006-AR7; SAMI 2006-
>
> AR8; SAMI 2007-AR1; and GMFT 2006-AR3.

**Thomas F. Marano**

663.    As a Senior Managing Director and head of the Mortgage-Backed Securities,

Asset-Backed Securities, and Commercial Mortgage-Backed Securities Departments at BSC

(now J.P. Morgan Securities) during the relevant period, Defendant Thomas F. Marano had

intimate knowledge of and control over Bear Stearns' securitizations, and exercised control over

this primary violator. As a Director of both SAMI and BSABS during the relevant period,

Marano also exercised control over both of these primary violators. Marano's control is

evidenced by his signature on each of the registration statements for all 24 Bear Stearns

securitizations at issue.

**Joseph T. Jurkowski**

664.    As a Managing Director of BSC (now J.P. Morgan Securities) during the

relevant period, a Vice President at Bear Stearns Mortgage Securities Inc., a Vice President at

-215-

Structured Asset Mortgage Investments Inc., and a Vice President at BSABS, Defendant Joseph

T. Jurkowski, Jr. was intimately involved in Bear Stearns' securitizations, and exercised control

over primary violators BSC and BSABS.  Jurkowski's control is evidenced by his signature on

the registration statements for each of the following Bear Stearns securitizations:

> BSABS 2006-AC4; BSABS 2006-AQ1; BSMF 2006-SL1; BSMF
>
> 2006-AC1; BSABS 2007-1; BSABS 2007-AC2; BSABS 2007-
>
> HE3; and GMFT 2006-AR1.

### Matthew E. Perkins

665.    As co-head of the Asset-Backed Securities Group at Bear Stearns during the

relevant period, Defendant Matthew E. Perkins was intimately involved in Bear Stearns'

securitizations.  As the President (Principal Executive Officer) and a Director of BSABS during

the relevant period, Perkins also exercised control over this primary violator and over each of the

Bear Stearns' offerings for which BSABS acted as Depositor.  Perkins' control is evidenced by

his signature on the registration statements for each of the following Bear Stearns securitizations:

> BSABS 2006-AC4; BSABS 2006-AQ1; BSABS 2007-1; BSABS
>
> 2007-AC2; BSABS 2007-HE3;  BSMF 2006-AC1; BSMF 2006-
>
> SL1; and GMFT 2006-AR1.

### Samuel L. Molinaro, Jr.

666.    Defendant Samuel L. Molinaro, Jr. was one of Bear Stearns' most senior

executives.  Until Bear Stearns' collapse in March 2008, Molinaro served as Chief Financial

Officer of BSI and BSC (now J.P. Morgan Securities) from October 1996; Executive Vice

President of BSI and BSC from December 1, 2001; and Chief Operating Officer of BSI and BSC

from August 2007.  Molinaro became a member of the Bear Stearns Management and

Compensation Committee in 1999 and served as a Director of BSC.  In these capacities,

Molinaro exercised control over primary violator BSC.  Molinaro was also the Treasurer

(Principal Financial and Accounting Officer) and a Director of BSABS during the relevant

period, and exercised control over this primary violator and each of the Bear Stearns' offerings

for which BSABS acted as Depositor.  Molinaro's control is evidenced by his signature on the

registration statements for each of the following securitizations:

> BSABS 2006-AC4; BSABS 2006-AQ1; BSMF 2006-SL1; BSMF
>
> 2006-AC1; BSABS 2007-1; BSABS 2007-AC2; BSABS 2007-
>
> HE3; and GMFT 2006-AR1.

### C.  **WaMu Securitizations**

**WaMu Bank (Now JPMC Bank)**

667.    WaMu Bank (now JPMC Bank), as the Sponsor of the WaMu 2005-AR1, WaMu

2006-AR7, and WaMu 2007-HE2 securitizations, had day-to-day control over the related

Depositor and, through the Depositor, the WaMu 2005-AR1, WaMu 2006-AR7, and WaMu

2007-HE2 Trusts.  WaMu Bank (now JPMC Bank) acquired and selected the loans that would be

securitized and determined the terms under which those loans were sold to the Depositor and

then to the WaMu 2005-AR1, WaMu 2006-AR7, and WaMu 2007-HE2 Trusts.  WaMu Bank

(now JPMC Bank) also determined and approved the structure of the securitizations and the

manner in which the Depositor and the WaMu 2005-AR1, WaMu 2006-AR7, and WaMu 2007-

HE2 Trusts sold the related Certificates, and controlled the disclosures made in connection with

the WaMu 2005-AR1, WaMu 2006-AR7, and WaMu 2007-HE2 offerings.

**WMMSC**

668.    WMMSC, as the Sponsor of the WMALT 2006-AR1 and WMALT 2006-AR5

securitizations, had day-to-day control over the related Depositor and, through the Depositor, the

WMALT 2006-AR1 and WMALT 2006-AR5 Trusts.  WMMSC acquired and selected the loans

that would be securitized and determined the terms under which those loans were sold to the

Depositor and then to the WMALT 2006-AR1 and WMALT 2006-AR5 Trusts.  WMMSC also

determined and approved the structure of the securitizations and the manner in which the

Depositor and the WMALT 2006-AR1 and WMALT 2006-AR5 Trusts sold the related

Certificates, and controlled the disclosures made in connection with the WMALT 2006-AR1 and

WMALT 2006-AR5 offerings.

669.    As the Depositor for the WaMu 2005-AR1 securitization, WMMSC also had day-

to-day control over the WaMu 2005-AR1 Trust.  WMMSC created the WaMu 2005-AR1 Trust

and used it as its agent to hold the pool of underlying mortgage loans and issue the WaMu 2005-

AR1 Certificates for sale to investors.  WMMSC formed the pool of mortgage loans underlying

the WaMu 2005-AR1 Certificates, and determined the tranches of interests in the pool and their

various levels of seniority.  WMMSC then transferred the pool to the WaMu 2005-AR1 Trust,

which had no discretion or control over the mortgages in the pool.  WMMSC also controlled the

disclosures made in connection with the WaMu 2005-AR1 offering.

**WMAAC**

670.    WMAAC, as the Depositor for four of the five WaMu securitizations at issue

(WMALT 2006-AR1, WMALT 2006-AR5, WaMu 2006-AR7, and WaMu 2007-HE2), had day-

to-day control over each of the four related WaMu Trusts.  WMAAC created the WaMu Trusts

and used them as agents to hold the pools of underlying mortgage loans and issue the related

WaMu Certificates for sale to investors.  WMAAC formed the pools of mortgage loans

underlying the related WaMu Certificates, and determined the tranches of interests in the pools

and their various levels of seniority.  WMAAC then transferred the pools to each of the WaMu

Trusts, which had no discretion or control over the mortgages in the pools. WMAAC also controlled the disclosures made in connection with the four WaMu offerings.

### Richard Careaga

671.    As a First Vice President of WMAAC during the relevant period, Defendant Richard Careaga was intimately involved in the day-to-day affairs of this primary violator. As evidenced by his signature on the registration statements, Careaga also had control over the following four WaMu securitizations at issue in this case: WMALT 2006-AR1, WMALT 2006-AR5, WaMu 2006-AR7, and WaMu 2007-HE2.

### David Beck

672.    As WaMu Bank's former Chief Investment Officer and then head of the Bank's capital markets group during the relevant period, Defendant David Beck was involved in and exercised control over every one of WCC's securitizations. As the President (Principal Executive Officer) and a Director of WMAAC during the relevant period, Beck also exercised control over this primary violator. Beck also controlled four WaMu offerings, as evidenced by his signature on the registration statements for the following four WaMu offerings at issue in this case: WMALT 2006-AR1, WMALT 2006-AR5, WaMu 2006-AR7, and WaMu 2007-HE2.

### Diane Novak

673.    As a former Senior Vice President and Senior Compliance Officer, Legal and Compliance Division, at WaMu Bank (now JPMC Bank), and Chief Compliance Officer at WCC during the relevant period, Defendant Diane Novak was intimately involved in the day-to-day affairs of these primary violators, and exercised control over them, including the implementation of their compliance policies. Novak was also a Director of WMAAC during the relevant period, and exercised control over it. In addition, Novak exercised control over four

-219-

WaMu securitizations, as evidenced by her signature on the registration statements for the following offering:  WMALT 2006-AR1, WMALT 2006-AR5, WaMu 2006-AR7, and WaMu 2007-HE2.

**Thomas Green**

674.    As the Chief Financial Officer (Principal Financial Officer) of WMAAC during the relevant period, Defendant Thomas Green had intimate knowledge and control over the finances of this primary violator, including revenue generation from securitizations.  As evidenced by his signature on the relevant registration statements, Green exercised control over the following four WaMu offerings at issue in this case:  WMALT 2006-AR1, WMALT 2006-AR5, WaMu 2006-AR7, and WaMu 2007-HE2.

**Rolland Jurgens**

675.    As a Senior Vice President and Capital Markets Controller at WaMu Bank (now JPMC Bank) during the relevant period, Defendant Rolland Jurgens was intimately involved in and exercised control over accounting for WaMu Bank's securitizations.  As the Controller (Principal Accounting Officer) of WMAAC during the relevant period, Jurgens was also intimately familiar with the operations of this primary violator and exercised control over it.  As evidenced by his signature on the relevant registration statements, Jurgens also exercised control over the following four WaMu offerings at issue in this case:  WMALT 2006-AR1, WMALT 2006-AR5, WaMu 2006-AR7, and WaMu 2007-HE2.

## FIRST CAUSE OF ACTION
### (Primary Violations of the Massachusetts Uniform Securities Act)

676.    MassMutual incorporates by reference and realleges each and every allegation as set forth above in paragraphs 1 through 675, as if fully set forth herein.

677.    Under Massachusetts General Laws, Chapter 110A, Section 410(a)(2), any person who "offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading," is liable to the purchaser of the security.

678.    The Sponsors (JPM Mortgage Acquisition, EMC, Alesco, WMMSC, and WaMu Bank (now JPMC Bank)), the Depositors (JPMAC, SAMI, BSABS, WMMSC, and WMAAC), the Underwriters (J.P. Morgan Securities (both in its own capacity and as successor to BSC) and WCC), and the Trusts (although not named as defendants) qualify as sellers of the Certificates because they issued, marketed, and/or sold the Certificates to the public for their own financial benefit.

679.    The Sponsors, Depositors, Underwriters, and Trusts offered to sell and sold the Certificates to MassMutual in the State of Massachusetts.

680.    The Sponsors, Depositors, Underwriters, and Trusts offered and sold the Certificates to MassMutual by means of false and misleading statements of material fact and omissions of material facts necessary to make the statements made not misleading.

681.    As set forth in more detail in paragraphs 74 to 644 above, the public statements of the Sponsors, Depositors, Underwriters, and Trusts, including in the Offering Materials, were materially false and misleading because, among other things, they misrepresented the underwriting standards applicable to the mortgage loans backing the Certificates, misrepresented the use of exceptions to the disclosed underwriting guidelines and alternative documentation programs, misrepresented the LTV and CLTV ratios and appraisal information for the loans,

misrepresented the owner-occupancy information for the loans, and failed to disclose that a large

number of non-compliant loans had been waived into the offerings.

682.    MassMutual did not know, and in the exercise of due diligence could not have

known, of the untruths and omissions.

683.    MassMutual will elect its remedy before the entry of judgment.  For each

Certificate, MassMutual will seek statutory damages, including interest, or will make or arrange

a tender before entry of judgment.

### SECOND CAUSE OF ACTION
### (Joint and Several Liability Under the Massachusetts Uniform Securities Act)

684.    MassMutual incorporates by reference and realleges each and every allegation as

set forth above in paragraphs 1 through 683, as if fully set forth herein.

685.    Under Massachusetts General Laws, Chapter 110A, Section 410(b), "[e]very

person who directly or indirectly controls a seller liable under subsection (a), every partner,

officer, or director of such a seller, [and] every person occupying a similar status or performing

similar functions" is liable jointly and severally with and to the same extent as the seller.

686.    As set forth above, the Sponsors (JPM Mortgage Acquisition, EMC, Alesco,

WMMSC, and WaMu Bank (now JPMC Bank)), Depositors (JPMAC, SAMI, BSABS,

WMMSC, and WMAAC), Underwriters (J.P. Morgan Securities (both in its own capacity and as

successor to BSC) and WCC), and Trusts are liable as sellers under subsection (a).

687.    Defendant JPM Mortgage Acquisition is jointly and severally liable to the same

extent as the JPMorgan primary violators because it controlled one or more JPMorgan primary

violators, including with respect to the JPMorgan securitizations at issue.

688.    Defendant JPMAC is jointly and severally liable to the same extent as the JPMorgan primary violators because it controlled one or more JPMorgan primary violators, including with respect to the JPMorgan securitizations at issue.

689.    Defendant David M. Duzyk is jointly and severally liable to the same extent as the JPMorgan primary violators because he was an officer and director and controlled the operations of one or more JPMorgan primary violators, including with respect to the JPMorgan securitizations at issue.

690.    Defendant Louis Schioppo, Jr. is jointly and severally liable to the same extent as the JPMorgan primary violators because he was an officer and controlled the operations of one or more JPMorgan primary violators, including with respect to the JPMorgan securitizations at issue.

691.    Defendant William A. King is jointly and severally liable to the same extent as the JPMorgan primary violators because he was an inside director and controlled the operations of one or more JPMorgan primary violators, including with respect to the JPMorgan securitizations at issue.

692.    Defendant EMC is jointly and severally liable to the same extent as the Bear Stearns primary violators because it controlled one or more Bear Stearns primary violators, including with respect to the Bear Stearns securitizations at issue.

693.    Defendant Alesco is jointly and severally liable to the same extent as the Bear Stearns primary violators because Alesco controlled one or more Bear Stearns primary violators, including with respect to the Bear Stearns securitizations at issue.

694.    Defendant SAMI is jointly and severally liable to the same extent as the Bear Stearns primary violators because it controlled one or more Bear Stearns primary violators, including with respect to the Bear Stearns securitizations at issue.

695.    Defendant BSABS is jointly and severally liable to the same extent as the Bear Stearns primary violators because it controlled one or more Bear Stearns primary violators, including with respect to the Bear Stearns securitizations at issue.

696.    Defendant Jeffrey L. Verschleiser is jointly and severally liable to the same extent as the Bear Stearns primary violators because he was an officer and controlled the operations of one or more Bear Stearns primary violators, including with respect to the Bear Stearns securitizations at issue.

697.    Defendant Michael B. Nierenberg is jointly and severally liable to the same extent as the Bear Stearns primary violators because he was an officer and controlled the operations of one or more Bear Stearns primary violators, including with respect to the Bear Stearns securitizations at issue.

698.    Defendant Jeffrey Mayer is jointly and severally liable to the same extent as the Bear Stearns primary violators because he was a director and/or officer and controlled the operations of one or more Bear Stearns primary violators, including with respect to the Bear Stearns securitizations at issue.

699.    Defendant Thomas F. Marano is jointly and severally liable to the same extent as the Bear Stearns primary violators because he was a director and/or officer and controlled the operations of one or more Bear Stearns primary violators, including with respect to the Bear Stearns securitizations at issue.

700.     Defendant Joseph T. Jurkowski, Jr. is jointly and severally liable to the same extent as the Bear Stearns primary violators because he was an officer and controlled the operations of one or more Bear Stearns primary violators, including with respect to the Bear Stearns securitizations at issue.

701.     Defendant Matthew E. Perkins is jointly and severally liable to the same extent as the Bear Stearns primary violators because he was an officer and/or director and controlled the operations of one or more Bear Stearns primary violators, including with respect to the Bear Stearns securitizations at issue.

702.     Defendant Samuel L. Molinaro, Jr. is jointly and severally liable to the same extent as the Bear Stearns primary violators because he was a director and officer and controlled the operations of at least two Bear Stearns primary violators, including with respect to the Bear Stearns securitizations at issue.

703.     Defendant JPMC Bank (formerly WaMu Bank) is jointly and severally liable to the same extent as the WaMu primary violators because WaMu Bank controlled one or more WaMu primary violators, including with respect to the WaMu securitizations at issue.

704.     Defendant WMMSC is jointly and severally liable to the same extent as the WaMu primary violators because it controlled one or more WaMu primary violators, including with respect to the WaMu securitizations at issue.

705.     Defendant WMAAC is jointly and severally liable to the same extent as the WaMu primary violators because it controlled one or more WaMu primary violators, including with respect to the WaMu securitizations at issue.

706. Defendant Richard Careaga is jointly and severally liable to the same extent as the WaMu primary violators because he was an officer and controlled the operations of one or more WaMu primary violators, including with respect to the WaMu securitizations at issue.

707. Defendant David Beck is jointly and severally liable to the same extent as the WaMu primary violators because he was a director and/or officer and controlled the operations of two or more WaMu primary violators, including with respect to the WaMu securitizations at issue.

708. Defendant Diane Novak is jointly and severally liable to the same extent as the WaMu primary violators because she was an officer and/or director and controlled the operations of one or more WaMu primary violators, including with respect to the WaMu securitizations at issue.

709. Defendant Thomas Green is jointly and severally liable to the same extent as the WaMu primary violators because he was an officer and controlled the operations of one or more WaMu primary violators, including with respect to the WaMu securitizations at issue.

710. Defendant Rolland Jurgens is jointly and severally liable to the same extent as the WaMu primary violators because he was an officer and controlled the operations of one or more WaMu primary violators, including with respect to the WaMu securitizations at issue.

## **PRAYER FOR RELIEF**

WHEREFORE, MassMutual prays for relief as follows:

1. On the first cause of action, for primary violations of the Massachusetts Uniform Securities Act, relief in the form of damages and/or statutory recovery upon tender;

-226-

2.      On the second cause of action, for joint and several liability under the

Massachusetts Uniform Securities Act, relief in the form of damages and/or

statutory recovery upon tender; and

3.      Such other and further relief as the Court may deem just and proper.


**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), MassMutual hereby demands a trial

by jury on all issues triable by jury.


DATED:  April 8, 2011                    EGAN, FLANAGAN AND COHEN, P.C.


                                         By:    /s/ Edward J. McDonough Jr.
                                                Edward J. McDonough Jr. (SBN 331590)
                                                Egan, Flanagan and Cohen, P.C.
                                                67 Market Street, P.O. Box 9035
                                                Springfield, Massachusetts  01102
                                                Telephone:  413-737-0260
                                                Fax:  413-737-0121


                                         MASSACHUSETTS MUTUAL LIFE
                                         INSURANCE COMPANY


                                         By:    /s/ Bernadette Harrigan
                                                Bernadette Harrigan (Mass. Bar No. 635103)
                                                Assistant Vice President & Counsel
                                                Massachusetts Mutual Life Insurance Company
                                                1295 State Street
                                                Springfield, Massachusetts 01111
                                                Telephone:  413-788-8411
                                                Fax:  413-226-4268

Of counsel:

QUINN EMANUEL URQUHART &
  SULLIVAN, LLP

    Philippe Z. Selendy
    Jennifer J. Barrett
    51 Madison Avenue, 22nd Floor
    New York, New York 10010
    Telephone:  212-849-7000
    Fax:  212-849-7100

    A. William Urquhart
    Harry A. Olivar, Jr.
    Molly Stephens
    865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017
    Telephone:  213-443-3000
    Fax:  213-443-3100